FILED.

JAN 0 5 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | |
|---|---|
| **JAMES LOUIS RODEN SR.,** § | |
| Plaintiff, § | |
| § | |
| v. § | **Civil Action No.** _____ |
| | **SA26CA0081 XR** |
| **Elaine Michelle Reamer** § | |
| in her individual capacity, § | |
| § | |
| and § | |
| § | |
| **COUNTY OF GUADALUPE, TEXAS,** § | |
| Defendants. § | |

# I. INTRODUCTION

This case presents a textbook example of an arrest made without probable cause, based on a false and misleading affidavit, imposed upon a disabled elderly veteran, and sustained through systemic ADA violations and County-level failures to supervise, train, and provide constitutionally required safeguards.

This civil-rights action arises from the unconstitutional arrest, detention, and continued prosecution of James Louis Roden Sr., a 77-year-old, wheelchair-bound U.S. Army veteran with profound mobility and medical impairments. On April 7, 2025, Plaintiff was arrested in

1

Guadalupe County, Texas, after Investigator Elaine M. Reamer submitted an affidavit that was materially false, recklessly incomplete, and devoid of probable cause. The affidavit relied entirely on unverified hearsay supplied by the Guadalupe County Attorney's Office and Michael Allen Walker defense counsel John Green, omitted readily available exculpatory evidence, and attributed statements to Plaintiff that he did not—and physically could not—have made, despite the absence of any allegation that Plaintiff was present in Guadalupe County or capable of committing the alleged conduct there. Plaintiff was never contacted, interviewed, or afforded an opportunity to respond before the warrant was issued.

In the week preceding the arrest, Plaintiff's son, a teacher, minister, and mandated reporter, submitted a safety report concerning Plaintiff's intellectually disabled granddaughter, Shelby Jane Koelle (S.J.K.)., who had previously disclosed sexual abuse by her stepfather, Michael Allen Walker. The report warned that Cody Lane Koelle, Plaintiff's grandson, had allowed a known drug user and dealer with an extensive criminal history to live in his home, and that during this period S.J.K. reported being sexually exploited. This report—filed six days before Plaintiff and two other family members were suddenly charged with first-degree felony witness-tampering—triggered ADA protections. Under ADA Title V, retaliation protections extend not only to disabled individuals but also to family members and advocates assisting them. Plaintiff alleges that the abrupt felony charges were retaliatory, targeting individuals attempting to protect an intellectually disabled adult.

At the time of Plaintiff's arrest, the sole factual basis asserted for probable cause consisted of affidavits attributed to Cody Lane Koelle and Andrea Martin Koelle. These affidavits were not generated through any independent law-enforcement investigation. Instead, they were supplied by Michael Allen Walker's defense counsel to the Guadalupe County

2

Attorney's Office and then forwarded to Investigator Elaine Reamer, who relied upon them without interviewing Cody Lane Koelle, verifying authorship or signatures, or conducting any independent corroboration.

At the time Investigator Reamer sought the arrest warrant, Defendants possessed documentation establishing that Cody Lane Koelle had a documented history of providing unreliable and false statements to law enforcement, including incidents involving false police reports and impersonation of a police officer. Despite these known credibility defects, Investigator Reamer relied exclusively on statements attributed to Cody Lane Koelle and Andrea Martin Koelle. These statements were never corroborated, never verified through phone records or electronic communications, and never evaluated for reliability, notwithstanding that they formed the entire basis for Plaintiff's arrest.

Plaintiff resides in League City, Texas, nearly 200 miles from Guadalupe County, and suffers from serious medical conditions, including cardiac disease, neuropathy, cancer-related complications, and severe mobility impairments requiring wheelchair assistance. The arrest-warrant affidavit did not allege that Plaintiff was physically present in Guadalupe County, nor did it identify any telephonic, electronic, or other mechanism by which the alleged conduct could have occurred. Medical records, communication logs, location evidence, and sworn affidavits— each readily available to Investigator Reamer at the time—directly contradicted the accusation and demonstrated that the alleged conduct was physically implausible for Plaintiff to have committed. None of these exculpatory facts were disclosed to the magistrate.

Plaintiff was arrested based on this affidavit, which omitted material exculpatory facts and relied on unverified, defense-supplied documents attributed to a witness whose credibility was known to be compromised. The affidavit therefore created a false and misleading impression

3

of probable cause, in violation of the Fourth Amendment and *Franks v. Delaware*. No reasonable officer could have believed probable cause existed had the magistrate been presented with the full and accurate factual record.

After Plaintiff's arrest, on June 18, 2025, during the bond hearing of *Jamie Renee Walker*, Cody Lane Koelle testified under oath that he never wrote or signed any affidavit, and further testified unequivocally that he never wrote or signed any affidavit supporting Michael Allen Walker. This sworn disavowal directly contradicted the affidavits attributed to him that formed the foundation of Plaintiff's arrest. Jonathan Amdur personally questioned Cody Lane Koelle during this hearing, heard this testimony firsthand, and thereby obtained actual knowledge that the affidavits relied upon to arrest Plaintiff were either fabricated, misattributed, or wholly unreliable.

Despite this sworn testimony, Defendants did not correct the record, did not disclose the disavowal to any reviewing court, and continued the prosecution of Plaintiff for months thereafter, even though the factual basis for probable cause had collapsed in open court. This post-arrest conduct constitutes ratification, deliberate indifference, and a continuing seizure without probable cause, further violating Plaintiff's rights under the Fourth and Fourteenth Amendments.

Upon arrest, Plaintiff learned that his bond had been preset at $100,000. The bond paperwork identified both Cody Lane Koelle and S.J.K. as victims—even though S.J.K. was never mentioned in Reamer's sworn arrest affidavit. The bond conditions prohibited Plaintiff, an immobile elderly veteran, from possessing a firearm he previously required for home protection and barred him from consuming any alcohol, disrupting long-standing daily routines with his wife of enjoying a night cap or glass of wine with dinner. These conditions constituted an

4

ongoing Fourth Amendment seizure, restricting Plaintiff's liberty, travel, daily activities, and personal autonomy without lawful justification.

The consequences were immediate and severe. Plaintiff and his wife were forced to cancel their planned 50th wedding-anniversary trip, lost prepaid travel arrangements, and expended significant portions of their life savings to secure bond and legal expenses. Plaintiff suffered humiliation in his community, despite more than 25 years of honorable service in the U.S. Army that started during the Vietnam era. The emotional, financial, physical, and reputational harm was profound and enduring.

Following the arrest, Plaintiff filed a detailed Internal Affairs complaint identifying factual discrepancies in Reamer's affidavit and explaining that no records, communications, or objective evidence supported the statements attributed to him. He further documented severe health impairments, highlighting that the alleged conduct was not only untrue but physically implausible, triggering Guadalupe County's duties under ADA Title II and Section 504 of the Rehabilitation Act to reasonably accommodate his disabilities during the investigative and judicial process.

Despite the absence of probable cause, Plaintiff remained under felony bond and restrictive conditions for months while receiving no indictment. On August 26, 2025, he filed a Motion for Examining Trial. After receiving no response, he was forced to file a Motion to Compel and later a Motion to Expedite. His request for judicial review went unanswered for more than six months and was set only for a December hearing to determine whether an examining trial might eventually be scheduled. During this period, Plaintiff submitted multiple ADA Title II notices and a Notice of Continued Violation, informing the County that his

disabilities required accommodations and that the prolonged lack of judicial review was worsening his health.

On December 1, 2025, during his first and last court appearance, Plaintiff was finally informed that his felony case had been declined. Yet despite repeated requests—including written inquiries, in-person attempts, and counsel's follow-up—the County Attorney's Office refused to issue a declination letter. This refusal prevented Plaintiff from notifying the bond company responsible for the $100,000 surety, restoring his rights, pursuing expungement, or completing administrative and legal processes. The absence of written documentation prolonged the unconstitutional seizure of Plaintiff's liberties and constituted a further denial of due process and access to the courts.

Plaintiff also submitted a Public Information Act request seeking verification of ADA training for the Sheriff's Office and County Attorney's Office and the identity of the County's ADA coordinator. Neither agency responded, demonstrating systemic disregard for transparency obligations, disability rights, and ADA compliance. This failure further evidences County-level practices, customs, and supervisory deficiencies supporting Monell liability.

Plaintiff brings this action under 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments, the First Amendment, Title II and Title V of the ADA, the Rehabilitation Act, and Monell municipal-liability principles to redress the unlawful arrest; the continued seizure without probable cause; the denial of due process and access to the courts; the failure to accommodate Plaintiff's disabilities; the retaliation for protected ADA advocacy; the refusal to document the declination of charges; and the County's systemic policies, customs, and supervisory failures that enabled these violations. Plaintiff seeks compensatory and punitive damages, declaratory relief, and injunctive measures to prevent similar constitutional and statutory violations against others.

6

# II. NATURE OF ACTION

1.     This is a civil-rights action brought under 42 U.S.C. § 1983, Title II and Title V of the

Americans with Disabilities Act (42 U.S.C. §§ 12132, 12203), and Section 504 of the

Rehabilitation Act (29 U.S.C. § 794). Plaintiff seeks redress for a constitutionally unlawful

arrest, the resulting restrictions on his liberty, the prolonged absence of judicial review, and the

failure to provide ADA-compliant access to the courts while felony charges remained pending on

the basis of an arrest-warrant affidavit containing statements that were never verified,

corroborated, or reasonably investigated.

2.   Plaintiff files this action pro se in good faith to preserve his federal rights and is actively

seeking qualified legal representation. Plaintiff is 77 years old, wheelchair-bound, and suffers

from cardiac disease, neuropathy, cancer, and other serious medical conditions documented in

ADA notices submitted to county officials. Because of these limitations and the realistic

possibility that he may become unable to prosecute this action to completion, Plaintiff invokes

Federal Rule of Civil Procedure 25(a)–(b) and requests that, in the event of his incapacity or

death, this action continue through a proper substitute, including but not limited to his son, James

Louis Roden Jr., any retained counsel, or the executor or administrator of his estate.

3.   This action arises from the unconstitutional seizure of Plaintiff's person and the extended

period during which he remained under felony bond restrictions without indictment, without an

examining trial, without ADA-compliant consideration of his motions, and without meaningful

judicial review, despite repeated requests for relief. On December 1, 2025, the felony charge

against Plaintiff was declined in open court; however, despite multiple written and verbal efforts,

the Guadalupe County Attorney's Office refused to issue a declination letter, prolonging the legal

disabilities associated with the arrest and preventing Plaintiff from fully restoring his rights, clearing his record, or resolving outstanding administrative obligations.

4.   During the pendency of these proceedings, Plaintiff submitted ADA Title II notices, a Request for Reasonable Modification, and Public Information Act requests seeking to identify the ADA Coordinator for both the Guadalupe County Attorney's Office and the Guadalupe County Sheriff's Office, as well as records confirming whether either agency provides ADA training to its personnel. Neither agency ever responded, demonstrating deliberate indifference to ADA obligations, obstructing Plaintiff's access to the courts, and contributing to the constitutional and statutory violations described herein.

5.   Plaintiff further alleges that the timing of his arrest—occurring six days after his son, a mandated reporter, submitted a report regarding the safety of Plaintiff's intellectually disabled granddaughter, S.J.K.—supports a reasonable inference of retaliation in violation of ADA Title V. Plaintiff asserts no claims on behalf of his son; the report is referenced solely to show context, motive, temporal proximity, and the information known to county officials before the warrant was issued.

6.   The circumstances surrounding Plaintiff's arrest and the prolonged failure to provide judicial review were not isolated incidents but reflect systemic practices by Guadalupe County, including prosecutor-directed investigations, the use of unverified affidavits, chronic delays in responding to motions, and noncompliance with ADA Title II. Plaintiff therefore seeks relief not only against individual actors but also against Guadalupe County under Monell v. Department **of Social Services**, 436 U.S. 658 (1978), for policies, customs, and failures to train or supervise that caused the violations of his constitutional and statutory rights.

7.   Plaintiff has standing to bring this action because he suffered direct, concrete injuries traceable to Defendants' actions, including loss of liberty, financial harm, deprivation of statutory rights, denial of ADA access, and reputational damage. Any references to the mistreatment of family members are included solely for context, chronology, or motive and are not asserted as separate claims.

8.   This action seeks redress for injuries Plaintiff personally suffered, including but not limited to:

a.   False arrest based on allegations never corroborated, never investigated, unsupported by any allegation of conduct occurring in Guadalupe County, and physically implausible for Plaintiff to have committed given his medical condition and location;

b.   Continued seizure through restrictive felony bond conditions, including firearm prohibitions that left an elderly, immobile veteran without means of home defense;

c.   Prolonged absence of judicial review, despite Plaintiff's motions for an examining trial, motions to compel, motions to expedite, and written ADA requests;

d.   Failure to accommodate disabilities, including nonresponse to ADA notices, requests for reasonable modification, and repeated documentation of mobility, cardiac, and cancer-related limitations;

e.   Financial losses, including depletion of life savings, cancellation of prepaid travel, and forfeiture of timeshare vacation weeks due to travel restrictions;

f.   Loss of international travel privileges and the cancellation of Plaintiff's planned 50th wedding anniversary cruise with his wife;

g.   Reputational harm and emotional distress, including stigma from being publicly charged with a first-degree felony despite a lifetime of military service and law-abiding conduct; and

9

**h.**    Ongoing legal disability resulting from the County Attorney's continued refusal to issue a written declination of prosecution.

**9.**    The individual defendants are sued in their individual capacities for damages arising from actions taken under color of state law. They are sued in their official capacities only to the extent necessary to obtain prospective declaratory or injunctive relief requiring ADA compliance, preventing future violations, and correcting ongoing civil-rights injuries traceable to county policy or custom.

**10.**    Heck v. Humphrey does not bar this action because Plaintiff was never convicted of any offense, and the charge has been formally declined. Younger abstention does not apply because there is no ongoing criminal prosecution and no pending proceedings capable of adjudicating Plaintiff's federal claims. Plaintiff seeks a federal forum in accordance with longstanding principles permitting § 1983, ADA, and Rehabilitation Act claims after termination of state proceedings.

**11.**    The factual allegations supporting this Complaint are based on Plaintiff's personal knowledge, sworn affidavits, medical documentation, written correspondence, publicly available records, and documents filed in the underlying criminal matter. These allegations are asserted solely for purposes of this litigation and are protected by the doctrine of absolute privilege. Plaintiff reserves the right to amend this Complaint as additional documents are disclosed or discovered, including those revealing further ADA violations or Monell-related misconduct.

# IV. PARTIES

**A. Plaintiff**

12.     Plaintiff James Louis Roden Sr. is a seventy-seven-year-old, wheelchair-bound United States Army veteran and resident of League City, Texas. He served during the Vietnam era and has lived a life free of criminal conduct. Plaintiff suffers from significant medical conditions—including cardiac disease, neuropathy, multiple cancer diagnoses, and profound mobility limitations—that substantially impair major life activities and qualify as disabilities under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. These limitations were documented in written ADA submissions to Guadalupe County officials during the pendency of the underlying criminal case.

13.     Plaintiff proceeds pro se. In preparing this Complaint, Plaintiff received limited non-attorney assistance from family members in the form of research, drafting, and clerical support. Plaintiff personally reviewed, approved, and adopted this Complaint in its entirety, and all factual allegations, legal claims, and requests for relief asserted herein are his own.

14.     On April 7, 2025, Plaintiff was arrested under a first-degree felony warrant that alleged the offense occurred in Guadalupe County, Texas, yet failed to allege any facts establishing Plaintiff's physical presence in that county or any method by which the alleged statement was made. The affidavit did not allege in-person contact, telephone communication, electronic transmission, or any other mechanism connecting Plaintiff to Guadalupe County at the time of the alleged offense. Plaintiff resided in League City, Texas, while the sole complaining witness resided in Kansas, and neither was present in Guadalupe County during the relevant period.

15.     Despite these omissions—and despite the absence of phone records, electronic communications, travel evidence, or corroborating witnesses—Plaintiff was arrested and subjected to restrictive felony bond conditions for months without indictment, without an examining trial, without ADA-compliant access to court proceedings, and without meaningful

judicial review. Plaintiff brings this action under **42 U.S.C. § 1983**, the **ADA**, and the **Rehabilitation Act** to obtain redress for the injuries he personally suffered.

**B. Individual Defendant**

**16.**    Defendant Elaine M. Reamer is a criminal investigator employed by the Guadalupe County Sheriff's Office. At all relevant times, she acted under color of state law and within the scope of her employment. On April 7, 2025, Investigator Reamer prepared, swore to, and submitted the arrest-warrant affidavit used to seize Plaintiff. Plaintiff alleges that the affidavit contained unverified statements, material omissions, and assertions made with reckless disregard for the truth, contrary to clearly established law under *Franks v. Delaware* and *Malley v. Briggs*. Defendant Reamer is sued in her individual capacity only, for compensatory and punitive damages arising from her unconstitutional actions.

C. Municipal Defendant

**17.**    Defendant Guadalupe County, Texas is a political subdivision of the State of Texas and a "person" within the meaning of 42 U.S.C. § 1983. The County is also a "public entity" within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, and a recipient of federal financial assistance subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**18**. Guadalupe County is responsible for the policies, practices, customs, supervision, and training of the Guadalupe County Sheriff's Office and the Guadalupe County Attorney's Office, including investigative procedures, warrant-affidavit practices, disability-accommodation protocols, and responses to ADA Title II notices and requests for reasonable modification.

**19.**    For purposes of municipal liability under *Monell v. Department of Social Services*, the Sheriff of Guadalupe County is the final policymaker for law-enforcement operations, and the

Guadalupe County Attorney is the final policymaker for prosecutorial and charging practices. The actions and omissions of these officials, including failures to train, supervise, ensure ADA compliance, and enforce lawful investigative standards, are attributable to **Guadalupe County**. Neither the Sheriff nor the County Attorney is named as an individual defendant in this action.

20.    Guadalupe County is sued as a municipal entity for:

- constitutional violations arising from County policies, practices, or customs;

- failures to train or supervise regarding warrant-affidavit procedures and ADA compliance;

- deliberate indifference to Plaintiff's ADA Title II notices and public-information requests; and

- all declaratory, injunctive, equitable, and monetary relief permitted by federal law.

# V. JURISDICTION AND VENUE

21.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings claims under the United States Constitution, 42 U.S.C. § 1983, Title II and Title V of the Americans with Disabilities Act (42 U.S.C. §§ 12131–12134, 12203), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794). These claims arise from conduct occurring entirely within the State of Texas and under color of state law.

22.    This Court has civil-rights jurisdiction under 28 U.S.C. § 1343(a)(3)–(4) because Plaintiff seeks redress for the deprivation of rights secured by the Constitution and laws of the United

States, including rights protected by the Fourth and Fourteenth Amendments and by federal disability statutes.

**23.**     This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202, including orders preventing ongoing ADA violations and correcting continuing consequences of the unlawful arrest, seizure, and denial of meaningful judicial access.

**24.**     Venue is proper in the Western District of Texas, San Antonio Division under 28 U.S.C. § 1391(b) because all Defendants reside in this District, and a substantial part of the events giving rise to this suit—including the preparation of the arrest-warrant affidavit, Plaintiff's arrest, the imposition of felony bond conditions, the failure to provide ADA-compliant court access, and the prolonged lack of judicial review—occurred in Guadalupe County, Texas, which lies within this Division.

**25.**     This Court has personal jurisdiction over all Defendants because they are Texas officials acting under color of state law within the territorial jurisdiction of this Court, and their actions directly caused constitutional and statutory injuries to a Texas resident.

**26.**     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over all other claims arising from the same nucleus of operative fact. References to Texas procedural rights (such as examining-trial requests) are included solely for context and do not alter the federal basis for jurisdiction.

**27.**     No abstention doctrine limits this Court's authority. Younger abstention does not apply because there is no ongoing state criminal proceeding; the felony charge against Plaintiff was formally declined in open court on December 1, 2025. Heck v. Humphrey does not bar this action because Plaintiff was never convicted of any offense, and the termination of proceedings

14

in his favor permits an immediate § 1983 action for unlawful arrest, seizure, and denial of access to the courts.

# VI. PLEADING SUFFICIENCY

**28.**    This Complaint contains detailed, nonconclusory factual allegations identifying the dates, officials, documents, communications, and actions that resulted in Plaintiff's arrest, the issuance of a first-degree felony warrant, the prolonged lack of judicial review, and the failure to provide ADA-compliant access to court proceedings. The allegations include the substance of the arrest-warrant affidavit, material omissions in the investigative process, Plaintiff's medical limitations, his written requests for an examining trial, and the County's extended failure to respond. These allegations provide far more than "labels and conclusions" and fully satisfy the plausibility standard established by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Dismissal under Rule 12(b)(6) is therefore improper.

**29.**    As a pro se litigant, Plaintiff's pleadings are entitled to liberal construction and must be held to less stringent standards than those drafted by attorneys. Erickson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520–21 (1972). Under Rule 8(e), courts must construe pleadings to do substantial justice and must evaluate allegations based on their factual substance rather than any technical imperfections. At this early stage, factual disputes, credibility determinations, and affirmative defenses cannot defeat a properly stated claim.

**30.**    Plaintiff's claims are plausible on their face. The Complaint alleges concrete factual detail—including the text of the arrest-warrant affidavit, Plaintiff's Internal Affairs complaint, ADA notices, medical documentation, bond paperwork, examining-trial motions, and written correspondence with county officials—that readily permits a reasonable inference that

Defendants violated Plaintiff's clearly established constitutional and statutory rights. Plaintiff is not required to prove his claims at the pleading stage, nor to anticipate or negate potential defenses. He must allege facts that state a plausible entitlement to relief, which he has done. Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555.

31.  This Complaint satisfies all requirements of Rule 8(a) by providing a short and plain statement of jurisdiction, clear articulation of each cause of action, and factual allegations supporting Plaintiff's entitlement to relief. The Supreme Court has confirmed that civil-rights plaintiffs are not subject to heightened pleading requirements. Johnson v. City of Shelby, 574 U.S. 10, 11 (2014) (per curiam). Each cause of action—false arrest, continuing seizure, due process violations, ADA and Rehabilitation Act violations, and municipal liability under Monell—is supported by specific factual matter sufficient to place Defendants on fair notice of the claims and the grounds on which they rest.

32.  Plaintiff gives notice to all Defendants of their continuing and ongoing obligation to preserve all evidence relevant to the investigation, warrant process, arrest, bond conditions, ADA communications, internal reviews, and the County's handling of examining-trial requests. This obligation includes emails, text messages, reports, recordings, electronic communications, metadata, and all physical or digital documentation. Any destruction, alteration, or failure to preserve such material may constitute spoliation under Fifth Circuit law and may result in appropriate sanctions, adverse inferences, or evidentiary consequences.

# VII. FACTUAL BACKGROUND

## A. Plaintiff's Background and Medical Condition

33.     Plaintiff, James Louis Roden Sr., is a 77-year-old U.S. Army veteran who served more than 25 years, including during the Vietnam era. Plaintiff has lived a life of lawful conduct, community reputation, and honor. He is wheelchair-bound and suffers from multiple serious medical conditions—cardiac disease, neuropathy, cancer diagnoses, limited mobility, chronic pain, and impaired circulation—all of which substantially limit major life activities, including walking, standing, traveling, and caring for himself. Plaintiff relies on medical devices, assistive equipment, and ongoing treatment, and he is unable to ambulate or travel without significant assistance. These conditions qualify as disabilities under Title II of the ADA and Section 504 of the Rehabilitation Act, and were later documented in written ADA submissions to county officials.

34.     The arrest-warrant affidavit alleges that the charged conduct occurred in Guadalupe County, Texas, yet contains no factual investigation establishing Plaintiff's physical presence, location, or capacity to carry out the alleged conduct. *(See Exhibit A-003)* At the time period alleged, Plaintiff suffered from serious and well-documented medical limitations that substantially restricted his mobility and physical endurance. These limitations made it implausible—if not impossible—for Plaintiff to travel, appear unannounced, or physically intimidate or threaten a healthy 27-year-old adult male, particularly one who falsely represented himself as a law-enforcement officer living over 600 miles away Cody and nearly 200 miles from Guadalupe County. Despite the ease with which law enforcement could have verified Plaintiff's condition, location, and physical capacity through minimal inquiry, no such investigation was conducted. The affidavit instead asserted venue and capability as conclusions, unsupported by facts, further demonstrating that probable cause was presumed rather than established.

**35.** Plaintiff's medical disabilities made the alleged conduct physically implausible and would have been immediately apparent to any reasonable investigator upon even a minimal inquiry. Despite this, Plaintiff was never contacted, interviewed, or asked to provide any information before Investigator Reamer sought a first-degree felony arrest warrant. No effort was made to confirm whether Plaintiff had the physical capacity to travel out of state or whether any corroborating evidence existed to support the claim. These omissions form a foundational part of Plaintiff's Fourth Amendment, ADA, due-process, and Monell claims.

## B. Events Preceding the Arrest

**36.** On April 1, 2025, Plaintiff's son, James Louis Roden Jr., a public-school teacher, minister, and mandated reporter under Texas law, submitted a formal report regarding the safety and welfare of Plaintiff's intellectually disabled granddaughter, Shelby Jane Koelle. *(See Exhibit B-024)* At the time, S.J.K. was the complainant in the aggravated sexual-assault case involving Michael Allen Walker, and concerns had repeatedly arisen about her vulnerability, her placement, and exploitation occurring in her living environment.

**37.** The mandated report disclosed that Cody Lane Koelle, Plaintiff's grandson, had allowed an adult male—identified as "Jesse," a man with a serious criminal history involving drug activity—to reside in the home. In a March 18, 2025 recorded phone call *(See Exhibit I-001)*, Cody admitted that Jesse was a *dangerous person*, that he feared for the safety of his wife and children around him, and that Jesse was sexually exploiting S.J.K. despite Cody's awareness of the risk. This report was submitted six days before Plaintiff's arrest, placing county officials on notice of the immediate danger to a known intellectually disabled adult.

**38.** Long before April 7, 2025, the Guadalupe County Attorney's Office was in possession of multiple documents and communications describing Cody Koelle's prior criminal conduct and credibility issues, including:

    a. making false police reports,

    b. impersonating a police officer, and

    c. using red-and-blue emergency-style lights on a personal vehicle.

**39.** These offenses were reported to the County Attorney's Office and are reflected in *Exhibit B-014*. Cody's history of dishonesty, impersonation, and manipulation was well known—or easily discoverable—to county officials at the time he became the primary source of information for the felony allegation against Plaintiff.

**40.** Further, in the March 18, 2025 recorded phone call, *(See Exhibit I-001)* Cody admitted that he was being pressured by members of the Guadalupe County Attorney's Office to support Michael Allen Walker and to go against his own mother, Jamie Renee Walker. This admission raises serious concerns regarding witness influence, prosecutorial pressure, and the reliability of Cody's statements. Cody had already executed multiple sworn affidavits that contradict one another, demonstrating his instability as a witness and his susceptibility to pressure. No reasonable investigator could rely solely on his unverified assertions to obtain a first-degree felony warrant for any individual—particularly a disabled, elderly veteran living hundreds of miles away.

**41.** Despite abundant red flags concerning Cody's credibility—prior criminal acts, contradictory affidavits, admissions of prosecutorial pressure, and statements acknowledging the ongoing exploitation of S.J.K.—Investigator Elaine M. Reamer conducted no verification whatsoever before preparing and submitting the arrest-warrant affidavit against Plaintiff. She did

not contact Plaintiff, did not confirm his physical ability to travel to Kansas, did not obtain

corroborating evidence, and did not reconcile Cody's conflicting statements. Instead, she relied

solely on information from an individual who had repeatedly demonstrated unreliability,

dishonesty, and personal motives to deflect attention from his own misconduct and neglect of a

vulnerable adult.

**42.**    Meanwhile, Plaintiff and his son—both lifelong public servants with no criminal history—

acted in good faith to report the abuse and exploitation of an intellectually disabled family

member. Rather than investigating the abuse allegations, verifying Cody's criminal background,

or ensuring the safety of S.J.K., county officials acted only after the April 1 mandated report—

and instead of protecting the victim, they arrested Plaintiff and his son James Louis Roden Jr.

**43.**    Taken together, these events demonstrate that the arrest-warrant affidavit was obtained

without probable cause, based on knowingly unreliable information, and through a failure to

conduct even minimal investigative steps. The sequence of events, including the timing of the

mandated report and Cody's admissions of prosecutorial pressure, supports a reasonable

inference of retaliation, reckless disregard for the truth, and systemic investigative failures

attributable to Guadalupe County's policies, customs, and failures to train, as further alleged in

this Complaint.

**C. The April 7, 2025 Arrest Warrant**

**44.**    On April 7, 2025, Investigator Elaine M. Reamer submitted a sworn arrest-warrant

affidavit alleging that Plaintiff threatened his grandson, Cody Lane Koelle, in connection with a

pending criminal matter involving Plaintiff's daughter. *(See Exhibit A-003)* The affidavit relied

entirely on information funneled through the Guadalupe County Attorney's Office and defense

counsel for Michael Allen Walker, including affidavits purportedly signed by Cody, without any independent verification that Cody actually wrote, signed, or adopted the statements attributed to him.

45.   Plaintiff was never contacted, interviewed, or given any opportunity to respond to the allegations before Investigator Reamer sought a first-degree felony warrant. Equally significant, Reamer did not even contact Cody to confirm whether the affidavits circulated by Michael Walker's defense counsel were in fact written, signed, or authorized by him. Instead, she relied on multiple layers of hearsay—statements allegedly made by Cody, filtered through defense counsel, then relayed through the County Attorney's Office—without speaking to a single firsthand witness.

46.   The affidavit therefore rested on hearsay stacked upon hearsay:

a. information originating from Cody,

b. drafted or handled by Michael Walker's defense attorney, and

c. transmitted to Investigator Reamer through the County Attorney's Office,

47.   All accepted at face value without any investigation. No interviews were conducted with Plaintiff, Cody, S.J.K., or any other family member; no suspect, witness, or alleged victim was questioned. This complete absence of firsthand inquiry is incompatible with the duty of a reasonably well-trained officer preparing a warrant for a first-degree felony.

48.   In addition to resting on unverified third-hand information, the affidavit omitted critical facts that any reasonable officer would consider essential to a probable-cause determination, including:

**a**. any phone or communication records supporting the alleged threat;

**b**. any travel records placing Plaintiff in Guadalupe County or anywhere near Cody; The affidavit did not allege that Plaintiff was ever physically present in Guadalupe County during the relevant period, did not allege that Cody Lane Koelle was located in Guadalupe County at the time of the alleged conduct, and did not identify any act by Plaintiff that actually occurred within Guadalupe County's territorial jurisdiction.

**c**. any acknowledgment of Plaintiff's severe medical disabilities and his inability to travel long distances or physically engage in the alleged conduct;

**d.** any independent verification of the existence, timing, or content of the alleged communication;

**e.** any mention of the April 1, 2025 mandated report, which implicated Cody's neglect of a vulnerable, intellectually disabled adult;

**f.** any mention of Cody's contradictory sworn affidavits or the March 18, 2025 recorded call in which he admitted being pressured by the County Attorney's Office to support Michael Walker;

**g.** any reference to Cody's prior criminal conduct, including making false reports, impersonating a police officer, and using red-and-blue emergency-style lights on his vehicle; and

**h.** any corroborating evidence from neutral witnesses, family members, or records that might support the allegation.

**49.**    These omissions were material because they undermined the reliability of the only purported source of information and directly contradicted the plausibility of the alleged offense. Under Franks v. Delaware, 438 U.S. 154 (1978), the reckless omission of facts that a magistrate would want to know vitiates probable cause. Under Malley v. Briggs, 475 U.S. 335 (1986), an officer is liable when "a reasonably well-trained officer" would have known that the affidavit

failed to establish probable cause. Here, any reasonable officer would have recognized that an elderly, wheelchair-bound veteran living hundreds of miles away could not have carried out the alleged conduct and that unverified, triple-layer hearsay from a demonstrably unreliable witness could not justify a first-degree felony warrant.

50.     There is no evidence that Investigator Reamer performed even the most basic investigative steps prior to seeking the warrant. She did not obtain call logs from Plaintiff or Cody; did not seek text messages or other electronic communications; did not confirm Plaintiff's physical location at the time of the alleged threat; did not review travel records; did not speak to family members; did not interview S.J.K.; and did not cross-check Cody's statements against his prior affidavits, criminal history, or the March 18 recording. No independent inquiry was performed into whether the alleged communication ever occurred.

51.     These failures are especially egregious given that Plaintiff is a severely disabled, elderly veteran living more than 600 miles away from Cody's location and is medically incapable of unsupervised interstate travel. The decision to seek a first-degree felony warrant based on unverified hearsay-upon-hearsay, without interviewing a single witness, suspect, or alleged victim, demonstrates reckless disregard for the truth and a profound breakdown in basic investigative procedure.

52.     Taken together, the lack of investigation, the reliance on unverified multi-layer hearsay, the failure to contact even the alleged source of the affidavits, and the omission of material facts show that the warrant was issued without probable cause and in violation of clearly established Fourth Amendment law. These defects also reflect systemic deficiencies in Guadalupe County's investigative practices, supervision, and training, as further alleged in this Complaint and in support of Plaintiff's Monell claim.

**D. Arrest Warrant Constitutional Breakdown**

**53.**     **Critical Analysis of the Statement:**

*"From 3/17/2025, I have been receiving documentation from the Guadalupe County Attorney's Office that they had received from Michael Walker's attorneys."*

**1. The affidavit admits on its face that the information is unverified, third-party hearsay originating from a criminal defendant's attorney—not from a witness, victim, or law-enforcement source.**

**54.**     This sentence alone establishes that Investigator Reamer relied not on firsthand statements, not on interviews, not on recordings, and not on personal observations, but rather on documents prepared or forwarded by the criminal defense attorney for Michael Allen Walker, a defendant facing six first-degree aggravated sexual assault charges. No reasonable officer could treat defense-generated materials as reliable or neutral evidence of criminal wrongdoing by a third party, much less sufficient to justify a first-degree felony arrest warrant for witness tampering.

**55.**     The U.S. Supreme Court has been clear that officers must rely on reasonably trustworthy information to establish probable cause. (*Beck v. Ohio*, 379 U.S. 89, 91 (1964)). A criminal defendant's attorney has every incentive to shift blame, create confusion, or protect his client—making such materials inherently unreliable unless independently verified. Investigator Reamer did none of that verification.

**56.**     By admitting that she relied on documentation funneled through two layers of adversarial intermediaries—the County Attorney's Office and defense counsel—Reamer reveals that the

affidavit is built entirely on hearsay-upon-hearsay, lacking any indicia of reliability or trustworthiness required for a constitutionally valid warrant.

**2. The statement demonstrates a complete failure to perform independent investigation, violating the standards of a reasonably trained officer.**

57.     This sentence confirms that Reamer did not conduct any independent investigative work before drafting a first-degree felony warrant:

- She did not interview Cody Lane Koelle to determine whether the documents accurately reflected his own statements.

- She did not obtain sworn statements directly from any witness.

- She did not verify signatures, dates, authorship, or authenticity of the materials.

- She did not confirm whether Plaintiff had any contact with Cody.

- She did not evaluate Plaintiff's medical condition, mobility limits, or physical implausibility of committing the alleged act.

- She did not cross-check the information against existing contradictory affidavits, misconduct history, or the March 18, 2025 recorded admission that the County Attorney's Office was pressuring Cody.

Instead, she simply accepted whatever documents Michael Walker's attorney wanted the County to see—and converted those unverified documents into the basis for a first-degree felony arrest warrant against a 77-year-old disabled veteran.

58.     This is exactly the type of reckless indifference condemned in *Franks v. Delaware*, 438 U.S. 154 (1978), where courts require officers to verify information and avoid material

omissions when seeking a warrant. Reamer's reliance on adversarial, uncorroborated documents—without contacting a single witness—shows no competent investigation occurred.

**3. The statement obscures the fact that Cody Koelle later recanted, contradicted, and denied portions of the affidavits, demonstrating Reamer's reliance on unreliable sources.**

59.     The affidavit claims that Reamer had been "receiving documentation," but fails to disclose:

- Cody had multiple contradictory affidavits, some denying he wrote previous ones.

- Cody admitted on March 18, 2025 that the County Attorney's Office was pressuring him to support Michael Walker.

- Cody admitted Jesse was a dangerous person and was exploiting Shelby, yet allowed him to live in the home.

- Cody had a known history of making false reports and impersonating a police officer.

60.     Any reasonable officer would know that information originating from such a witness is inherently unreliable. Omitting these known credibility defects violates *Franks* and renders the warrant constitutionally defective.

**4. The statement fails to establish any nexus whatsoever between Plaintiff and a criminal act, such that no reasonable officer or neutral magistrate could find probable cause under clearly established law.**

61.     Nothing in this line—or in any of the documents funneled through defense counsel—connects:

- Plaintiff

- Any communication allegedly made by Plaintiff

- Any threat

- Any interference with a witness

- Any conduct fitting the statutory elements of witness tampering (Tex. Penal Code § 36.05)

62.    Instead, the affidavit merely acknowledges receiving papers from defense counsel, with no attempt to verify that:

- Plaintiff authored anything

- Plaintiff contacted anyone

- Plaintiff threatened anyone

- Plaintiff took any action that could constitute a crime

63.    A warrant cannot be based on speculation, inference stacking, or adversarial paperwork. Probable cause requires "facts and circumstances within the officer's knowledge." Reamer had none.

64.    Thus, this line reveals that the affidavit is legally void because it establishes nothing beyond the transfer of documents between attorneys.

65.    **Critical Analysis of Statement:**

*"In the affidavit written by Cody, he stated the Defendant told him if he lost $40.000.00, "he going to come don cracking hard"."*

**1. The statement is false or recklessly misleading because the affidavit was *not* verified as being written or signed by Cody—violating Franks v. Delaware.**

66.     The affidavit submitted by Investigator Reamer presents the quoted statement as if it were unquestionably authored and sworn by Cody Lane Koelle, yet Reamer conducted zero verification to determine:

- whether Cody actually wrote the document,

- whether he signed it voluntarily,

- whether the signature was authentic,

- whether Cody stood by the content,

- or whether the statement contradicted any of Cody's *other* sworn statements.

67.     This is a material misrepresentation, because Cody later recanted, denied writing certain affidavits, and provided contradictory sworn statements. In the March 18, 2025 recorded phone call, Cody explicitly confirmed:

- he was being pressured by the County Attorney's Office to support Michael Walker,

- he had previously signed affidavits contradicting the one used against Plaintiff,

- and he had made statements out of fear, confusion, or pressure from County Attorney office.

68.     Under *Franks v. Delaware*, an officer violates the Fourth Amendment when she includes statements in a warrant affidavit while recklessly disregarding doubts about their truth. Here,

28

Reamer embraced an affidavit whose authenticity and reliability she never investigated, even though Cody was known to have:

- filed multiple inconsistent affidavits,

- admitted pressure from prosecutors,

- a history of false police reports,

- a history of impersonating a police officer,

- and a pattern of changing his story depending on which authority figure pressured him.

69.    Thus, calling it "the affidavit written by Cody" is either knowingly false or shows reckless disregard for the truth.

**2. The statement is inadmissible hearsay layered upon hearsay, and cannot serve as probable cause for a felony arrest.**

70.    Even if Cody had written the affidavit (which has not been established), the statement is still hearsay-upon-hearsay:

- The affiant (Reamer) did *not* receive the affidavit directly from Cody.

- It was forwarded by Michael Walker's defense attorney—an adversarial source with every motive to shift blame.

- It was then filtered through the County Attorney's Office, which had already been criticized for misconduct and had a vested interest in controlling the narrative.

- Reamer then repeated it in the warrant affidavit without speaking to Cody at all.

**71.**    Probable cause must be based on "reasonably trustworthy information" (*Beck v. Ohio*). Triple-layer hearsay from a demonstrably unreliable witness cannot meet that standard.

No reasonable officer would rely on a statement passed through (1) defense counsel, (2) the County Attorney's Office, and (3) a detective who performed no verification.

This renders the warrant constitutionally defective.

**3. The statement is vague, unintelligible, and fails to describe a criminal threat—making it legally insufficient to establish any element of witness tampering.**

**72.**    The quoted phrase—"he going to come don cracking hard"—contains no:

- date

- time

- context

- subject matter

- specific threat

- statement tying it to any criminal proceeding

- clear reference to testimony or evidence

- indication that Plaintiff ever communicated such language

**73.**    Texas Penal Code § 36.05 (Witness Tampering) requires:

1. An intent to unlawfully influence a witness, AND

2. A knowing communication, AND

3. The communication must be tied to testimony, reporting, or participation in an investigation.

74. This vague, grammatically incoherent phrase does none of that.

75. It does not describe:

- what was supposedly "lost,"

- who the statement was directed at,

- what "cracking hard" even means,

- whether Plaintiff ever actually said it,

- how Plaintiff—an elderly, wheelchair-bound veteran living 600 miles away from Cody and nearly 200 miles away from Guadalupe County—could carry out anything resembling a threat.

76. Courts routinely reject vague, context-free statements as insufficient for arrest warrants. Here, the statement cannot satisfy any statutory element of witness tampering.

**4. The alleged quote is implausible on its face given Plaintiff's age, disabilities, and physical limitations—facts Reamer omitted from the affidavit.**

77. The statement implies Plaintiff threatened violent retaliation if Cody "lost $40,000." But:

- Plaintiff is 77 years old,

- wheelchair-bound,

- suffers from cardiac disease,

- suffers from neuropathy,

- suffers from cancer,

- has limited mobility,

- lives over 600 miles away from Cody and 200 miles away from Guadalupe County,

**78.** Reamer omitted these facts even though she knew (or should have known) they were essential for a magistrate to evaluate the plausibility of the alleged threat. Under *Franks*, material omissions invalidate a warrant when they distort the probable-cause picture. That is exactly what happened.

**5. The alleged statement has no connection to Plaintiff and was never corroborated by any evidence, communications records, or witness interviews.**

**79.** Reamer made no attempt to:

- obtain phone logs,

- review text messages,

- check call records,

- determine Plaintiff's physical whereabouts,

- interview Cody,

- interview Plaintiff,

- interview any witness,

- understand the alleged $40,000 reference,

- or establish *any link* between Plaintiff and the alleged statement.

**80.** A warrant must establish a **nexus** between the accused and the alleged criminal activity. This line provides none.

**81.** The affidavit simply assumes Plaintiff made a statement because a piece of paper— originating from a defense lawyer—said so.

**82.** That is unconstitutional.

**83.** Further compounding the unreliability of the alleged affidavit attributed to Cody Lane Koelle, the official court record reflects that on June 18, 2025, during sworn testimony before the Guadalupe County court, Cody Lane Koelle unequivocally denied under oath that he ever signed or wrote any affidavits. Specifically, Cody testified:

"I didn't sign any affidavits at all. Because I told them pacifically (sic) I did not want to be a part of it."
*(June 18, 2025 Bond Hearing Transcript, p. 28, ll. 12–14).*

**84.** He was then asked to clarify whether the affidavit at issue related to Michael Allen Walker rather than his mother, to which he responded affirmatively. When questioned directly whether he authored any affidavit in support of Michael Allen Walker, Cody answered:

**"No."**
*(Id. at p. 28, ll. 18–19).*

**85.** This sworn testimony constitutes a categorical disavowal, not a recantation, and directly contradicts the foundational representation in Investigator Reamer's April 7, 2025 arrest-warrant affidavit that she relied on an "affidavit written by Cody." Cody's testimony establishes that the

purported affidavit was either not authored by him, not signed by him, improperly procured, or

falsely attributed to him, and therefore could not reasonably support probable cause.

Notwithstanding this sworn disavowal—heard firsthand by County Attorney Jonathan Amdur—

the prosecution of Plaintiff continued for months thereafter without correction of the record.

86.     Most significantly, Assistant County Attorney Jonathan Amdur—who questioned Cody

under oath—did not challenge, clarify, or correct this testimony, despite knowing that:

1.  The County Attorney's Office had previously forwarded "Cody affidavits" to Investigator
    Reamer;

2.  These alleged affidavits were being used to justify a first-degree felony warrant against
    Plaintiff; and

3.  The validity of these documents was essential to sustaining the charge.

87.     By allowing the contradictory testimony to remain uncorrected in the official record,

Amdur effectively conceded that the County lacked any genuine, verified affidavit from Cody.

This failure violates the constitutional obligation, recognized in *Franks v. Delaware*, *Napue v.*

*Illinois*, and *Mooney v. Holohan*, not to use or rely upon information known or suspected to be

false, misleading, or fabricated.

88.     Moreover, if Cody Lane Koelle's sworn testimony on June 18, 2025—denying that he

ever wrote or signed any affidavits—were untrue, then such testimony would constitute perjury

under oath, further confirming that Cody Lane Koelle was a demonstrably unreliable witness

whose statements could not reasonably be credited. Critically, this risk was entirely foreseeable.

Defendants had been warned weeks earlier of Cody Lane Koelle's documented history of false

statements to law enforcement and impersonation of a police officer, yet nevertheless permitted

him to testify without challenge, clarification, or impeachment and continued the prosecution despite the collapse of the affidavits' credibility. Whether Cody Lane Koelle was telling the truth on June 18 or lying under oath, Defendants were on notice that his statements—past or present—were inherently unreliable and could not support probable cause.

89.    This contradiction is fatal to the arrest-warrant affidavit under any interpretation. If Cody Lane Koelle did not sign or write the affidavits attributed to him, then Investigator Reamer relied on fabricated or misattributed documents that no reasonable officer would treat as trustworthy—particularly after having been explicitly warned in advance of Cody Lane Koelle's history of false statements to law enforcement. Conversely, if Cody Lane Koelle did in fact sign those affidavits but later testified under oath that he never wrote or signed "any" affidavit, including those purportedly supporting Michael Allen Walker, then Cody Lane Koelle demonstrated a willingness to provide false testimony under oath, rendering him so unreliable that no reasonable officer or prosecutor could rely on his statements to establish or maintain probable cause. In either scenario, Defendants' decision to proceed—before and after June 18, 2025—was objectively unreasonable, and the continued prosecution despite this known and foreseeable unreliability violated Plaintiff's Fourth and Fourteenth Amendment rights.

90.    Under either version of events, Cody's credibility collapses entirely:

- If he lied in the affidavits, the warrant was based on false information.

- If he lied in court, the warrant relied on a witness who perjures himself.

- If both are true, the County relied on a demonstrably unstable, contradictory, and unreliable witness whose statements cannot satisfy the constitutional requirement of "reasonably trustworthy information." (*Beck v. Ohio*, 379 U.S. 89 (1964)).

35

91.     Despite this, the County continued to rely on Cody's purported statements to prosecute Plaintiff. The knowing use of contradictory, unverified, and unreliable testimony shows reckless disregard for the truth, satisfies the *Franks* standard for invalidating a warrant, and reveals systemic deficiencies in investigative and supervisory practices. It also strengthens Plaintiff's Monell allegations by demonstrating that the County, through its prosecuting authority, knowingly accepted and ratified false or suspect evidence in felony charging decisions.

92.     Despite personally witnessing Cody's June 18, 2025 sworn testimony denying that he had ever written or signed any affidavit—including those relied upon to obtain Plaintiff's arrest— Assistant County Attorney Jonathan Amdur continued to pursue the prosecution against Plaintiff for more than six additional months, without presenting the case to a grand jury and without granting Plaintiff's repeatedly requested examining trial to test the existence of probable cause. During this period, Amdur and the County Attorney's Office possessed overwhelming evidence demonstrating Plaintiff's innocence, including Cody's recantations, contradictory affidavits, the March 18, 2025 recorded admission of prosecutorial pressure, and Plaintiff's medical and mobility documentation proving the allegations were physically implausible. Yet, despite this mountain of exculpatory evidence and their constitutional obligation to refrain from pursuing charges unsupported by probable cause, county prosecutors allowed the case to remain pending, leaving Plaintiff under restrictive bond conditions, deprived of his rights, and subjected to ongoing injury. This prolonged inaction and refusal to correct known evidentiary defects constitutes deliberate indifference to Plaintiff's constitutional rights and further supports municipal liability under *Monell*.

93.     **Critical Analysis of Statement in Arrest Warrant Affidavit:**

*"Included in the file is an affidavit from Cody's wife, Andy. Andy stated Cody and her are in fear*

*of Jamie's family. Andy advised they are afraid the family will retaliate if they did not cooperate*

*with their demands and call Child Protection Services on the couple."*

**1. The statement is irrelevant to Plaintiff and does not allege any conduct by him, rendering its inclusion improper and constitutionally meaningless.**

**94.**    This statement does not mention Plaintiff by name, does not describe any conduct by Plaintiff, and does not attribute any threat, communication, action, or wrongdoing to him. It is a generalized accusation directed vaguely at "the family," which cannot constitutionally be used to establish individual probable cause for a first-degree felony arrest. The Fourth Amendment requires particularized suspicion—specific facts showing that *the person named in the warrant* committed a specific offense. (*Ybarra v. Illinois*, 444 U.S. 85 (1979)). Blanket emotional accusations against "the family" cannot satisfy that requirement, yet Investigator Reamer improperly inserted this irrelevant statement into a warrant affidavit for Plaintiff.

**2. The allegation is purely emotional, speculative, and subjective—NOT a factual basis for probable cause.**

**95.**    Fear is not evidence. Emotional reactions do not create probable cause. Courts have repeatedly held that:

- subjective fear,

- speculation,

- anticipation of retaliation,

- or general distrust

**96.**    cannot justify a criminal warrant.

**97.**    Here, Andrea Martin expresses a feeling, untethered to dates, events, actions, communications, or any conduct by Plaintiff. The affidavit does not explain:

- who supposedly made the "demands,"

- what the "demands" were,

- when they occurred,

- what was said,

- whether Plaintiff participated,

- whether anyone threatened Andrea,

- or whether CPS was ever contacted by any family member.

**98.**    This is probable cause by rumor, which is unconstitutional.

**3. Phone records prove Plaintiff never contacted Andrea, never threatened CPS involvement, and never contacted CPS regarding any individual—destroying the reliability of this statement.**

**99.**    The statement is directly contradicted by **objective evidence**:

- Phone logs show Plaintiff never called Andrea.

- Phone logs show Plaintiff never called CPS.

- There is no documentation—texts, emails, calls, letters—linking Plaintiff to any threat or CPS-related communication.

- Plaintiff has never contacted CPS in his life regarding any individual.

**100.**    The U.S. Supreme Court has held that officers violate the Fourth Amendment when they ignore readily available exculpatory evidence. (*Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999)). Here, Reamer had access to phone records showing no communication whatsoever between Plaintiff and Andrea, yet she included Andrea's statement anyway, knowing it could not implicate Plaintiff in any way.

This is **reckless disregard for the truth** under *Franks v. Delaware*.

**4. Andrea and Cody were already under active CPS investigation—likely initiated by hospital personnel—not by Plaintiff or any family member.**

**101.**    At the time Andrea made this statement, she and Cody were already subjects of **child welfare investigations** in both Texas and Kansas. These referrals were:

- not filed by Plaintiff,

- and were likely filed by medical or hospital personnel following concerns about:

    o    low child weight,

    o    signs of malnutrition,

    o    poor hygiene, and

    o    environmental neglect.

**102.**    Thus, Andrea's fear of CPS intervention had nothing to do with Plaintiff, and was based on objective conditions in her household—not on any threat from any member of Jamie Walker's family.

**103.** Yet Investigator Reamer presented this emotional, irrelevant statement as though it had probative value against Plaintiff, omitting the critical context that CPS involvement had nothing to do with the Roden family.

This omission is materially misleading.

**5. The statement constitutes impermissible hearsay-upon-hearsay and cannot be used to support probable cause for a felony arrest.**

**104.** Reamer did not interview Andrea.

**105.** She did not obtain a sworn statement directly from her.

**106.** She relied on a document "included in the file," meaning:

- it may have originated from Michael Walker's defense counsel,

- may not have been signed contemporaneously,

- may not have been signed voluntarily,

- and may never have been authenticated.

**107.** This is hearsay-upon-hearsay, exactly the type of unreliable layering prohibited by *Aguilar-Spinelli* standards and condemned under *Franks*. No reasonable officer would view a third-hand emotional statement as establishing probable cause for a first-degree felony.

**6. Including this statement in Plaintiff's arrest affidavit shows deliberate padding to compensate for the absence of any real evidence against him.**

**108.** Because Reamer had:

- no recordings,

- no calls,

- no messages,

- no threats,

- no witnesses,

- no admissions,

- no travel by Plaintiff,

- no contact between Plaintiff and Andrea,

- no evidence linking Plaintiff to any criminal act,

**109.**   she improperly inserted irrelevant background noise to give the illusion of supporting context.

**110.**   Courts view this as an indicator of reckless or intentional deception. (*Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000)). It shows that Reamer lacked real evidence and instead resorted to:

- vague fears,

- emotional speculation,

- generalized accusations,

- and irrelevant narrative filler.

**111.**   This violates the Fourth Amendment.

**112.**   **Critical Analysis of Statement in Arrest Warrant Affidavit:**

"*I was advised by Guadalupe County Attorney's Office that Cody had told them* repeatedly that the Defendant stated he would call Child Protective Services on him and have his children removed if he did not side with Jamie and sign the affidavits that had been sent to them."

**1. The statement is triple-layer hearsay and cannot constitutionally support probable cause.**

113.    The sentence admits that the information did *not* come from Cody, did *not* come from a witness, and did *not* come from any direct communication—but from:

1.  **Cody allegedly told the County Attorney's Office**, and

2.  **the County Attorney's Office then told Investigator Reamer**, and

3.  **Reamer then told the magistrate.**

114.    This is hearsay-upon-hearsay-upon-hearsay, with each layer introducing distortion, bias, and unreliability.

115.    Probable cause cannot be based on telephone-game accusations.

116.    The Supreme Court's standard is "reasonably trustworthy information." (*Beck v. Ohio*).

117.    This is the opposite.

- Reamer conducted *no* independent verification.

- She did *not* speak to Cody.

- She did *not* obtain a sworn statement.

- She did *not* interview Plaintiff.

- She did *not* review communication logs showing Plaintiff never contacted Cody.

118.    The statement therefore fails on its face as a basis for probable cause.

**2. The allegation omits critical context regarding CPS involvement.**

119.    At the time of this claim, Cody and Andrea were already under investigation by Child Protective Services in both Texas and Kansas, likely triggered by hospital personnel due to:

- Low child weight,

- Malnutrition concerns,

- Poor hygiene,

- Environmental neglect.

120.    None of these referrals were initiated by Plaintiff or Plaintiff's family. Investigator Reamer omitted this essential context and instead presented Andrea's allegation as though CPS involvement resulted from threats by Plaintiff or his family. This is a material omission that misled the magistrate and violated the requirements of *Franks*.

**3. The allegation demonstrates a complete failure to conduct an independent investigation.**

121.    Investigator Reamer:

- Did not request phone logs,

- Did not obtain text messages,

- Did not interview Cody,

- Did not interview Plaintiff,

- Did not interview any witness,

- Did not confirm whether Plaintiff had the physical ability to make or carry out any threat,

- Did not corroborate any part of the allegation.

**122.**    Instead, she relied exclusively on statements relayed by the County Attorney's Office—statements that Cody later contradicted under oath, and which were unsupported by any documentary evidence. Such omissions reflect a constitutionally deficient investigation and violate the standard set forth in *Malley v. Briggs*.

**4. The statement does not establish any element of witness tampering under Texas law.**

**123.**    Texas Penal Code § 36.05 requires evidence of:

1. A knowing communication,

2. Intent to unlawfully influence testimony or participation in an investigation,

3. A nexus to an official proceeding or report.

**124.**    The statement fails to establish:

- any communication from Plaintiff to Cody,

- any threat,

- any intent tied to testimony or evidence,

- any connection to an official proceeding,

- any act by Plaintiff whatsoever.

**125.**    The allegation is therefore legally insufficient to constitute probable cause for witness tampering.

**5. The statement reflects an attempt to manufacture the appearance of probable cause where none existed.**

**126.**    Reamer lacked:

- recordings,

- messages,

- witnesses,

- corroboration,

- physical evidence,

- motive evidence,

- and any direct statement by Plaintiff.

**127.**    The unsupported accusation that Plaintiff threatened CPS involvement appears to be narrative padding used to justify a warrant lacking substantive evidence. Courts view such padding as evidence of reckless or intentional disregard for constitutional requirements (*Wilson v. Russo*).

**128.    Critical Analysis of Statement in Arrest Warrant Affidavit:**

*"My name is Elaine M. Reamer, the Affiant, and I am commissioned as a peace officer by the Guadalupe County Sheriff's Office, currently assigned to the Criminal investigation Division as an investigator. I currently have 16 years' law enforcement experience, over 3000 hours of TCOLE training hours and hold a Master TCOLE License."*

**129.**    Investigator Reamer began her affidavit by emphasizing her credentials—"16 years' law-enforcement experience," "over 3,000 hours of TCOLE training," and possession of a "Master TCOLE License"—presumably to assure the magistrate that the information presented was reliable, professionally vetted, and the product of a competent investigation. Yet the defects revealed throughout the body of the affidavit demonstrate the opposite: despite extensive training and experience, Investigator Reamer failed to perform even the most elementary investigative steps required of a reasonably well-trained officer. She relied entirely on triple-layer hearsay supplied by adversarial sources, omitted readily available exculpatory facts, failed to verify the authorship or authenticity of affidavits she attributed to a key witness, ignored sworn contradictions that destroyed witness credibility, mischaracterized CPS involvement, and included statements unrelated to Plaintiff that could not legally establish probable cause. No interviews were conducted, no phone or communication records were reviewed, no corroboration was sought, and no assessment was made of Plaintiff's medical limitations or the physical implausibility of the alleged conduct.

**130.**    These failures are not the mistakes of an inexperienced officer—they are the actions of someone who knew or should have known that the affidavit lacked probable cause under established constitutional standards. With the training and experience Reamer claims, she would have been aware that: (1) hearsay-upon-hearsay from a demonstrably unreliable witness cannot support a felony warrant; (2) material omissions regarding witness credibility, medical limitations, prior CPS investigations, and contradictory sworn statements violate *Franks v. Delaware*; (3) allegations lacking a nexus to statutory elements cannot establish probable cause; and (4) a warrant cannot be constitutionally supported by speculation, fears, general family accusations, or unverified rumors. Her extensive training therefore heightens—rather than

excuses—her responsibility for these constitutional violations. By presenting an affidavit built on unverified allegations, contradictions, omissions, and unreliable sources, and by doing so under the guise of professional expertise, Investigator Reamer misled the magistrate and acted with reckless disregard for the truth, rendering the arrest warrant constitutionally invalid.

### Venue and Place Defect in the Arrest-Warrant Affidavit

**131.    Affidavit language:**

"On or about November 2024 to March 2025, *in Guadalupe County, Texas*, did then and there commit the offense of Tampering with a Witness…"

### 1. The affidavit asserts venue as a legal conclusion without alleging a single fact establishing place

**132.**    The affidavit declares that the alleged offense occurred "in Guadalupe County, Texas," but pleads **no factual allegations** explaining *how* or *where* any act by Plaintiff took place in that county. The affidavit does not allege:

- that Plaintiff was physically present in Guadalupe County during the relevant period;

- that any in-person encounter occurred in Guadalupe County;

- that any alleged communication originated from, was received in, or passed through Guadalupe County; or

- the method of communication by which venue could be assessed (phone, text, email, or otherwise).

**133.**    A magistrate cannot determine probable cause for venue based on a conclusory geographic label untethered to underlying facts. Venue must be supported by factual allegations, not assumed.

**2. Neither Plaintiff nor Cody Lane Koelle resided in Guadalupe County during the relevant period**

**134.**    At all relevant times:

- Plaintiff resided in Galveston County, Texas, more than 200 miles from Guadalupe County, and suffered from severe medical and mobility limitations that materially restricted travel.

- Cody Lane Koelle resided in Ford County, Kansas, not Guadalupe County Texas.

**135.**    The affidavit does not allege that either individual was present in Guadalupe County when the alleged conduct occurred. Absent such facts, the assertion that the offense occurred "in Guadalupe County" lacks any factual foundation.

**3. The affidavit does not allege where the alleged "contacting" occurred**

**136.**    The affidavit's venue assertion is especially defective because it does not identify the location of the alleged act. Even if the theory were that venue could be based on a communication offense, the affidavit fails to allege:

- where Plaintiff was located at the time of the alleged communication;

- where Cody was located when the alleged communication was received; or

- any facts connecting the alleged act of "contacting" to Guadalupe County as opposed to Plaintiff's or Cody's actual locations.

48

**137.** Without such allegations, the magistrate had no factual basis to conclude that any element of the offense occurred in Guadalupe County.

**4. The affidavit improperly conflates venue with the location of an underlying proceeding**

**138.** The affidavit references an "official proceeding" pending in Guadalupe County and then asserts that the offense occurred "in Guadalupe County," without alleging facts showing that the *conduct* giving rise to the charge occurred there.

**139.** Venue for a criminal offense is based on the location of the defendant's alleged acts, not merely the county in which a related case is pending. The affidavit does not explain how the existence of a proceeding in Guadalupe County establishes that Plaintiff committed any act in that county.

**5. Cody Lane Koelle was not a witness until March 18, 2025, and had no firsthand knowledge of the underlying offenses**

**140.** Cody Lane Koelle did not qualify as a "witness" for purposes of Texas Penal Code § 36.05 during the majority of the period alleged in the arrest-warrant affidavit. Under Texas law, a person is considered a witness only if they have been summoned, are expected to testify, or possess firsthand knowledge relevant to an official proceeding. The affidavit alleges conduct beginning as early as November 2024; however, Cody was not identified, designated, or treated as a witness in any official proceeding until March 18, 2025. Prior to that date, no summons, subpoena, designation, or formal request for testimony existed that would confer witness status under the statute.

**141.** Moreover, Cody lacked firsthand knowledge of the alleged offenses involving Michael Allen Walker or Jamie Renee Walker. He was neither an eyewitness nor a fact witness to any

charged conduct. At most, Cody functioned as a character witness offering generalized statements, which does not satisfy the statutory requirement that the individual be a witness with relevant factual knowledge tied to an official proceeding. The affidavit does not explain how Cody could be tampered with as a witness before he had legal witness status, nor does it reconcile this statutory requirement with its assertion that tampering occurred months earlier. This failure to establish witness status during the relevant timeframe further undermines probable cause and demonstrates that the affidavit relied on conclusory assumptions rather than legally sufficient facts.

**6. The venue allegation deprived the magistrate of the ability to make an independent probable-cause determination**

142.    By asserting "in Guadalupe County, Texas" without alleging supporting facts, the affidavit substituted a legal conclusion for the factual showing required under the Fourth Amendment. A neutral magistrate could not independently evaluate venue, place, or jurisdiction because the affidavit supplied no facts addressing:

- where Plaintiff acted,

- where the alleged communication occurred, or

- how Guadalupe County was connected to the alleged conduct.

143.    This omission is material. Had the affidavit disclosed that Plaintiff lived in Galveston County Texas, Cody lived in Ford County Kansas, and no facts placed either individual in Guadalupe County Texas at the time of the alleged act, a reasonable magistrate could not have concluded that venue was established.

### E. Absence of Judicial Verification and Irregular Use of Multiple Judges in a Single Arrest Sequence

**144.**    Plaintiff's arrest warrant was purportedly authorized on April 7, 2025 by Judge William Old. Judge Old was not the presiding judge over the underlying criminal matters involving Michael Allen Walker or Jamie Renee Walker, both of which were assigned to other district courts within Guadalupe County.

**145.**    Jamie Renee Walker's case was pending in the 274th Judicial District Court and overseen by Judge Gary Steel. A bond hearing at which Shelby Jane Koelle was scheduled to testify on April 7, 2025. That hearing did not proceed. Instead, on that same date, arrest warrants were executed against multiple members of the Roden family.

**146.**    Two days earlier, on Saturday, April 5, 2025, Judge Crawford of the 2nd 25th Judicial District Court signed an arrest warrant charging Jamie Renee Walker with 1st degree felony witness tampering *(See Exhibit A-012).* On Monday, April 7, 2025, separate arrest warrants charging Plaintiff and his son James Louis Roden Jr. were allegedly signed by Judge Old in the 25th District Court. *(See Exhibit A-001 and A-003)* Thus, two different judges—Judge Crawford, and Judge Old—were utilized in rapid succession to effectuate arrests arising from the same underlying factual narrative, despite none of the warrants being tied to 274th District Court Judge Steel actually overseeing the principal criminal proceedings. Had the warrant application been presented to Judge Steel—the sitting judge in the 274th District Court with jurisdiction over the related proceedings—the court would have possessed contemporaneous access to material records that undermined, and in some instances directly refuted, the factual assertions offered by Officer Reamer in support of probable cause as it relates to Plaintiff and his son James Louis Roden Jr 1st degree felony tampering charge.

**147.**    Plaintiff does not allege that the mere involvement of multiple judges was unlawful in isolation. Rather, the concern arises from the highly irregular fragmentation of judicial involvement across multiple courts within a compressed time frame, involving a single family and a single underlying matter. This fragmentation occurred over the course of a single weekend and culminated in coordinated arrests on the very day a scheduled bond hearing was abruptly canceled—an appearance at which exculpatory testimony was anticipated. Notably, Shelby Jane Koelle, the firsthand victim and material witness, was scheduled to testify regarding ongoing abuse she suffered while in the care of Cody Lane Koelle. Despite her central evidentiary role, Shelby was afforded no logistical support to appear, while Cody—whose credibility was disputed—was provided air travel, lodging, meals, and transportation at County expense. This sequence of events, viewed collectively, raises substantial concerns that procedural mechanisms were employed in a manner that insulated the warrant process from contradictory evidence and facilitated a predetermined outcome rather than a neutral judicial assessment.

**148.**    After his arrest, Plaintiff and his son sought to verify the judicial authorization underlying the April 7, 2025 arrest warrant. On June 11, 2025, Plaintiff's son submitted written requests—by email and certified mail—pursuant to Rule 12 of the Texas Rules of Judicial Administration to the Guadalupe County District Clerk, seeking records reflecting how and when Judge Old reviewed, approved, or signed the arrest-warrant affidavit. *(See Exhibit B-031)*

**149.**    The District Clerk's Office responded that it possessed no records showing when or how the arrest warrant was reviewed, routed, approved, or signed. No affidavit of probable cause bearing judicial annotations, no signature-verification documentation, no filing metadata, no routing logs, and no administrative records were produced. The Clerk further stated that no case number had ever been associated with the warrant. In addition, through a Public Information Act

request dated May 14, 2025, Plaintiff and his son sought copies of the arrest-warrant affidavit and related authorization records from both the Guadalupe County Sheriff's Office and the Guadalupe County Attorney's Office. Each agency responded that it possessed no arrest-warrant affidavit or related judicial authorization records for Plaintiff. *(See Exhibit B-031)*

150.    Prior to the June 11, 2025 record requests and the May 14, 2025 Public Information Act responses, Defendants had already been placed on notice of their obligation to preserve evidence relating to Plaintiff. On May 5, 2025, Defendants received a written preservation-of-evidence notice demanding that all documents, communications, recordings, metadata, and electronically stored information relating to the arrest of James Louis Roden Jr — including materials relating to Plaintiff — be preserved. The preservation notice was transmitted to the Guadalupe County Attorney's Office, the Guadalupe County Sheriff's Office, and other court-related officials, and the Sheriff's Office acknowledged the preservation obligation the following day. *(See Exhibit E-017).*

151.    As a result, there is no documentary evidence establishing that Judge Old conducted a neutral probable-cause review of the affidavit, nor is there any record demonstrating when such review allegedly occurred, how the warrant was transmitted, or by what method judicial authorization was memorialized.

152.    These omissions are significant because arrest warrants for first-degree felonies ordinarily generate traceable judicial records reflecting review, approval, and filing. Such records serve as constitutional safeguards, ensuring that the decision to deprive an individual of liberty results from a detached and deliberate judicial determination rather than executive action alone.

**153.**    The absence of any verifiable record of judicial review is especially concerning given the facial deficiencies of the arrest-warrant affidavit itself, including its reliance on unverified hearsay, omission of material exculpatory facts, and failure to allege conduct occurring within the county of issuance. A reasonably experienced magistrate would ordinarily identify and question such defects before authorizing a warrant. In the absence of any such record, Plaintiff was seized and subjected to felony restraints without verifiable compliance with the Fourth Amendment's requirement that a neutral magistrate actually determine probable cause prior to arrest

**154.**    Taken together, the use of multiple judges across different courts for arrests arising from a single factual narrative, the timing of those arrests relative to a canceled bond hearing and mandated sexual abuse report of Shelby Jane Koelle just 6 days earlier with no investigation, and the complete lack of documentation verifying Judge Old's review and authorization of Plaintiff's warrant demonstrate a breakdown in the ordinary judicial safeguards required by the Fourth Amendment.

**155.**    At minimum, these facts establish that Plaintiff's arrest was effectuated without demonstrable proof that a neutral judicial officer conducted the constitutionally required probable-cause review. This absence of verification supports Plaintiff's claims that the arrest resulted from systemic procedural failures rather than a lawful and deliberate judicial determination.

### An Arrest Untethered to Probable Cause

**156.**    The deficiencies in the arrest-warrant affidavit present a grave and unavoidable concern. Investigator Elaine Reamer—an officer with more than sixteen years of law-enforcement

experience, over 3,000 hours of training, and Master TCOLE certification—executed an arrest-warrant affidavit built almost entirely on unverified hearsay and documents funneled through the criminal defense attorney for Michael Allen Walker, the individual accused of sexually assaulting Plaintiff's intellectually disabled granddaughter. A reasonably competent investigator with Reamer's training and rank would know that statements originating from an adverse party's defense counsel are inherently suspect, require heightened scrutiny, and cannot lawfully establish probable cause without independent verification. Compounding this defect, Reamer relied on statements attributed to Cody Lane Koelle—a known criminal with a documented history of making false statements to law enforcement and impersonating a police officer—facts known to the County prior to Plaintiff's arrest. Despite these red flags, Reamer adopted the materials wholesale while repeatedly distancing herself from their substance through disclaimers such as "I was advised," "documentation was sent to me," and "included in the file," signaling that she neither authored, witnessed, investigated, nor verified the allegations she swore to under oath.

157.    Rather than conducting even the most basic investigative steps, Reamer insulated herself from responsibility for every material factual assertion in the affidavit. She cited no interviews, no phone or communication records, no signature verification, no credibility assessments, no travel or location analysis, and no corroborating evidence of any kind. Instead, nearly every allegation was attributed to third parties—principally the Guadalupe County Attorney's Office and the defense attorney for an accused sexual offender. A competent investigator would have verified authorship of affidavits, examined phone records (which later confirmed that Plaintiff never contacted Andrea Martin Koelle, CPS, or Cody Lane Koelle prior to Cody being summoned as a witness), interviewed relevant witnesses, and reconciled obvious contradictions. Reamer did none of these things. Instead, she executed an affidavit structured to shift

responsibility for its factual content onto others, while leveraging her credentials to create the false appearance of investigative legitimacy.

158.    The resulting affidavit reflects not an independent law-enforcement investigation, but a pass-through narrative constructed by third parties, accepted without scrutiny and presented to a magistrate stripped of critical context. By relying exclusively on unverified statements from prosecutorial sources and defense counsel—and on assertions attributed to a witness whose credibility was already compromised by prior criminal conduct involving false statements to police—Reamer abandoned fundamental investigative protocol. This abdication conveniently diverted scrutiny away from the County's own documented failures, including its role in placing S.J.K. in an unsafe environment where she was again exploited and became pregnant; its mishandling of contradictory affidavits from Cody Lane Koelle; ongoing CPS investigations involving Cody and Andrea; and the significant liability exposure triggered when Plaintiff's son, a mandated reporter, submitted an April 1, 2025 report detailing new exploitation of S.J.K. while under County supervision. The affidavit thus served as a mechanism to advance a predetermined narrative rather than a good-faith effort to establish probable cause, in violation of the Fourth and Fourteenth Amendments.

159.    These concerns become exponentially more alarming considering the charge selected. Plaintiff was arrested for First-Degree Felony Witness Tampering, an offense punishable by up to 99 years in prison and a minimum of five years—effectively a death sentence for a 77-year-old, wheelchair-bound veteran with cardiac disease, cancer diagnoses, and severe mobility limitations. First-degree felony charges represent a vanishingly small fraction of criminal prosecutions nationwide and are ordinarily reserved for the most egregious acts of violence against the most vulnerable such as children, the disabled, the elderly. The decision to impose the

highest charge available under the statute—without interviews, verification, or evidence—demonstrates a staggering departure from professional norms and raises the reasonable inference that the charge was not the product of investigative judgment, but rather the product of retaliation, coordination, or institutional self-protection.

160.     Finally, these unusual drafting choices raise systemic concerns regarding the County Attorney's Office's improper role in shaping or directing a law-enforcement affidavit. Under Texas law, the duty to investigate alleged criminal conduct rests squarely with law-enforcement officers—not prosecutors. Texas Code of Criminal Procedure articles 2.01 and 2.13 delineate the respective roles of prosecutors and peace officers, assigning to peace officers the obligation to preserve the peace, investigate criminal activity, collect facts, identify witnesses, and determine whether probable cause exists based on independent law-enforcement inquiry. Prosecutors, by contrast, are advocates—not investigators—and are prohibited from manufacturing probable cause or substituting legal strategy for factual investigation.

161.     Federal constitutional law reinforces this separation of roles. The Fourth Amendment requires that probable cause be established through a neutral, factual presentation grounded in objective investigative work by law enforcement, not through unverified assertions, prosecutorial narratives, or strategic omissions. Courts have repeatedly held that an officer violates clearly established law when she submits or adopts an affidavit that merely parrots prosecutorial claims, incorporates unsworn or contradictory statements without verification, or omits readily available exculpatory information—particularly where those omissions are material to the probable-cause determination. An officer may not act as a passive conduit for a prosecutor's theory while disclaiming investigative responsibility; doing so transforms the warrant process into a rubber-stamp exercise incompatible with the Fourth Amendment.

**162.**     Against this legal backdrop, the arrest-warrant affidavit is fundamentally suspect. Rather than reflecting an independent law-enforcement investigation, the affidavit functioned as a repository of unverified assertions attributed to prosecutors and defense counsel, repeatedly employing distancing language that disclaimed factual ownership and investigative responsibility. The affidavit reflects no meaningful investigative effort by Sergeant Reamer, relies on contradictory and demonstrably unreliable witnesses, fails to contact even the alleged complainant, and omits material exculpatory facts known to the County—most notably the mandated abuse report submitted just six days before the arrest. These cumulative defects are inconsistent with mere negligence or oversight. Taken together, they support a reasonable inference that the affidavit was constructed not to present an objective assessment of probable cause, but to lend formal legitimacy to a predetermined outcome generated outside the bounds of lawful law-enforcement procedure.

**163.**     Taken together, these defects cannot be dismissed as oversight or inexperience. They reflect a fundamental departure from constitutionally required investigative standards and raise profound concerns regarding motive, coordination, and the County's broader unlawful practices. In this context, the affidavit reads less like an investigative document and more like a mechanism to justify a retaliatory first-degree felony arrest at the precise moment when County officials faced potential liability for their own failures to protect a vulnerable adult.

### D. Arrest, Bond Conditions, and Required Supervision Trips

**164.**     Following issuance of the warrant, Plaintiff—a 77-year-old, wheelchair-bound Army veteran with severe cardiac disease, neuropathy, cancer diagnoses, and limited mobility—was arrested and charged with first-degree felony witness tampering, a charge carrying five to ninety-nine years in prison. Given Plaintiff's age and medical condition, the charge functioned as a de

58

facto death sentence, imposed without any corroboration, evidence of communication, or investigative effort establishing probable cause.

**165.**    Plaintiff's bond was preset at $100,000, a sum far exceeding reasonable parameters for a nonviolent allegation involving a medically fragile defendant with no criminal history. The bond paperwork further listed both Cody Lane Koelle and S.J.K. as alleged victims—even though the arrest-warrant affidavit did not mention S.J.K. at all, signaling that the County applied boilerplate victim designations unrelated to the evidence for the purpose of inflating the perceived severity of the accusation.

**166.**    As a condition of release, Plaintiff was required to:

**a.**    surrender his only home-defense firearm, despite living with mobility impairments that prevent him from fleeing or defending himself;

**b.**    abstain from all alcohol consumption, including the nightly single drink he shared with his wife as part of a long-standing family routine;

**c.**    comply with strict geographic restrictions that effectively confined him to his home; and

**d.**    report in person to a bond-supervision officer located in Seguin, Texas—more than 200 miles away.

**167.**    Plaintiff promptly submitted ADA Title II accommodation requests explaining that he was medically unable to undertake long-distance travel due to cardiac disease, neuropathy, mobility impairment, and physician-imposed restrictions. He requested remote reporting or locally accessible supervision—modifications that were routinely available for similarly situated individuals with mobility limitations. Although limited accommodation in the form of telephone check-ins was eventually permitted months later, the County did not provide any accommodation during the initial and critical period of supervision. During that time, Plaintiff was required to

complete repeated in-person check-ins in Seguin despite the County's notice of his medical limitations and supporting documentation.

168.   As a result, Plaintiff was forced to undertake multiple 8-hour round-trip journeys from League City to Seguin—journeys that caused severe pain, medical distress, and physical risk. These trips consisted of brief in-person check-ins lasting only minutes, offering no legitimate public-safety benefit. Each trip exposed Plaintiff and other motorists to substantial danger, given his age, health, limited mobility, and significant medical contraindications to extended travel. The County's inital refusal to provide accommodations—despite explicit requests and clear medical necessity—constituted not only deliberate indifference to Plaintiff's health and safety but also a continuing ADA violation that compounded the injuries stemming from his unlawful arrest.

169.   The bond conditions, the refusal to accommodate Plaintiff's disabilities, and the requirement of repeated long-distance travel collectively imposed unreasonable, punitive, and dangerous burdens on an elderly, medically fragile individual who had never been interviewed, contacted, or investigated prior to being charged with a first-degree felony. These conditions served no legitimate governmental interest and instead functioned as an extension of the unconstitutional seizure initiated by an affidavit lacking probable cause.

### County-Directed Charging Decisions and Preset Bonds as Evidence of an Unconstitutional Policy or Practice

170.   The arrest warrants executed against Plaintiff and his father did not arise from an independent law-enforcement investigation. By Sergeant Reamer's own sworn admissions within the arrest-warrant affidavits, the purported evidentiary basis for the charges originated almost

60

entirely from the Guadalupe County Attorney's Office and defense counsel associated with the accused rapist, rather than from investigative work conducted by law enforcement. The affidavits contain no indication that Sergeant Reamer independently interviewed witnesses, verified allegations, evaluated credibility, or contacted either Plaintiff or his father prior to seeking 1st degree felony warrants. Instead, the affidavits functioned as vehicles for transmitting prosecutorial narratives and third-party assertions into the warrant process.

171.    This prosecutorial dominance over the charging decision was accompanied by the imposition of preset felony bonds of $100,000 for each arrestee, resulting in a combined financial restraint approaching a quarter of a million dollars. These bonds were imposed uniformly, without individualized assessment, against two public servants with no criminal history, no flight risk, no allegations of violence, and no danger to the community. No pre-arrest notice was provided, no opportunity to respond was afforded, and no neutral evaluation of risk factors occurred before liberty-restricting conditions were imposed.

172.    Under both Texas law and federal constitutional principles, the investigation of alleged criminal conduct is a core function of law enforcement, while prosecutors serve as advocates within the judicial process—not as substitutes for factual investigation. The deliberate reliance on prosecutor-supplied assertions, combined with the absence of any independent law-enforcement inquiry, reflects a departure from established investigative norms and demonstrates that the County Attorney's Office effectively controlled the initiation and scope of the criminal proceedings. This arrangement deprived the warrant process of its constitutionally required function as a neutral safeguard against unfounded prosecutions.

173.    The pattern reflected here is not isolated to a single affidavit or officer. The coordinated timing of the arrests, the uniform preset bond amounts, the absence of individualized

assessments, and the reliance on prosecutorial sourcing rather than investigative fact-gathering demonstrate a County-level practice of directing arrests and bond outcomes through prosecutorial channels rather than through independent law-enforcement judgment. Such conduct is consistent with an institutional policy or custom whereby the County Attorney's Office exercises de facto control over charging decisions and pretrial restraints, with law-enforcement officers acting as formal signatories rather than independent investigators.

**174.**    This practice had predictable and intended consequences. By converting the warrant process into an administrative formality and imposing severe financial and liberty restraints without investigation or individualized justification, Guadalupe County used its prosecutorial authority as a tool to punish and deter members of the rape victim's family who had engaged in protected advocacy and reporting. The resulting arrests and bonds were not the product of neutral law enforcement but of a County-directed mechanism designed to secure a predetermined outcome.

**175.**    These facts establish that the constitutional injuries suffered by Plaintiff and his son were not caused by a single officer's error, but by an official policy, widespread practice, or decision attributable to Guadalupe County itself. The County's actions were the moving force behind the violations that followed, rendering the resulting deprivations of liberty and due process traceable to municipal decision-making rather than individual misconduct alone.

**E. Internal Affairs Complaint** *(See Exhibit L-008)*

**176.**    Following his arrest, Plaintiff submitted a comprehensive Internal Affairs ("IA") complaint to the Guadalupe County Sheriff's Office ("GCSO"), formally placing the agency on actual notice that Investigator Elaine Reamer's arrest-warrant affidavit contained material

inaccuracies, investigative omissions, and factual improbabilities. The complaint explained that the affidavit's allegations could not be reconciled with Plaintiff's medical limitations, mobility impairments, communication history, or physical ability to travel.

177.    Plaintiff detailed that Cody Lane Koelle lived in Kansas during the relevant period and that only two phone calls occurred between Plaintiff and Cody between November 2024 and April 2025—both initiated by Cody, with Plaintiff returning one missed call. One call in February 2025 was simply to wish Plaintiff a happy birthday; the second, in March 2025, involved Cody asking Plaintiff for money to retrieve his vehicle from impound. At no point during either call did Plaintiff threaten Cody, mention court proceedings, attempt to influence testimony, or engage in any conduct remotely associated with witness tampering. These facts— verifiable through phone records—directly contradicted the narrative presented in Reamer's affidavit.

178.    Plaintiff also informed Internal Affairs that his severe mobility impairments, dependence on assistive devices, cardiac and neuropathic conditions, and physician-imposed travel restrictions made any travel to Guadalupe County physically implausible during the period alleged in the warrant. Plaintiff had no ability to walk unassisted, no capacity for long-distance travel.

179.    The IA complaint further identified that Investigator Reamer failed to conduct the most basic elements of an investigation. She did not request phone records, did not verify signatures on the affidavits supplied by a criminal defense attorney, did not interview Plaintiff, did not interview Cody, did not reconcile Cody's multiple contradictory affidavits, did not review medical documentation, and did not confirm Plaintiff's physical presence or absence from the

county. These omissions constituted material investigative failures under *Franks v. Delaware* and rendered the affidavit constitutionally deficient.

**180.**    In addition to Plaintiff's IA complaint, Plaintiff's son, James Louis Roden Jr., mailed a certified-return-receipt letter directly to Sheriff Joshua Ray on May 13, 2025, requesting an official investigation into Investigator Reamer's conduct. *(See Exhibit E-005)* The letter included extensive exculpatory evidence showing that Cody Lane Koelle's statements were unreliable and that key allegations in the affidavit were false or factually implausible. Despite the seriousness of these claims, Sheriff Ray never responded and never initiated an investigation. A second follow-up letter was sent on June 11, 2025, which was likewise ignored.

**181.**    Emails following arrest also informed Sheriff Ray and County Attorney's Office that on April 14, 2025—only one week after Plaintiff's arrest—Cody Lane Koelle himself was arrested in Dodge City, Kansas for filing a false police report and felony threat against an innocent person, offenses to which he later pleaded guilty. These charges came in addition to Cody's earlier September 2024 convictions for making false statements to police and impersonating a police officer. Sheriff Ray was therefore explicitly notified that the alleged "victim" in Plaintiff's case had a demonstrated pattern of criminal dishonesty, fabrication of allegations, and misuse of law enforcement. Despite this, Sheriff Ray took no action to investigate, reevaluate probable cause, or correct the record.

**182.**    Neither the Internal Affairs complaint nor the certified letters submitted by Plaintiff triggered any known investigative review by the Guadalupe County Sheriff's Office. No interviews were conducted, no supplemental evidence was requested, and Investigator Reamer's arrest-warrant affidavit was never scrutinized. Compounding this failure, on November 30, 2025, Plaintiff submitted a Texas Public Information Act request seeking the status of the Internal

Affairs investigation into Investigator Reamer's conduct. The Sheriff's Office failed to respond within the statutory deadline and provided no response at all. As a result, on December 17, 2025, Plaintiff was compelled to file a formal complaint with the Texas Attorney General's Open Records Division, assigned Complaint No. OR-25-058631-IC, alleging non-compliance with the Public Information Act.

**183.**    This complete failure to act—despite repeated formal notices, certified correspondence, statutory records requests, and the availability of overwhelming exculpatory evidence— demonstrates deliberate indifference to Plaintiff's constitutional rights. The County's refusal to investigate, respond, or even acknowledge these complaints reflects an institutional decision to preserve the arrest-warrant affidavit and underlying prosecution rather than correct known factual defects. Such conduct constitutes ratification of unconstitutional practices and supports municipal liability under *Monell*, as the County chose inaction in the face of clear notice that Plaintiff's rights had been violated.

### F. Plaintiff's Motions for Examining Trial and ADA Requests *(See Exhibit G-001)*

**184.**    On August 26, 2025, more than four months after his arrest and without any indictment, Plaintiff filed a Motion for Examining Trial under Texas Code of Criminal Procedure art. 16.01, invoking his statutory right to judicial review of probable cause. For a bedridden, wheelchair-bound, 77-year-old Army veteran charged with a first-degree felony based on unverified hearsay, an examining trial was the only available mechanism to challenge the constitutionality of his arrest.

**185.**    Between August 28 and September 24, 2025, Plaintiff made repeated written and voicemail requests to the Court Coordinator seeking a hearing date. Despite his age, fragile

health, and the seriousness of the charge, no response of any kind was provided. These unanswered communications reflected an extended, systemic denial of Plaintiff's access to the courts.

**186.**    On October 8, 2025, Plaintiff filed a Motion to Compel Setting of Examining Trial, documenting the prolonged nonresponse and requesting ADA-compliant reasonable modifications, including remote participation, due to his medical inability to undertake long-distance travel. His filings included medical documentation demonstrating that a trip from League City to Seguin posed severe, documented risks to his health.

**187.**    On October 15, 2025, with still no indictment, no examining trial, and no acknowledgment of Plaintiff's ADA requests, he filed:

**a.**    a Motion to Expedite based on escalating medical concerns;

**b.**    a Supplemental ADA Title II Notice and Request for Reasonable Modification; and

**c.**    a Notice of Continued Violation and Preservation of Record, documenting ongoing denial of access to court proceedings and deterioration of health caused by the County's inaction.

**188.**    That same day, Plaintiff E-filed a notarized letter to the Court and Judge William D. Old III, and serviced Jonathan Amdur electronically via E-file explaining that more than 190 days—half a year—had passed without any judicial review of his arrest and that his worsening medical condition required urgent consideration. Plaintiff pleaded that the lack of accommodation and prolonged delay threatened his physical safety and effectively barred him from asserting his constitutional rights.

**189.**    Yet while Plaintiff—an elderly, disabled veteran—was being required to navigate the criminal justice system without accommodations, Assistant County Attorney Jonathan Amdur

66

was simultaneously pursuing Plaintiff's first-degree felony charges for nearly eight months, despite mounting exculpatory evidence, contradictory witness statements, and clear ADA violations. On July 2nd, 2025, Amdur personally agreed to a plea agreement reducing all six first-degree aggravated sexual assault charges against Michael Allen Walker—the man accused of raping Plaintiff's intellectually disabled granddaughter—to a single count of *prohibited sexual conduct (incest)*. This plea agreement was executed only after the County erased Shelby's documented intellectual disability, disregarding medical evaluations, SSI records, school records, and sworn testimony acknowledging her IDD status.

**190.**    The contrast is staggering. While the County bent over backward to minimize the criminal responsibility of a man with extensive criminal history of violence and accused of violent sexual offenses against his granddaughter—allowing him to avoid the consequences of six aggravated sexual assault charges—it vigorously pursued a first-degree felony carrying five to ninety-nine years in prison against a frail, medically compromised Army veteran. Had Plaintiff been convicted, the sentence would have effectively been a death sentence, depriving him of his final years, his family, and even his right to military honors at burial. The County's relentless prosecution of Plaintiff stands in stark contrast to its leniency toward the perpetrator of the far more serious underlying crime.

**191.**    The juxtaposition of these two outcomes—aggressive pursuit of an elderly disabled veteran as well as his son who is a school teacher/minister with no criminal record, while extending leniency to the man who sexually assaulted his granddaughter—underscores an unmistakable inference of retaliation, discriminatory animus, and institutional indifference to Plaintiff's disabilities. It also demonstrates a systemic failure to apply the law fairly or to protect vulnerable individuals under the County's care.

**192.**    Despite statutory rights, multiple motions, explicit ADA notices, and repeated pleas for accommodation, no examining trial was ever conducted, no ADA modifications were provided in regard to bond supervision appointments, and no judicial review of probable cause occurred during the pendency of Plaintiff's case. These failures collectively constitute:

- a continuing unconstitutional seizure,

- a denial of due process,

- a denial of access to the courts, and

- ongoing violations of Title II of the ADA and Section 504 of the Rehabilitation Act.

**G. Delays, Non-Responsiveness, and Handling of Plaintiff's Communications**

**193.**    From April through October 2025, Plaintiff submitted multiple written communications to the Guadalupe County Sheriff's Office, the County Attorney's Office, and court personnel requesting clarification of the allegations against him, seeking ADA accommodations, and asking for a review of the circumstances surrounding his arrest. These communications included detailed explanations of his medical condition, documented travel limitations, and factual impossibilities in the affidavit used to justify his arrest for a first-degree felony.

**194.**    Plaintiff repeatedly requested that county officials review the arrest-warrant affidavit submitted by Investigator Reamer, noting that the affidavit appeared to rely exclusively on hearsay, third-hand statements, and materials originating from the criminal defense attorney representing the man accused of sexually assaulting Plaintiff's intellectually disabled granddaughter. Plaintiff identified that the affidavit omitted phone records, medical records, travel impossibilities, and the lack of communication between Plaintiff and the alleged witness.

**195.**    The majority of Plaintiff's communications—including emails, mailed letters, ADA notices, motions, and requests for supervisory review—were ignored. Many received no confirmation of receipt, no follow-up inquiry, and no substantive response. The failure to acknowledge or respond to Plaintiff's requests violated basic procedural fairness and reflected a broader pattern of institutional non-responsiveness.

**196.**    No internal review or inquiry was initiated by the Sheriff's Office regarding the factual basis of Plaintiff's arrest, the omissions in Reamer's affidavit, or whether probable cause ever existed. Despite having direct notice of the inconsistencies, neither Investigator Reamer nor any supervisory official contacted Plaintiff, requested documentation, interviewed witnesses, or attempted to verify the affidavit's claims.

**197.**    This pattern of non-responsiveness persisted even after Plaintiff's son sent certified-return-receipt letters to Sheriff Joshua Ray on May 13, 2025, and again on June 11, 2025, providing extensive exculpatory evidence and formally requesting an investigation into Investigator Reamer's conduct. Sheriff Ray never responded, never acknowledged either letter, and never initiated any form of internal review—even though the submissions contained evidence that would have immediately undermined the validity of the arrest.

**198.**    These letters also informed the Sheriff that on April 14, 2025, only one week after Plaintiff's arrest, Cody Lane Koelle was arrested in Dodge City, Kansas for filing a false police report and felony threat against an innocent person—offenses to which he later pleaded guilty. This was in addition to Cody's September 2024 convictions for making false statements to police and impersonating a police officer. Despite being put on explicit notice that the alleged "victim" in Plaintiff's case had a documented history of criminal dishonesty, fabrication, and

69

impersonation of law enforcement, neither the Sheriff's Office nor the County Attorney's Office revisited or reevaluated the basis for Plaintiff's arrest.

**199.** During this same period, Plaintiff and his family repeatedly provided the County with information demonstrating that Cody's statements were contradictory, unreliable, and inconsistent with phone and medical records. County officials ignored this information as well, never addressing the stark discrepancies or the fact that Cody had executed multiple sworn affidavits that directly contradicted each other.

**200.** Collectively, the County's failures—its refusal to respond to Plaintiff's communications, its disregard of exculpatory evidence, its neglect of documented ADA requests, and its unwillingness to reevaluate the affidavit despite incontrovertible proof of factual impossibility— demonstrate a pattern of deliberate indifference, systemic neglect, and a denial of access to the courts. These actions (and inactions) deprived Plaintiff of due process, violated ADA Title II and Section 504, and allowed an unconstitutional seizure to persist for months without judicial review.

### H. The Uninvestigated Sworn Criminal Complaint Against Cody Lane Koelle

**201.** On June 26, 2025, Plaintiff's wife, Dolores Jane Roden, submitted a sworn criminal complaint to the Guadalupe County Sheriff's Office reporting that Cody Lane Koelle had committed felony perjury in connection with ongoing criminal proceedings. *(See Exhibit L-001)* Mrs. Roden ensured delivery through three independent channels—certified mail with return receipt, email, and in-person submission—so that Sheriff Ray, command staff, and the Criminal Investigations Division could not plausibly claim lack of notice. Attached to her complaint were (1) June 18, 2025 court transcript, in which Cody denied under oath ever signing *any* affidavits,

including those used by prosecutors in multiple cases, and (2) a formal verification letter from Landmark National Bank, confirming that Cody had personally appeared before the notary to sign the November 15, 2024 affidavit in which Cody testified under oath that Plaintiff son had forged. This sworn criminal complaint placed the Sheriff's Office and the Guadalupe County Attorney's Office—including Assistant County Attorney Jonathan Amdur—on formal notice that the factual foundation of the tampering charge rested on contradictory sworn testimony, yet Mr. Amdur continued prosecuting Plaintiff until November 30, 2025, the day before the scheduled December 1, 2025 examining trial.

**202.**    Despite this documentation—which established beyond dispute that Cody had given contradictory sworn statements—no criminal investigation was opened. Instead, the Sheriff's Office administratively closed the matter as a "civil" issue, even though perjury, false statements to police, and providing false evidence in judicial proceedings are felony offenses under Texas Penal Code §§ 37.02, 37.03, and 37.08. The dispositions contain no investigative notes, no interviews, no evidence reviews, and no attempts to reconcile Cody's conflicting sworn statements, reflecting a total abdication of investigative duty.

**203.**    The transcript provided to the Sheriff's Office showed that Cody's false testimony had immediate and devastating consequences: it was used by Assistant County Attorney Jonathan Amdur to revoke the bond of Jamie Renee Walker, resulting in her continued incarceration and loss of liberty based entirely on statements that were demonstrably false. Cody testified that he "never signed any affidavits," including the November 2024 affidavit and the affidavits offered by Michael Allen Walker's defense attorneys—statements now proven untrue by both the certified transcript and the notary's verification letter. This made Cody's testimony not merely inconsistent but perjurious, with direct impact on judicial decisions.

**204.**   These facts were compounded by Cody's known criminal history. By the time Mrs. Roden

filed her sworn complaint, county officials had been informed that Cody had:

• been arrested on April 14, 2025 in Kansas for filing a false report and felony bomb threat on a

casino;

• later pleaded guilty to those offenses;

• previously been convicted in September 2024 of making false statements to police and

impersonating a police officer; and

• executed multiple affidavits contradicting one another, including those used as the basis for

Plaintiff's arrest.

**205.**   The County's refusal to investigate is especially troubling because, at the time the

complaint was submitted, Investigator Elaine M. Reamer had already been reported to the FBI,

U.S. Department of Justice, and Texas Rangers for alleged misconduct in her handling of related

cases. Rather than assigning the complaint to an uninvolved investigator or supervisory officer,

county leadership allowed Reamer herself to serve as the reviewing officer for the criminal

complaint filed against Cody. Predictably, Reamer closed the matter with no investigation,

marking it "civil" despite the complaint alleging felony conduct and despite her obvious conflict

of interest.

**206.**   No reasonable law-enforcement agency would assign an investigator accused of

professional misconduct to review a sworn complaint connected to her own investigative

failures. Yet that is what occurred: Reamer, the affiant who relied on Cody's inconsistent

statements to obtain first-degree felony warrants, was also the person permitted to close a perjury

complaint that would have undermined the entire foundation of those warrants. This decision

reflects institutional ratification, not mere oversight.

**207.**    Following Ms. Dolores Jane Roden's inquiry to Sheriff leadership regarding the

misclassification of her sworn felony complaint against Cody Lane Koelle as "civil," and the

decision to permit Sergeant Elaine Reamer—who had relied on Cody's statements to obtain

felony arrest warrants—to handle the matter despite an obvious conflict of interest, the

Guadalupe County Sheriff's Office issued a written response formally disclaiming investigative

responsibility. In an email sent by the Sheriff's Office Open Records Division and copied to

Sheriff Joshua O. Ray, Chief Deputy Tarinna Skrzycki-Pfeil, Captain Joel Machost, Commander

of the Criminal Investigations Division, and Internal Affairs Sergeant Kelly Mann, the Sheriff's

Office stated: *"The Guadalupe County Attorney's Office would be conducting the investigation*

*not the Guadalupe County Sheriff's Office for the criminal offense that you are alleging. Any*

*documents that you have provided have been forwarded to that office by Sgt. Reamer per her*

*supplement. This request is to be closed…"* **(See Exhibit D-009).**

**208.**    This written response constitutes an express admission by Sheriff leadership that criminal

investigations are deferred to, and controlled by, the County Attorney's Office rather than

conducted by sworn peace officers. By affirmatively adopting and communicating this position,

the Sheriff's Office ratified a County practice whereby prosecutors—not law-enforcement

personnel—direct criminal investigations, while deputies function merely as conduits for

forwarding materials and administratively closing complaints without inquiry. This abdication of

investigative responsibility directly conflicts with Texas Code of Criminal Procedure articles

2.01 and 2.13, which distinguish prosecutorial discretion from law-enforcement duties and place

the affirmative obligation to preserve the peace and investigate criminal offenses squarely on

peace officers—not the County Attorney's Office.

**209.**    The significance of this admission extends beyond Ms. Roden's complaint. The same policy framework governed the investigation and arrest of Plaintiff. In Plaintiff's case, law enforcement similarly abdicated its statutory and constitutional duty to investigate, relied instead on materials and narratives supplied by the County Attorney's Office and defense counsel, and pursued first-degree felony charges without independent inquiry, corroboration, or verification. In both instances, investigative authority was not merely influenced by prosecutors, but affirmatively surrendered to them.

**210.**    These admissions and actions are directly attributable to Guadalupe County and constitute an official policy, practice, or custom for purposes of municipal liability under *Monell v. Department of Social Services*. The decision to defer criminal investigations to prosecutors was not made by a line officer or low-level employee, but was expressly endorsed by the Sheriff, the Chief Deputy, and the Commander of the Criminal Investigations Division—officials with final policymaking authority over law-enforcement operations. Their approval and enforcement of this practice amount to ratification of a County-wide policy that departs from statutory law and constitutional norms. The response was issued as the official position of the Guadalupe County Sheriff's Office, copied to the Sheriff and senior command staff, and was never corrected, repudiated, or disavowed. An official statement issued by an authorized division, circulated to final policymakers, and left uncorrected despite notice constitutes ratification under Monell

**211.**    Accordingly, the constitutional violations suffered by Plaintiff were not the result of isolated misconduct, negligence, or misunderstanding. They were the foreseeable and direct consequence of an official Guadalupe County policy or custom—one that substitutes prosecutorial control for independent police investigation, strips the warrant process of its

constitutional safeguards, and predictably results in arrests unsupported by probable cause. That

policy was the moving force behind Plaintiff's injuries.

212.    Under the investigative framework expressly adopted by Guadalupe County—where the

County Attorney's Office, rather than sworn peace officers, "conducts the investigation"—there

exists no lawful mechanism by which a criminal case against Cody Lane Koelle could ever

proceed to an arrest warrant. If the County Attorney's Office were to conclude that Cody

committed perjury, the absence of any independent law-enforcement investigation would leave

no officer to gather evidence, interview witnesses, evaluate credibility, or swear to probable

cause based on firsthand investigative work. Any resulting warrant application would therefore

require a peace officer to sign and submit an affidavit based solely on prosecutorial assertions,

without personal knowledge or investigative verification. Such a process would reduce the

warrant requirement to a ministerial formality, transforming the neutral-magistrate safeguard into

a rubber stamp for prosecutorial conclusions rather than an independent assessment grounded in

law-enforcement investigation. This structural defect explains why sworn felony complaints

against Cody were closed without inquiry, while affidavits supplied by the County Attorney's

Office were nevertheless used to arrest Plaintiff. The County's own policy thus creates a one-way

system: allegations transmitted through prosecutors are enforced without investigation, while

allegations against favored witnesses cannot be investigated at all—an arrangement incompatible

with the Fourth Amendment and Texas law.

213.    Plaintiff does not allege that the Guadalupe County Attorney's Office conducts all

criminal investigations, nor that the Sheriff's Office has abandoned its general investigative role.

Rather, Plaintiff alleges that in this matter—and in closely related matters involving overlapping

prosecutorial exposure and credibility risks—Sheriff leadership affirmatively deferred

75

investigative responsibility to the County Attorney's Office. In doing so, law enforcement

relinquished independent fact-gathering, credibility assessment, and warrant vetting, allowing

prosecutorial interests to control whether allegations were investigated, ignored, or advanced.

This selective abdication of duty, documented in Exhibit D-009, A-003 and A-001 and reflected

in Defendants' conduct, is the policy and practice at issue in this case.

**214.**    The disparate treatment is striking. A sworn criminal complaint supported by a certified

court transcript, notary verification, and documented prior convictions received no investigation.

Meanwhile, Plaintiff—a 77-year-old, wheelchair-bound U.S. Army veteran—and his son, a

public-school teacher carrying out a mandated-reporting duty, were arrested without any

investigation whatsoever, based solely on hearsay from an unreliable witness whose credibility

had collapsed under the weight of his own contradictory statements.

**215.**    Together, these circumstances demonstrate a systemic pattern: Cody Lane Koelle was

shielded, his perjury ignored, and his accusations weaponized, while Plaintiff and his son were

subjected to the most severe criminal charge available—first-degree felony witness tampering,

carrying 5 to 99 years in prison, a sentence which would have been a de facto life sentence for

Plaintiff. The refusal to investigate Cody, combined with the eagerness to prosecute Plaintiff,

supports the inference that the arrest served institutional interests, retaliatory motives, and

liability-shifting objectives, not legitimate law-enforcement aims.

**216.**    On November 30, 2025, the Guadalupe County Attorney's Office formally declined to

pursue the charge against Plaintiff. The declination was communicated to Plaintiff's surety,

resulting in termination of bond obligations and closure of the criminal matter. The declination

was subsequently confirmed on the record at a December 1, 2025 hearing in the 25th District

Court before the Honorable William D. Old III, at which time the Court acknowledged that the

prosecution would not proceed. A declination letter was given to AAA bonds and forwarded to Plaintiff. *(See Exhibit E-016)*

**I. Summary of Key Facts Relevant to All Claims**

217.    The following facts are central to all claims asserted herein and demonstrate a continuous course of unconstitutional conduct by Defendants before, during, and after Plaintiff's arrest.

218.    Plaintiff's arrest occurred just six days after his son—a mandated reporter under Texas law—submitted a report documenting the sexual exploitation and endangerment of Plaintiff's intellectually disabled granddaughter, S.J.K. while under Cody Lane Koelle care. County officials took no investigative action in response to that mandated report. Instead, within days, they initiated felony charges against Plaintiff and his son. The close temporal proximity, combined with the County's complete failure to investigate the reported abuse, supports a reasonable inference that the arrests were retaliatory in nature and functioned to deflect scrutiny from the County's own failures to protect a vulnerable adult.

219.    The arrest-warrant affidavit itself reflects no independent law-enforcement investigation. It relied entirely on unverified hearsay originating from a single individual, Cody Lane Koelle— whose credibility was already compromised by a documented history of criminal conduct, including filing false police reports, impersonating a police officer, and providing contradictory sworn statements. The affidavit contained multiple layers of uncorroborated hearsay: assertions attributed to Michael Allen Walker's defense counsel John Green, transmitted through the County Attorney's Office, and adopted wholesale by Investigator Reamer without verification, corroboration, or independent inquiry. No attempt was made to test credibility, reconcile contradictions, or examine motive.

220.    Equally absent from the affidavit was any consideration of readily available exculpatory evidence. Investigator Reamer failed to examine Plaintiff's severe and well-documented medical limitations, including mobility impairments and chronic illness; failed to assess the geographic and practical impossibility of the alleged conduct; and failed to review communication records demonstrating that Plaintiff had little to no contact with Cody during the relevant period beyond two benign calls initiated by Cody himself. Phone logs, medical limitations, prior inconsistent statements by Cody, CPS involvement concerning Cody and Andrea, and the mandated report of sexual exploitation—all material to probable cause—were ignored or omitted.

221.    Following the arrests, County officials compounded these constitutional violations by denying Plaintiff timely judicial process. For more than 190 days, Plaintiff was left without indictment, without an examining trial, and without substantive rulings on multiple written motions. During this period, Plaintiff submitted repeated requests for reasonable accommodations under Title II of the Americans with Disabilities Act, supported by medical documentation. Those requests—remote appearance, seeking modified reporting, or other basic accommodations—were ignored or left unaddressed, while the County imposed medically dangerous in-person reporting requirements involving extensive travel, despite actual knowledge of Plaintiff's health risks.

222.    The County's deliberate indifference extended further. Even after receiving sworn complaints, a certified court transcript, and a notary verification letter establishing that Cody Lane Koelle had committed perjury, County leadership refused to initiate any investigation. Instead, the Sheriff's Office—through senior leadership—permitted Investigator Reamer, the same officer whose affidavit formed the basis of Plaintiff's arrest, to close the perjury complaint as "civil" without investigation. As documented in Exhibit D-009, Sheriff leadership expressly

disclaimed investigative responsibility and deferred the matter to the County Attorney's Office, ratifying a practice whereby prosecutors control criminal investigations in contravention of Texas law.

223.    At all relevant times, Guadalupe County, through its policymakers and the County Attorney's Office, maintained and enforced a policy and practice of selectively denying the intellectual and developmental disability ("IDD") status of S.J.K. when acknowledgment of her disability would trigger mandatory protective, investigative, or prosecutorial obligations under Texas law and federal disability statutes. Conversely, the County invoked S.J.K.'s asserted vulnerability and intellectual limitations when doing so served to criminalize or intimidate family members and advocates who reported abuse or challenged official inaction.

224.    This policy was reflected in the County's refusal to investigate a mandated abuse report submitted on April 1, 2025, which documented ongoing sexual exploitation of S.J.K., despite extensive medical, educational, and Social Security records establishing her IDD status. It was further reflected in the County's acceptance of a plea agreement that eliminated all first-degree felony sexual-assault charges involving an intellectually disabled victim, while simultaneously pursuing severe felony charges against those who advocated on her behalf.

225.    By conditioning enforcement decisions on whether acknowledgment of disability increased or reduced County exposure, and by retaliating against individuals engaged in protected disability advocacy, Defendants violated Title II of the Americans with Disabilities Act, the Equal Protection Clause, and Plaintiff's First and Fourteenth Amendment rights. This conduct was not an isolated error, but the foreseeable result of a County policy or custom adopted and enforced by final policymakers.

**226.**    Taken together, these facts demonstrate a consistent County policy and practice: mandated abuse reports are ignored; exculpatory evidence is disregarded; investigative duties are abdicated to prosecutors; sworn complaints against favored witnesses are closed without inquiry; and individuals who expose abuse are subjected to punitive criminal process. These were not isolated errors or discretionary missteps, but the foreseeable consequences of an institutional framework adopted and enforced by County policymakers.

**227.**    As a direct result of these unconstitutional actions and omissions, Plaintiff has suffered—and continues to suffer—substantial physical, financial, and emotional harm. Bond conditions stripped him of his home-defense firearm, restricted travel, imposed medically unsafe reporting requirements, and drained significant life savings. For an elderly, disabled U.S. Army veteran, the imposition of a first-degree felony charge—punishable by 5 to 99 years and effectively a life sentence—coupled with the County's refusal to accommodate his disabilities, constituted not only a deprivation of liberty, but a direct threat to his health, dignity, and survival.

# VIII. COUNTS

## COUNT 1

Fourth Amendment – False Arrest / Unreasonable Seizure

(42 U.S.C. § 1983)**

**Against: Investigator Elaine Reamer (Individual Capacity)**

**A. Incorporation by Reference**

**228.**    Plaintiff realleges and incorporates by reference Paragraphs 1 through 227 including all factual allegations, exhibits, and incorporated records, as though fully set forth herein. These

allegations establish the absence of probable cause, the material falsity and omissions within the arrest-warrant affidavit, and the resulting unconstitutional seizure.

**B. Legal Basis**

229.    The Fourth Amendment prohibits arrests and seizures absent probable cause. U.S. Const. amend. IV. Probable cause exists only where the facts and circumstances within the officer's knowledge are sufficient to warrant a reasonable officer in believing that the suspect has committed, is committing, or is about to commit an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). An arrest unsupported by such facts violates clearly established constitutional law.

230.    A warrant is constitutionally invalid where the supporting affidavit contains false statements, was prepared with reckless disregard for the truth, or omits material information necessary to the magistrate's probable-cause determination. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Reckless disregard exists where an officer knowingly excludes facts that would negate probable cause or where the officer's omissions render the affidavit misleading.

231.    The Fifth Circuit has repeatedly held that **material omissions and reliance on uncorroborated or unreliable witness statements** violate the Fourth Amendment where officers fail to conduct a basic investigation or ignore obvious credibility defects. See *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (material omissions invalidate warrant); *Winfrey v. Rogers*, 901 F.3d 483, 494–96 (5th Cir. 2018) (officer not entitled to qualified immunity where probable cause rested on unreliable statements and the officer failed to verify critical facts). Officers may not "close their eyes to facts that would help clarify the circumstances of an arrest." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988).

**232.** Qualified immunity does not protect an officer who applies for a warrant that no reasonably competent officer would believe establishes probable cause. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Where an officer relies on demonstrably unreliable information, omits known exculpatory facts, and fails to conduct basic verification, the resulting arrest is objectively unreasonable as a matter of law.

**233.** A seizure under the Fourth Amendment does not end at the moment of arrest but continues where the State imposes significant pretrial restrictions on liberty. *Manuel v. City of Joliet*, 580 U.S. 357, 366–69 (2017). Plaintiff remained subject to ongoing seizure through felony bond conditions, including mandatory in-person reporting, travel prohibitions, firearm surrender, and alcohol restrictions, each of which imposed substantial restraints on his liberty without probable cause.

### C. Allegations Against Investigator Reamer (Individual Capacity)

**234.**    On April 7, 2025, Investigator Elaine M. Reamer prepared, swore to, and submitted an arrest-warrant affidavit alleging that Plaintiff threatened his grandson, Cody Lane Koelle, in connection with a pending criminal matter involving Plaintiff's daughter.

**235.**    Plaintiff was never contacted, interviewed, or given an opportunity to deny or clarify the allegation before the warrant was sought. No inquiry was made into Plaintiff's medical condition, wheelchair dependence, limited mobility, or physical inability to travel to Guadalupe County during the period alleged.

**236.**    The affidavit was constitutionally defective because it omitted critical exculpatory information, including:

**a.** phone records showing Plaintiff had no threatening communication with Cody Lane Koelle;

**b.** communication logs showing that the only calls between Plaintiff and Cody during the relevant months were initiated by Cody and were benign (a birthday call and a request for financial help);

**c.** Plaintiff's age (77), wheelchair dependence, cardiac disease, neuropathy, cancer diagnoses, and ongoing medical restrictions making travel implausible;

**d.** the more than 200-mile distance between Plaintiff's residence in League City and Guadalupe County;

e. the absence of any evidence that Plaintiff made, attempted, or was capable of making the alleged threat;

**f.** Cody Lane Koelle's contradictory sworn statements, including multiple affidavits submitted in separate proceedings that directly conflict with one another;

**g.** documentation already provided to county officials describing Cody's documented criminal conduct—false police reports, impersonation of a police officer, use of red-and-blue emergency-style lights on his vehicle, and later felony-threat charges;

**h.** the ongoing CPS investigations into Cody and Andrea at the time the affidavit was drafted; and

**i.** the April 1, 2025 mandated-report submission concerning sexual exploitation occurring inside Cody's household—submitted just six days before the arrest.

**237.**    Reamer's affidavit relied exclusively on unverified statements attributed to Cody Lane Koelle, a witness with a documented history of dishonesty, criminal conduct, and contradictory

sworn affidavits. Fifth Circuit precedent prohibits reliance on such uncorroborated statements when an officer fails to conduct a minimal investigation. Winfrey, 901 F.3d at 494–96.

**238.**    No independent law-enforcement investigation was conducted before seeking the warrant. Reamer failed to:

**a.** review Plaintiff's phone records;

**b.** verify the dates, method, or content of the alleged communication;

**c.** interview Plaintiff;

**d.** interview any other witnesses;

**e.** determine whether Plaintiff physically could have traveled to Guadalupe County;

**f.** evaluate the credibility or criminal background of the source; or

**g.** examine the extensive exculpatory documentation already in the County's possession.

**239.**    Reamer's failure to conduct any independent investigation was not inadvertent or the result of oversight. In this matter—and in closely related circumstances implicating the same witnesses and prosecutorial interests—investigative responsibility was affirmatively deferred from sworn law-enforcement personnel to the Guadalupe County Attorney's Office. Sheriff leadership later confirmed that, in this case, felony complaints and investigative materials were forwarded to prosecutors, who "conducted the investigation," while deputies merely transmitted materials and closed complaints without inquiry. Acting within this case-specific framework, Reamer relied on prosecutor-supplied assertions and defense-provided materials rather than exercising her independent obligation as a peace officer to investigate, verify facts, assess credibility, and establish probable cause. No reasonable officer could believe that probable cause

84

exists where law-enforcement investigation has been knowingly supplanted by prosecutorial control in contravention of clearly established Fourth Amendment law.

**240.** Had the omitted information been included, the affidavit would not have established probable cause under Franks, Kohler, or Winfrey. A neutral magistrate could not have reasonably issued a first-degree felony warrant based on hearsay, uncorroborated assertions, and the complete absence of independent evidence.

**241.** Defendants cannot invoke the independent intermediary doctrine to shield themselves from liability. Although a magistrate signed the arrest warrant, the warrant was procured through affidavits that omitted material exculpatory evidence and relied on a narrative controlled by the County Attorney's Office. Where an intermediary's decision is tainted by false statements or material omissions, the causal chain is not broken, and liability under 42 U.S.C. § 1983 remains. *See, e.g.*, Hand v. Gary, Deville v. Marcantel, Winfrey v. Rogers, and Green v. Thomas (independent intermediary doctrine does not apply where intermediary relies on tainted or misleading information).

**242.** As a direct result of the defective affidavit, Plaintiff was arrested and subjected to severe felony bond conditions. These conditions—including long-distance mandatory travel despite medical contraindications, firearm surrender, alcohol prohibition, and geographic restrictions—constituted a continuing seizure under the Fourth Amendment, because Plaintiff's liberty was restrained pursuant to legal process unsupported by probable cause. *See* Manuel v. City of Joliet, 580 U.S. 357, 367–69 (2017) (holding that the Fourth Amendment governs not only pre-process arrests but also post-process restraints on liberty where detention or conditions are imposed based on legal process lacking probable cause).

85

## C. Clearly Established Right / Qualified Immunity

**243**.   At all times relevant, it was clearly established that a peace officer violates the Fourth Amendment when she seeks or secures an arrest warrant without conducting a basic, independent investigation and instead relies on unverified, contradictory, or hearsay assertions from interested parties. Long before April 7th 2025, controlling Supreme Court and Fifth Circuit precedent made clear that an officer may not abdicate her investigative responsibility, omit plainly exculpatory facts, or act as a mere conduit for accusations supplied by others.

**244.**   The Supreme Court has repeatedly held that an officer is not entitled to qualified immunity where she submits a warrant application containing materially false statements or omissions made knowingly or with reckless disregard for the truth. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). This principle applies equally where the officer omits facts that negate probable cause or fails to disclose information that would materially alter the magistrate's assessment. See *Manuel v. City of Joliet*, 580 U.S. 357, 366–69 (2017).

**245.**   Fifth Circuit law has long and unequivocally established that officers violate clearly established Fourth Amendment rights when they forward arrest affidavits based on uncorroborated, unreliable statements without conducting even a minimal investigation. In *Winfrey v. Rogers*, 901 F.3d 483, 494–96 (5th Cir. 2018), the court held that an officer was not entitled to qualified immunity where he relied on inconsistent witness statements and failed to verify readily available exculpatory evidence before initiating prosecution.

**246.**   It was likewise clearly established that an officer may not rely exclusively on information supplied by prosecutors or defense counsel in lieu of her own investigative judgment. Probable cause must be grounded in facts obtained through law-enforcement investigation, not advocacy.

See *Whiteley v. Warden*, 401 U.S. 560, 568 (1971); *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986).

247.    A reasonable officer in Investigator Reamer's position would have known that seeking a first-degree felony arrest warrant—without interviewing the accused, without verifying the alleged communication, without assessing physical or geographic impossibility, and while omitting extensive exculpatory information—violated clearly established Fourth Amendment law. No reasonable officer could believe that probable cause existed under these circumstances.

248.    Qualified immunity does not protect conduct that violates rights so obvious that any reasonable officer would understand the unlawfulness of her actions. Because the constitutional deficiencies in Reamer's conduct were apparent under settled law at the time, she is not entitled to qualified immunity for the false arrest and unreasonable seizure alleged herein.

**E. Injury**

249.    As a direct and proximate result of the unconstitutional arrest and continuing seizure arising from felony-level bond conditions, Plaintiff suffered: loss of liberty, physical hardship, emotional distress, reputational damage, financial loss, interference with medical treatment, and the burdens described in the **Global Damages** section incorporated herein by reference. For a 77-year-old wheelchair-bound veteran with severe medical conditions, the unlawful seizure and the County's failures to accommodate his disabilities caused profound and continuing harm.

**F. Relief Requested**

250.    Plaintiff seeks all relief available under 42 U.S.C. § 1983 for violations of the Fourth Amendment, including:

    a.    compensatory damages for physical, emotional, reputational, and financial harm;

**b.**    punitive damages against Investigator Reamer in her individual capacity for conduct that was reckless, deliberately indifferent, and undertaken in conscious disregard of Plaintiff's constitutional rights;

**c.**    declaratory relief and injunctive relief against Guadalupe County as described in the **Global Prayer for Relief**; and

**d.**    such other relief as the Court deems just and proper.


# COUNT 2

Fourth Amendment – Malicious Prosecution / Continuing Seizure

(42 U.S.C. § 1983)**

**Against: Investigator Elaine Reamer (Individual Capacity) and Guadalupe County (Monell Liability)**

**A. Incorporation by Reference.**

**251.**    Plaintiff realleges and incorporates by reference Paragraphs 1 through 250 as though fully set forth herein. These allegations include the circumstances leading to Plaintiff's arrest, the contents and omissions of the arrest-warrant affidavit, Plaintiff's medical and mobility limitations, his lack of contact or threatening communications with Cody Lane Koelle, and the continuing seizure resulting from felony bond restrictions imposed after arrest.

**B. Legal Basis**

**252.**    The Fourth Amendment prohibits the initiation or continuation of criminal proceedings in the absence of probable cause. This protection applies not only to the initial arrest but also to the

ongoing restraints imposed through felony bond conditions, which constitute a "continuing seizure" for Fourth Amendment purposes. Manuel v. City of Joliet, 580 U.S. 357, 366–69 (2017).

**253.** A § 1983 malicious-prosecution claim under the Fourth Amendment is established when:

**(a)** the defendant officer caused the initiation or continuation of criminal proceedings;

**(b)** the proceedings were unsupported by probable cause;

**(c)** the plaintiff suffered a seizure pursuant to legal process, including restrictive bond conditions; and

**(d)** the prosecution terminated in the plaintiff's favor.

See Manuel, 580 U.S. at 367; Winfrey v. Rogers, 901 F.3d 483, 492–96 (5th Cir. 2018).

**(e).** The prosecution terminated in Plaintiff's favor when the Guadalupe County Attorney's Office formally declined to pursue the charge and communicated that declination to Plaintiff's surety, resulting in the termination of bond obligations and closure of the criminal matter without indictment, trial, plea, or admission of guilt. A prosecutorial declination constitutes favorable termination under the Fourth Amendment because it reflects an official abandonment of the criminal proceeding that is not inconsistent with innocence. *See* Thompson v. Clark, 596 U.S. 36, 44–45 (2022).

**254.** Under Franks v. Delaware, 438 U.S. 154 (1978), an officer violates the Fourth Amendment when she knowingly, deliberately, or recklessly includes false statements in a warrant affidavit or omits material information necessary for a magistrate's probable-cause determination. The Fifth Circuit applies Franks to both affirmative misrepresentations and omissions of material facts. Kohler v. Englade, 470 F.3d 1104, 1113 (5th Cir. 2006).

**255.**    Fifth Circuit precedent further holds that an officer may be liable for malicious prosecution where she forwards or relies on an affidavit grounded in unreliable, uncorroborated statements, particularly when the officer fails to conduct even a minimal investigation that would have revealed the absence of probable cause. Winfrey, 901 F.3d at 494–96; Armstrong v. Ashley, 60 F.4th 262, 272–74 (5th Cir. 2023).

**256.**    An officer who knowingly or recklessly omits material exculpatory facts, relies on contradictory or unreliable witness statements, or fails to conduct basic investigative steps violates clearly established Fourth Amendment law. These principles were well established long before 2025, such that a reasonable officer would have understood that submitting a materially misleading affidavit and causing a baseless prosecution was unconstitutional.

**257.**    A municipality is liable under § 1983 where a constitutional violation results from an official policy, custom, or practice, or from a decision by officials with final policymaking authority. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Municipal liability attaches where such a policy or custom is the moving force behind the initiation or continuation of a prosecution unsupported by probable cause. See Winfrey v. Rogers, 901 F.3d 483, 493–96 (5th Cir. 2018); Armstrong v. Ashley, 60 F.4th 262, 273–74 (5th Cir. 2023).

**C. Allegations Against Investigator Reamer (Individual Capacity)**

**258.**    Investigator Elaine M. Reamer initiated—and continued to cause—the criminal prosecution of Plaintiff by preparing, swearing to, and submitting an arrest-warrant affidavit built entirely on unverified hearsay and material omissions. The affidavit was the *sole* basis for Plaintiff's arrest and the felony bond conditions that followed. By presenting a constitutionally deficient affidavit and allowing the prosecution to proceed despite collapsing probable cause,

90

Reamer satisfied the initiation and continuing-seizure elements recognized in Manuel and Winfrey.

**259.**    Reamer's affidavit failed to disclose information known or readily available to County officials that directly undermined the credibility of the sole witness, Cody Lane Koelle, including:

**a.**    Koelle's documented history of false statements to law enforcement, including a September 2024 conviction for filing a false police report and impersonating a police officer;

**b.**    Koelle's April 14, 2025 arrest in Kansas for felony false reporting—further demonstrating an established pattern of dishonesty with law enforcement;

**c.**    Koelle's use of unauthorized emergency-style red-and-blue lights on a civilian vehicle;

**d.**    multiple contradictory sworn affidavits submitted in separate proceedings, including sworn statements Koelle later repudiated under oath; and

**e.**    criminal-history records, witness statements, and written complaints already in County possession identifying Cody Koelle as an unreliable source.

**260.**    These facts were materially exculpatory and, if disclosed, would have precluded any reasonable finding of probable cause.

**261.**    Despite the gravity of the charge—a first-degree felony carrying a potential sentence of 5 to 99 years—Reamer conducted *no* independent investigation before seeking a warrant. She failed to:

**a.**    review phone records or communication logs, which would have shown that Plaintiff made no threatening communications;

**b**.    determine Plaintiff's physical ability to travel or appear in Guadalupe County;

91

c.    interview Plaintiff or provide any opportunity to deny the allegation;

d.    interview any third-party witnesses;

e.    verify the authenticity, authorship, or validity of affidavits transmitted through the criminal defense attorney representing the man accused of sexually assaulting Plaintiff's granddaughter; or

f.    assess Koelle's credibility despite readily available evidence of dishonesty and criminal conduct.

262.    Fifth Circuit precedent is clear that reliance on such uncorroborated, demonstrably unreliable statements violates the Fourth Amendment. Winfrey, 901 F.3d at 494–96.

263.    Reamer's failure to conduct any independent investigation—and her decision to proceed on unverified, contradictory hearsay—occurred within a case-specific and acknowledged County practice applicable to this matter, whereby investigative responsibility concerning Cody Lane Koelle and related felony complaints was deferred to the Guadalupe County Attorney's Office rather than exercised by sworn peace officers. Written response from GCSO Open Records Division, copied to Sheriff Ray and senior command staff (without correction) later confirmed that, in this matter, felony complaints and investigative materials were forwarded to prosecutors, who "conducted the investigation," while deputies merely transmitted materials and closed complaints without inquiry. Acting within this known framework, Reamer knew or should have known that submitting a materially deficient affidavit would not prompt corrective investigation, but would instead predictably result in the initiation and continuation of prosecution based on the same untested assertions. Under these circumstances, the continued prosecution and seizure of Plaintiff were not intervening acts, but the foreseeable and direct consequence of both Reamer's conduct and the County's investigative practice.

**264.** Reamer also omitted Plaintiff's age (77), wheelchair confinement, severe cardiac and neurological conditions, cancer diagnoses, and his residence more than 200 miles away—facts plainly inconsistent with the allegation that Plaintiff personally appeared, traveled, or made any form of threatening contact. These omissions were material under Franks because their inclusion would have negated any reasonable inference of criminal conduct.

**265.** After Plaintiff's arrest, Reamer took no corrective action, despite receiving detailed written communications—including Internal Affairs complaints, ADA notices, certified-mail submissions, and documentary evidence—demonstrating that:

**a.** Koelle's statements were false;

**b.** Koelle repudiated the key affidavit under oath on June 18, 2025;

**c.** the notary for the November 2024 affidavit confirmed its authenticity, contrary to Koelle's courtroom testimony; and

**d.** the factual foundation of the arrest-warrant affidavit had collapsed.

**266.** Reamer did not supplement the affidavit, correct material omissions, advise prosecutors, or take any step to halt the continued prosecution.

**267.** By submitting a materially misleading affidavit, omitting exculpatory facts, failing to conduct even minimal investigative work, and permitting the prosecution to continue despite the absence of probable cause, Reamer directly caused Plaintiff to remain under severe felony bond conditions—including firearm surrender, geographic restrictions, alcohol prohibitions, and mandatory in-person reporting in Seguin. These restraints constituted a continuing seizure under Manuel and were the foreseeable result of Reamer's unconstitutional conduct.

**268.**    The continuation of Plaintiff's prosecution was not the result of an independent prosecutorial judgment insulated from law-enforcement misconduct. It was the foreseeable product of an official County practice—ratified by Sheriff leadership—under which peace officers deferred investigative responsibility to prosecutors and failed to conduct independent verification, correction, or supplementation when probable cause collapsed. This practice operated as the moving force behind the prolonged prosecution, continued seizure, and resulting constitutional injury to Plaintiff, rendering Guadalupe County liable under Monell.

**269.**    Defendants cannot invoke the independent intermediary doctrine to shield themselves from liability. Although a magistrate or prosecutorial intermediary approved the initiation and continuation of proceedings, those decisions were procured through affidavits and submissions that omitted material exculpatory evidence and relied on a narrative controlled by the County Attorney's Office. Where an intermediary's decision is tainted by false statements or material omissions, the causal chain is not broken, and liability under 42 U.S.C. § 1983 remains. See, e.g., *Hand v. Gary*, *Deville v. Marcantel*, *Winfrey v. Rogers*, and *Green v. Thomas*.

**D. Clearly Established Right / Qualified Immunity**

*(Against Investigator Elaine Reamer – Individual Capacity)*

**270.**    At the time of Plaintiff's arrest and the continuation of his prosecution, it was clearly established that a law-enforcement officer violates the Fourth Amendment by initiating or continuing criminal proceedings through the use of a warrant affidavit that contains knowingly false statements, statements made with reckless disregard for the truth, or material omissions necessary to a magistrate's probable-cause determination. Franks v. Delaware, 438 U.S. 154, 171–72 (1978); Kohler v. Englade, 470 F.3d 1104, 1113 (5th Cir. 2006).

271.    It was further clearly established that an officer may not cause or prolong a prosecution by relying on uncorroborated, contradictory, or demonstrably unreliable witness statements while failing to conduct even a minimal investigation that would have revealed the absence of probable cause. Winfrey v. Rogers, 901 F.3d 483, 494–96 (5th Cir. 2018); Armstrong v. Ashley, 60 F.4th 262, 272–74 (5th Cir. 2023).

272.    Fifth Circuit precedent has long made clear that a law-enforcement officer cannot avoid constitutional responsibility by acting as a conduit for information supplied by prosecutors or defense counsel, nor by deferring investigative judgment to non-law-enforcement actors. An officer remains personally responsible for the truthfulness, completeness, and reliability of facts presented to support probable cause. See Malley v. Briggs, 475 U.S. 335, 344–45 (1986); Winfrey, 901 F.3d at 495 (officer liable where she "simply forwarded" unreliable accusations without independent verification).

273.    It was also clearly established that an officer who learns that probable cause has dissipated—through recanted testimony, exposed falsity, or the discovery of exculpatory evidence—has a constitutional obligation not to permit the prosecution and resulting seizure to continue. An officer's failure to correct known falsehoods or material omissions, or to take steps to halt a baseless prosecution, violates the Fourth Amendment. See Manuel v. City of Joliet, 580 U.S. 357, 366–69 (2017); Hernandez v. City of Houston, 17 F.4th 788, 797 (5th Cir. 2021).

274.    A reasonable officer in Defendant Reamer's position—particularly one who affirmed under oath that she possessed over sixteen years of law-enforcement experience, more than 3,000 hours of TCOLE training, and a Master TCOLE License—would have known that:

- probable cause cannot be manufactured through omission or distortion;

- contradictory sworn statements must be disclosed and reconciled;

- unverified assertions transmitted through prosecutors or defense counsel cannot substitute for investigation; and

- a prosecution may not be initiated or continued once its factual foundation has collapsed.

275. Here, Defendant Reamer affirmatively represented that she reviewed evidence which, in fact, directly contradicted the allegations presented in her affidavit and exonerated Plaintiff. Either Reamer failed to review the evidence she claimed to have reviewed, or she knowingly misrepresented its contents. Under either scenario, no reasonable officer could believe that initiating or continuing Plaintiff's prosecution was lawful.

276. Because the constitutional violations alleged were clear under existing precedent at the time of the conduct, and because Defendant Reamer's actions went beyond negligence into deliberate or reckless disregard for the truth, she is not entitled to qualified immunity for the malicious prosecution and continuing seizure of Plaintiff.

**E. Injury**

277. As a direct result of the unlawful initiation and continuation of criminal proceedings, Plaintiff suffered ongoing Fourth Amendment seizures and corresponding harm. These injuries— including physical, financial, emotional, reputational, and liberty-related damages—are incorporated by reference from the Global Damages section below.

**F. Relief Requested**

**278.** Plaintiff seeks all forms of relief available under 42 U.S.C. § 1983 for violations of the Fourth Amendment, including compensatory and punitive damages against Investigator Reamer in her individual capacity, as set forth in the Global Prayer for Relief.

# COUNT 3

**Fourteenth Amendment – Denial of Due Process**

**(Failure to Provide Timely Judicial Review / Examining Trial / Pre-Indictment Delay / ADA-Related Access Failures)**

**42 U.S.C. § 1983**

**Against: GUADALUPE COUNTY (Monell / Official-Capacity Liability)A. Incorporation by Reference**

**279.** Plaintiff realleges and incorporates by reference Paragraphs 1 through 277 as though fully set forth herein. The factual allegations previously stated establish the County's responsibility for providing timely judicial access, processing motions, and ensuring adherence to statutory procedures governing pre-indictment review and examining trials.

**B. Legal Basis**

**280.** The Fourteenth Amendment's Due Process Clause guarantees individuals the right to meaningful, timely access to judicial review when they are restrained of liberty through arrest or pretrial conditions. Due process requires the State to provide procedures that are fundamentally fair and accessible, particularly when the individual remains under significant restraints on liberty.

**281.** Texas law creates a statutory right to an examining trial prior to indictment. Tex. Code Crim. Proc. art. 16.01. Although the federal Constitution does not mandate such a procedure, once a State provides a statutory right, it must be administered in a manner consistent with the Fourteenth Amendment. Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) ("Having created a liberty interest through state law, the State may not arbitrarily deny it.").

**282.** A county violates due process when it engages in systemic delay or denies meaningful judicial access by:

   **(a)** refusing to set or hear motions requesting judicial review;

   **(b)** ignoring requests for an examining trial;

   **(c)** failing to provide timely probable-cause determinations;

   **(d)** refusing to respond to litigant correspondence or ADA accommodation requests; or

   **(e)** permitting criminal cases to remain stagnant without action while the individual remains subject to substantial restraints on liberty.

Such conduct constitutes arbitrary governmental action prohibited by the Fourteenth Amendment. See Manuel v. City of Joliet, 580 U.S. 357, 366–69 (2017) (continued pretrial restraint without judicial determination violates due process and the Fourth Amendment).

**283.** Guadalupe County may be held liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), where constitutional violations result from an official policy, established custom, systemic practice, or deliberate indifference in supervision or administration of criminal-procedure rights. A municipality's failure to provide timely hearings, respond to motions, enforce examining-trial procedures, or accommodate disabled individuals constitutes actionable Monell conduct when such failures are widespread, repeated, or consistent with County-level inaction.

**C. Allegations Against Guadalupe County**

284.    Plaintiff was arrested on April 7, 2025, and immediately placed under restrictive felony bond conditions that substantially limited his liberty, including firearm surrender, geographic restrictions, alcohol prohibition, and mandatory in-person reporting.

285.    On August 26, 2025—more than four months after his arrest and without any indictment having been returned—Plaintiff exercised his statutory right under Tex. Code Crim. Proc. art. 16.01 by filing a Motion for Examining Trial. This motion required the County to promptly set a hearing or otherwise provide judicial review of the arrest.

286.    Between August 26 and September 24, 2025, Plaintiff made repeated written and voicemail requests to the Court Coordinator requesting a hearing date. None of these communications received any response, reflecting a systemic practice of ignoring pre-indictment motions from unrepresented or disabled defendants.

287.    After receiving no acknowledgment from court personnel, Plaintiff was forced to file a Motion to Compel Setting of Examining Trial, documenting the County's persistent non-responsiveness. The filing also notified the County that the delay was depriving Plaintiff of constitutionally required judicial review.

288.    Even after the motion to compel, no examining trial was scheduled. Instead, the County provided the earliest available hearing date—a hearing merely to determine whether an examining trial *would ever be held*—for December 2025. This date fell more than 190 days after Plaintiff's arrest, an extraordinary delay that deprived Plaintiff of both statutory and constitutional protections.

289.    The due-process and access violations alleged herein did not occur in isolation. They were the foreseeable result of an official County practice under which responsibility for post-

arrest constitutional compliance—including judicial review, examining trials, and accommodation of known disabilities—was diffused and effectively disclaimed. As Sheriff leadership confirmed, investigative and case-related responsibility in Plaintiff's matter was deferred to the County Attorney's Office, while no County actor assumed responsibility for ensuring timely judicial process or ADA-compliant access. This absence of institutional accountability caused Plaintiff to remain subject to prolonged restraint without indictment, without an examining trial, and without reasonable accommodations, rendering the resulting Fourteenth Amendment violations attributable to County policy or custom under Monell.

290.    During this entire period, no indictment had been returned, meaning Plaintiff remained subject to severe restraints on liberty without judicial review of probable cause.

291.    Plaintiff submitted multiple ADA Title II notices during this period, each explaining that he was wheelchair-bound and suffered from heart disease, neuropathy, and cancer, and that repeated 8-hour round-trip travel to Seguin posed extreme medical risks. The County ignored every ADA notice, denied all accommodation requests, and provided no mechanism for remote participation.

292.    Despite these documented disabilities, Guadalupe County required Plaintiff to continue making in-person appearances for bond supervision—an 8-hour round trip from League City to Seguin—for brief visits that could have been conducted by phone or video, demonstrating deliberate indifference to federally protected disability rights.

293.    The County also failed to respond to Plaintiff's Internal Affairs complaints, written factual clarifications, and requests for review of the arrest-warrant affidavit. These communications identified material discrepancies—including documentary evidence undermining probable

cause—yet no County official conducted any review, initiated corrective action, or even acknowledged receipt.

294.    At no point did any County supervisor, prosecutor, judge, or court administrator take steps to address the prolonged delay, the lack of judicial review, the statutory right to an examining trial, or the ADA compliance failures. The County's nonresponse occurred across multiple departments—Court Administration, the County Attorney's Office, and the Sheriff's Office— reflecting a systemic practice rather than isolated oversight.

295.    As a result of these systemic failures, Plaintiff remained under substantial restraints on liberty for nearly eight months without judicial review, despite repeated motions, statutory entitlements, ADA notices, and documented deteriorating health. Plaintiff was effectively denied any meaningful opportunity to contest the arrest, present exculpatory evidence, or obtain the examining-trial protections guaranteed by Texas law and the Fourteenth Amendment.

**E. Injury**

296.    As a direct and foreseeable result of Guadalupe County's systemic failure to provide timely judicial review, failure to respond to motions, and disregard for Plaintiff's statutory and constitutional rights, Plaintiff remained under restrictive felony bond conditions for more than 190 days without any meaningful opportunity to contest the basis of his arrest.

297.    These delays deprived Plaintiff of due process, prolonged an unlawful restraint on liberty, exacerbated his medical deterioration, caused emotional distress, and resulted in significant financial and logistical hardship.

298.    Plaintiff incorporates by reference all injuries described in the Global Damages section,

including loss of liberty, health-related decline, travel burdens, and the psychological impact of being denied timely judicial access.

**F. Relief Requested**

**299.**    Plaintiff seeks all forms of relief available under 42 U.S.C. § 1983, including compensatory damages, declaratory relief, and all other remedies described in the Global Prayer for Relief.

**300.**    Because Count 3 is asserted against Guadalupe County in its official capacity, Plaintiff seeks damages against the County as permitted by Monell and declaratory relief confirming that the County's policies, practices, and customs violated Plaintiff's Fourteenth Amendment right to due process.

# COUNT 4

Violation of Title II of the Americans with Disabilities Act

(42 U.S.C. § 12132 – Failure to Accommodate Mobility and Medical Disabilities)**

**Against: Guadalupe County (Official Capacity Only)**

**A. Incorporation by Reference**

**301.**    Plaintiff realleges and incorporates by reference Paragraphs 1 thru 300 including all facts concerning Plaintiff's medical conditions, mobility impairments, written ADA notices, and the County's responses (or lack thereof), as though fully set forth herein.

**B. Legal Basis**

**302.**    Title II of the ADA provides that *"no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services,*

102

*programs, or activities of a public entity, or be subjected to discrimination by any such entity."*
42 U.S.C. § 12132. This prohibition applies to all phases of the criminal justice process,
including bond supervision, court access, internal-affairs processes, and communication with
court personnel.

**303.**    Guadalupe County, its Sheriff's Office, its courts, bond-supervision department, and all
court-administrative services are "public entities" within the meaning of 42 U.S.C. § 12131(1).
As such, they are required to provide reasonable modifications and accommodations to ensure
that individuals with disabilities maintain equal access to judicial services, court proceedings,
and compliance mechanisms mandated by criminal-justice agencies.

**304.**    Title II requires public entities to make reasonable modifications when (1) the plaintiff is a
qualified individual with a disability, (2) the disability or its limitations are known or obvious to
the public entity, and (3) the requested accommodation is reasonable and would not
fundamentally alter the nature of the program. See *Tennessee v. Lane*, 541 U.S. 509, 531–34
(2004); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1195–99 (10th Cir. 2007).

**305.**    The Fifth Circuit recognizes three ADA Title II theories applicable to cases such as this:

   **(a)** wrongful refusal to accommodate,

   **(b)** denial of access to court services, and

   **(c)** imposition of requirements that a disabled person cannot physically or medically perform.
See *Smith v. Harris Cnty.*, 956 F.3d 311, 318–20 (5th Cir. 2020); *Cadena v. El Paso Cnty.*, 946
F.3d 717, 723–26 (5th Cir. 2020). Plaintiff's allegations satisfy all three theories.

**306.**    Exclusion or discrimination under Title II can occur through constructive denial of
access—including when a public entity imposes physical, logistical, or medical demands that a

disabled person cannot safely meet. See *Tennessee v. Lane*, 541 U.S. at 531–34 (requiring accommodation to ensure meaningful access to courts). Requiring an elderly, wheelchair-bound individual with cardiac disease and neuropathy to undertake repeated 8-hour round-trip drives for 3-minute check-ins constitutes precisely the kind of discriminatory barrier the ADA prohibits.

**307.**    A public entity violates Title II when it is placed on actual notice—through written medical documentation, ADA requests, or obvious physical impairments—yet fails to modify procedures, respond to accommodation requests, or engage in any interactive process to facilitate access. See *Frame v. City of Arlington*, 657 F.3d 215, 229–31 (5th Cir. 2011) (en banc) (entities must ensure equal access to governmental services).

**308**.    The County's repeated failure to provide reasonable accommodations in Plaintiff's case was not the result of isolated error or misunderstanding. Rather, it flowed from a County structure under which responsibility for post-arrest case management—including bond supervision requirements, court access, scheduling, and response to ADA requests—was fragmented and effectively disclaimed. Despite actual knowledge of Plaintiff's severe mobility and medical disabilities, no County office accepted responsibility for evaluating or implementing reasonable modifications, resulting in the routine imposition of physically dangerous requirements without accommodation. This structural failure operated as a policy or custom of the County and caused Plaintiff to be excluded from meaningful access to County services, programs, and judicial proceedings in violation of Title II of the ADA.

**D. ADA Violations by Guadalupe County**

**1. Failure to Provide Reasonable Modifications**

**309.**    Despite receiving multiple written ADA Title II notices, medical documentation, and explicit explanations of Plaintiff's disabilities, Guadalupe County required Plaintiff—a 77-year-old, wheelchair-bound Army veteran with cardiac disease, neuropathy, cancer diagnoses, and physician-imposed travel restrictions—to undertake repeated 8-hour round-trip drives from League City to Seguin for brief in-person bond-supervision visits lasting only minutes. These requirements were imposed even though:

    **a.**    Plaintiff medically could not travel long distances without serious risk of cardiac decompensation, pressure-related injuries, and respiratory distress;

    **b.**    Plaintiff's treating physicians had expressly restricted long-distance travel;

    **c.**    the County already possessed, and routinely used, remote-reporting options—including telephone check-ins and virtual supervision—for other defendants; and

    **d.**    the County was fully aware that such travel placed Plaintiff in physical danger and created a substantial risk of harm.

**310.**    Despite having actual knowledge of Plaintiff's disability and medical limitations—and despite delaying limited accommodations in other areas, such as permitting telephone reporting to a bond supervisor and restricting court access to remote appearance only after the case was declined on November 30, 2025—the County refused every reasonable modification request relevant to Plaintiff's ongoing supervision. It denied telephonic reporting as a standing accommodation, rejected virtual appearances when they were medically necessary, refused to relocate or adjust supervision requirements, and made no effort to meaningfully evaluate Plaintiff's medical documentation. This refusal contravened established ADA obligations, state policy, and the County's own practices permitting alternative reporting for medically vulnerable individuals. As a result, Plaintiff was denied meaningful access to court supervision through the

imposition of conditions he was physically incapable of meeting, constituting a clear violation of Title II of the ADA as recognized in *Tennessee v. Lane*, *Cadena*, and *Smith*.

**2. Denial of Meaningful Access to Judicial Proceedings**

**311.** Guadalupe County further violated Title II of the ADA by denying Plaintiff meaningful access to the judicial process, including his statutory right to an examining trial under Tex. Code Crim. Proc. art. 16.01. Specifically, the County:

**a.** failed to acknowledge or act on any of Plaintiff's motions requesting the setting of an examining-trial date;

**b.** ignored Plaintiff's repeated ADA requests for remote or alternative access to court proceedings during the pendency of the case;

**c.** delayed any form of judicial review for more than 190 days following Plaintiff's arrest; and

**d.** refused to provide virtual or telephonic access despite being informed that Plaintiff was medically incapable of traveling without severe risk.

Although the County ultimately permitted remote access for a December 1, 2025 hearing, that accommodation was granted only after the case had already been declined on November 30, 2025, rendering the belated access illusory and underscoring the County's prolonged failure to provide meaningful and timely accommodation when it mattered.

**312.** These omissions—together with the County's failure to respond to Plaintiff's written communications—had the effect of preventing Plaintiff from meaningfully participating in his own criminal proceedings. The Supreme Court has recognized that access to judicial procedures is a core protection of Title II of the ADA, and the denial of such access through the failure to

provide reasonable accommodations constitutes actionable discrimination. *See Tennessee v. Lane*, 541 U.S. 509, 523–25 (2004). As a result of the County's inaction, Plaintiff was denied meaningful access to the courts through the imposition of requirements he was unable to satisfy due to his disability.

### 3. Imposition of Conditions Plaintiff Was Physically Unable to Meet

313.    The County imposed and enforced felony bond conditions that a non-disabled individual could have satisfied, but which Plaintiff—because of his disability—could not safely or reasonably perform. These conditions included:

a.    mandatory long-distance in-person reporting despite medical contraindications;

b.    restrictions requiring the surrender of his home-defense firearm, leaving a disabled and elderly person without basic security;

c.    geographic restrictions and travel requirements beyond Plaintiff's physical capabilities; and

d.    compliance with supervision protocols that created foreseeable risk of hospitalization or physical deterioration.

314.    By imposing supervision and reporting conditions that Plaintiff could not satisfy without jeopardizing his health or safety—and by refusing to modify those conditions despite repeated requests—the County discriminated against Plaintiff "by reason of disability" within the meaning of 42 U.S.C. § 12132. The County's refusal occurred despite the availability of reasonable alternatives and its demonstrated practice of permitting remote reporting in comparable circumstances. For example, during the period from November 9, 2024, to April 7, 2025, Jamie Renee Walker was permitted to complete bond supervision through remote check-ins, while Plaintiff James Roden Sr. was denied similar accommodation. This differential

107

treatment underscores that reasonable modifications were feasible and routinely employed, yet withheld from Plaintiff, resulting in the denial of meaningful access to court supervision without any legitimate governmental justification.

**4. Failure to Train or Supervise Employees Regarding ADA Compliance**

**315.** The County failed to train, supervise, or instruct court personnel, the Sheriff's Office, bond-supervision officers, and administrative staff on their obligations under Title II, including:

    **a.** how to recognize and respond to ADA modification requests;

    **b.** how to engage in the legally required interactive process;

    **c.** how to evaluate medical limitations and consider reasonable modifications; and

    **d.** how to ensure equal access to judicial services for disabled individuals.

**316.** These failures created a systemic practice of disregarding ADA notices, denying accommodations by silence, and applying facially neutral procedures in a manner that disproportionately harmed disabled and medically vulnerable individuals. This systemic disregard constituted deliberate indifference and was the moving force behind the ADA violations suffered by Plaintiff.

**F. Injury**

**317.** As a result of the County's violations of Title II, Plaintiff suffered exclusion from judicial proceedings, forced dangerous travel, emotional distress, physical deterioration, and additional harms incorporated from the Global Damages section.

**G. Relief Requested**

**318.**    Plaintiff seeks relief authorized under Title II of the ADA, including compensatory

damages, reasonable modifications, injunctive relief, and other remedies listed in the Global

Prayer for Relief.

# COUNT 5

Violation of Section 504 of the Rehabilitation Act of 1973

(29 U.S.C. § 794 – Disability Discrimination in Federally Funded Programs)

**Against: Guadalupe County (Official Capacity Only)**

## A. Incorporation by Reference

**319.**    Plaintiff realleges and incorporates by reference Paragraphs 1 through **317**, including all

facts, allegations, and claims previously stated, as though fully set forth herein. These

incorporated facts include Plaintiff's age, documented disabilities, medical limitations, written

ADA/504 notices, the County's refusal to grant accommodations, and the County's repeated

imposition of requirements Plaintiff was medically incapable of meeting.

## B. Legal Basis

**320.**    Section 504 of the Rehabilitation Act provides that no qualified individual with a

disability shall, solely by reason of their disability, be excluded from participation in, denied the

benefits of, or subjected to discrimination under any program or activity receiving federal

financial assistance. 29 U.S.C. § 794(a). The statute imposes obligations that are at least as

stringent as Title II of the ADA and, in several respects, more demanding, particularly where

federally funded justice-system programs are involved.

**321.** To establish a violation of Section 504, a plaintiff must show:

**(1)** that he is a qualified individual with a disability;

**(2)** that he is otherwise eligible to participate in or receive benefits from the public program or activity;

**(3)** that the program or activity receives federal financial assistance; and

**(4)** that he was denied access, excluded, or discriminated against solely by reason of his disability.

**322.** *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004); *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005).

**323.** Section 504 applies to counties, sheriff's departments, district attorney's offices, court administration, and bond-supervision programs when such entities receive federal financial assistance, including—but not limited to—funding for:

- criminal-justice administration;
- victim-services programs;
- courthouse security and operations;
- federal pass-through grants for law-enforcement services;
- ADA accessibility initiatives; or
- technology and case-management systems used to administer bond conditions and court access.

**324.** Where federal funding exists, Section 504 requires public entities not only to refrain from discriminatory acts but also to provide reasonable modifications, avoid policies that disproportionately burden disabled individuals, and ensure equal access to judicial proceedings and supervisory programs. See *Bennett-Nelson*, 431 F.3d at 454–56.

110

**325.**    Under Section 504, discrimination includes both affirmative acts—such as imposing

requirements a disabled person cannot meet—and omissions, such as failing to engage in the

required interactive process, ignoring written requests for modifications, refusing

accommodations while possessing full knowledge of a disability, or applying neutral policies in a

manner that excludes the disabled. *See Cadena v. El Paso Cnty.*, 946 F.3d 717, 724–26 (5th Cir.

2020).

**326.**    The discrimination alleged herein did not arise from isolated neglect or

miscommunication, but from a County structure governing federally funded justice-system

programs under which responsibility for ADA and Section 504 compliance—including

accommodation review, supervision requirements, court access, and response to disability

notices—was fragmented and effectively disclaimed. Despite receiving federal financial

assistance for court administration, supervision, and accessibility initiatives, Guadalupe County

failed to designate or empower any office or official to evaluate Plaintiff's accommodation

requests or implement reasonable modifications. This structural failure predictably resulted in the

imposition of medically dangerous requirements and the denial of meaningful access to federally

funded programs, constituting discrimination "by reason of" disability under Section 504.

**C. Plaintiff's Disability Status**

**327.**    Plaintiff is a 77-year-old, wheelchair-bound U.S. Army veteran with multiple severe and

well-documented medical impairments, including congestive heart failure, chronic neuropathy,

advanced mobility limitations, spinal deterioration, and ongoing cancer treatment. These

conditions substantially limit major life activities such as walking, standing, lifting, traveling,

and performing routine physical tasks. Plaintiff requires assistive devices, continuous medical

care, physician-restricted travel, and accommodations for transportation, mobility, and physical exertion.

328.    Plaintiff qualifies as an individual with a disability under Section 504 because his impairments markedly limit major bodily functions and mobility-related life activities. Plaintiff was—and is—fully capable of participating in judicial proceedings, court communications, and bond-supervision requirements when reasonable modifications (such as remote appearances, telephonic reporting, or scheduling accommodations) are provided. Plaintiff meets all eligibility criteria for participation in court functions and criminal-justice processes but was denied access solely because the County refused to modify its policies or practices despite receiving repeated written notice of his disabilities.

329.    Plaintiff's disability status was known or readily ascertainable to Guadalupe County at all times relevant to this case. Plaintiff expressly notified county officials through ADA and Section 504 notices, medical documentation, certified-mail submissions, and written requests describing his conditions, treatment restrictions, and inability to safely undertake long-distance travel. The County's awareness of Plaintiff's disability triggers the statutory obligations of Section 504 and precludes any argument that reasonable accommodations were not required. Plaintiff has personally met Officer Reamer in which she made notice of his disability upon meeting her in April 2024.

**D. Guadalupe County Receives Federal Financial Assistance**

330.    Guadalupe County is a recipient of federal financial assistance within the meaning of Section 504. The County receives federal funds through multiple channels, including but not limited to:

**a.** court-administration grants supporting judicial operations, technology systems, and access-to-justice initiatives;

**b.** sheriff's office operational grants, including federal funding for law-enforcement training, criminal-justice services, jail operations, and community-policing initiatives;

**c.** criminal-justice program assistance, including grants related to case management, victim services, protective-services coordination, and witness-assistance programs;

**d.** victim-services and witness-support programs, administered in part by the County Attorney's Office and Sheriff's Office;

**e.** transportation, courthouse-security, and ADA-accessibility initiatives, including federal allocations for structural accessibility, technology accommodations, and mobility assistance; and

**f.** federal ADA compliance funding, including funds designated for training staff, processing accommodation requests, and ensuring equal access for individuals with mobility and medical disabilities.

**331.**    The programs and activities supported by these federal funds encompass the exact governmental functions at issue in this case—namely, court scheduling, communication with criminal defendants, arrest and bond-supervision procedures, ADA modification processes, and access to judicial review. Because these programs operate with federal financial assistance, Guadalupe County is directly subject to the nondiscrimination requirements of Section 504 and must administer all related services in a manner that affords disabled individuals meaningful access.

**332.**    By denying Plaintiff reasonable modifications, ignoring his ADA notices, imposing physically unreasonable travel requirements, and failing to provide meaningful access to supervision procedures and judicial review, the County discriminated against Plaintiff in

programs and activities funded by the United States government, thereby violating Section 504's express statutory prohibitions.

### E. The County's Discriminatory Conduct

### 1. Failure to Provide Reasonable Accommodations

**333.** Despite receiving multiple written notices documenting Plaintiff's severe disabilities—including wheelchair dependence, cardiac impairment, neuropathy, and active cancer treatment—Guadalupe County failed to provide any reasonable modifications to ensure safe and meaningful access to criminal-justice proceedings and bond-supervision requirements.

**334.** Rather than provide readily available accommodations at the outset of supervision—such as remote reporting, telephonic check-ins, virtual court appearances, or locally accessible alternative supervision sites—the County required Plaintiff to undertake repeated eight-hour round-trip travel between League City and Seguin, Texas. Although limited remote supervision was eventually permitted months after Plaintiff's arrest, the County refused to implement such accommodations during the critical initial period despite being informed of Plaintiff's medical fragility and mobility limitations. As a result, Plaintiff was subjected to supervision requirements that he could not satisfy without substantial risk to his health and safety. The County's failure to timely modify these requirements denied Plaintiff the benefit of its supervision programs on equal terms and constituted a denial of reasonable accommodation in violation of Section 504 of the Rehabilitation Act.

### 2. Exclusion from Programs and Services by Reason of Disability

**335.** By ignoring Plaintiff's ADA and Section 504 accommodation requests, the County effectively excluded him from participation in essential judicial programs and services,

including:

> a. timely access to an examining trial under Texas law;
>
> b. timely judicial review of the arrest and bond conditions;
>
> c. safe and non-hazardous participation in bond-supervision reporting;
>
> d. equal access to court communications and scheduling procedures; and
>
> e. equal participation in pre-indictment proceedings, including opportunities to challenge

probable cause.

**336.**     These barriers were not imposed on similarly situated non-disabled defendants. They existed only because Plaintiff's disabilities required modifications the County unlawfully refused to make. As a direct result, Plaintiff was denied meaningful access to programs and services funded in part by federal money, in violation of Section 504.

### 3. Imposition of Physically implausible or Dangerous Requirements

**337.**     Guadalupe County imposed travel and reporting obligations that Plaintiff—because of his medical limitations—could not meet safely or consistently. These requirements forced Plaintiff to risk cardiac distress, falls, and worsening neuropathy simply to satisfy routine supervision check-ins that could easily have been conducted remotely.

**338.**     The County's initial refusal to adjust these obligations served no legitimate governmental interest. Reasonable alternatives existed, were commonly used for others, and required no fundamental alteration of the supervision process. Imposing dangerous travel conditions on a severely disabled elderly veteran amounted to discrimination solely by reason of his disabilities, contrary to the protections guaranteed under Section 504.

### 4. Deliberate Indifference

**339.**    Section 504 requires intentional discrimination, which may be established by deliberate indifference. Guadalupe County acted with deliberate indifference to Plaintiff's federally protected rights because:

**a.** Plaintiff submitted multiple written ADA/504 notices documenting his disabilities and proposing specific reasonable modifications;

**b.** County officials received these submissions through court filings, administrative routing, and certified mail;

**c.** no ADA coordinator ever contacted Plaintiff, despite statutory duties to do so;

**d.** no interactive process was initiated to evaluate Plaintiff's medical restrictions;

**e.** no reasonable modification was offered, considered, or discussed; and

**f.** the County continued to impose supervision and travel requirements that it knew posed extreme risk to Plaintiff's health and safety.

**340.**    This pattern of inaction, despite the County's notice of Plaintiff's disability and documented medical limitations, resulted in the denial of reasonable accommodations and excluded Plaintiff from equal participation in judicial services. The County's failure to timely implement readily available modifications caused Plaintiff to experience barriers to access and subjected him to supervision requirements that posed substantial risk to his health and safety, in violation of Section 504 of the Rehabilitation Act.

**G. Injury**

**341.**    As a result of these violations, Plaintiff suffered exclusion from judicial programs, dangerous travel demands, physical deterioration, emotional distress, and other harm incorporated from the Global Damages section.

116

## H. Relief Requested

**342.**    Plaintiff seeks compensatory damages, reasonable modifications, declaratory relief, and all other remedies available under Section 504, as set forth in the Global Prayer for Relief.

# COUNT 6

**Denial of Access to the Courts**

(First and Fourteenth Amendments, 42 U.S.C. § 1983)**

**Against: Guadalupe County (Official Capacity / Monell Liability)**

## A. Incorporation by Reference

**343.**    Plaintiff realleges and incorporates by reference Paragraphs 1 through 341 as though fully set forth herein. All factual allegations relating to the County's failure to schedule hearings, respond to motions, provide ADA accommodations, or permit meaningful participation in the criminal process are incorporated into this Count.

## B. Legal Basis

**344.**    The United States Constitution guarantees individuals a fundamental right of meaningful access to the courts. This right arises from both the First Amendment, which protects the ability to petition the government for redress of grievances, and the Fourteenth Amendment Due Process Clause, which ensures fair and meaningful judicial procedures.

**345.**    A government entity violates this right when it obstructs, delays, or prevents a criminal defendant from obtaining timely judicial review, filing motions, or participating meaningfully in legal proceedings. See *Bounds v. Smith*, 430 U.S. 817, 823 (1977) (right requires affirmative

steps to ensure access); *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (backward-looking claims arise when official action "caused the loss or inadequacy of a judicial remedy").

346.    Meaningful access requires that a defendant have a realistic and practical opportunity to challenge probable cause, request an examining trial, seek modification of bond conditions, and participate in pre-indictment proceedings without unreasonable, discriminatory, or punitive barriers. Denying hearings, ignoring motions, failing to respond to ADA notices, or imposing physically implausible appearance requirements violates this constitutional guarantee.

347.    The Fifth Circuit recognizes access-to-courts claims where government action effectively prevents or nullifies a litigant's ability to obtain judicial review. See *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (access violated where official conduct "hindered his ability to pursue a legal claim"); *Ruiz v. United States*, 160 F.3d 273, 275 (5th Cir. 1998) (systemic delays may amount to denial of access).

348.    A county may be held liable under **Monell v. Department of Social Services**, 436 U.S. 658 (1978), where the denial of access results from an official policy, a widespread custom or practice, or deliberate indifference in supervision or training. Liability attaches when the municipal action is the **moving force** behind the constitutional violation.

349.    The denial of Plaintiff's access to the courts did not result from isolated clerical error, judicial discretion, or ordinary delay. Rather, it flowed from a County practice under which responsibility for post-arrest judicial access—including docketing of motions, scheduling of hearings, response to filings, and accommodation of known disabilities—was fragmented and effectively disclaimed among County departments. In Plaintiff's case, no County office assumed responsibility for ensuring timely judicial review, responding to motions, or facilitating ADA-

compliant participation in proceedings, despite actual knowledge of Plaintiff's circumstances. This structural failure predictably resulted in prolonged inaction, lack of hearings, and the complete obstruction of Plaintiff's ability to be heard, rendering the denial of access attributable to County policy or custom under Monell.

## C. Denial of Access to the Courts by Guadalupe County

## 1. Failure to Provide Any Timely Judicial Review

**350.**    Plaintiff was arrested on April 7, 2025. For more than 190 days thereafter, Guadalupe County failed to provide any form of judicial review, despite Plaintiff remaining under severe felony bond restrictions. During this entire period, the County did not:

   a.   schedule or conduct an examining trial;

   b.   rule on any motion Plaintiff filed;

   c.   respond to requests for hearing dates;

   d.   provide a forum to contest probable cause; or

   e.   offer any judicial mechanism to review the continuing seizure.

**351.**    The only hearing date eventually offered—set for December 2025—was **not** an examining trial but merely a preliminary hearing to determine whether the County would even consider granting one. This delay, exceeding six months, effectively nullified Plaintiff's statutory right under Texas law and his federal constitutional right to meaningful, timely access to the courts.

**352.**    Such prolonged inaction constitutes a complete denial of access to judicial review and is inconsistent with the procedural protections required by the First and Fourteenth Amendments.

119

**2. Ignoring Motions and Communications**

**353.**    Between August and October 2025, Plaintiff submitted multiple filings and communications, including:

  **a.**    a Motion for Examining Trial;

  **b.**    a Motion to Compel Setting of Examining Trial;

  **c.**    a Motion to Expedite Hearing;

  **d.**    a Supplemental ADA Title II Notice and Request for Reasonable Modification;

  **e.**    a Notice of Continued Violation and Preservation of Rights;

  **f.**    a notarized letter to Judge William D. Old III; and

  **g.**    detailed factual clarifications and Internal Affairs submissions.

**354**.    Court administration, bond-supervision personnel, and County officials ignored every one of these communications, failing to acknowledge receipt, take action, or provide any explanation for their continued inaction.

**355.**    This refusal to process or respond to filings deprived Plaintiff of the ability to present exculpatory evidence, challenge the defective arrest-warrant affidavit, or secure any form of judicial intervention.

**3. ADA Failures That Barred Court Access**

**356.**    Plaintiff's severe medical and mobility disabilities—including congestive heart failure, neuropathy, cancer, and wheelchair dependence—made long-distance travel dangerous and medically contraindicated. Despite this, the County required repeated **eight-hour round-trip** drives from League City to Seguin for brief in-person supervision visits.

**357.**    The County ignored Plaintiff's ADA Title II and Section 504 notices, which explained that his disabilities prevented him from safely attending in-person proceedings or traveling long distances without substantial risk.

**358**.    By refusing to permit remote attendance, telephonic reporting, or local accommodations—despite these options being readily available and commonly used—Guadalupe County effectively denied Plaintiff the ability to participate in any judicial proceeding, thereby excluding him from the criminal process by reason of disability.

**4. Systemic Administrative Barriers**

**359**.    Guadalupe County maintained no functioning procedures to ensure that:

a.    motions were timely docketed or ruled upon;

b.    filings received responses from court personnel;

c.    ADA modification requests were reviewed by an ADA coordinator;

d.    bond-supervision requirements accounted for medical or mobility limitations;

e.    examining-trial requests were set within a reasonable or constitutionally adequate time.

**360.**    These systemic administrative failures—consistent with a County-wide pattern of non-responsiveness—prevented Plaintiff from presenting his defense, correcting factual inaccuracies, offering exculpatory documentation, or accessing the same procedural protections afforded to non-disabled defendants.

**5. Continuing Seizure Without Judicial Access**

**361.**    Throughout this period, Plaintiff remained under severe, liberty-restricting felony bond conditions—including firearm surrender, alcohol prohibition, geographic limitations, and mandatory in-person reporting—without **any** avenue to challenge the basis for the seizure.

**362.**    This prolonged restraint, imposed without judicial oversight or the ability to be heard, caused ongoing constitutional injury directly attributable to Guadalupe County's systemic obstruction of Plaintiff's access to the courts.

**E. Injury**

**363.**    As a result of the County's actions and omissions, Plaintiff was denied meaningful access to judicial proceedings and suffered constitutional injury, with all damages incorporated by reference from the Global Damages section.

**F. Relief Requested**

**364.**    Plaintiff seeks declaratory, compensatory, and all other relief available under 42 U.S.C. § 1983 as further detailed in the Global Prayer for Relief.

# COUNT 7

Municipal Liability – Policies, Customs, and Failure to Train

(42 U.S.C. § 1983; Monell v. Department of Social Services, 436 U.S. 658 (1978))**

**Against: Guadalupe County (Official Capacity Only)**

**A. Incorporation by Reference**

**365.**    Plaintiff realleges and incorporates by reference Paragraphs 1 through 364 as though fully set forth herein.

**B. Legal Basis**

**366.**    Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality is liable under § 1983 when a constitutional violation is caused by:

    **a.**    an official policy adopted by a final policymaker;

    **b.**    a widespread and well-settled custom or practice, even if not formally adopted; or

    **c.**    deliberate indifference in training, supervision, or discipline of employees, where the failure to act makes constitutional violations highly predictable.

**367.**    A municipality's liability may also arise when systemic practices, patterns of misconduct, or administrative failures are so persistent and widespread that they constitute a de facto policy—"a custom having the force of law"—adopted, condoned, or knowingly tolerated by county policymakers. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009).

**368.**    Deliberate indifference is established when municipal policymakers (1) know of a pattern of constitutional violations and fail to take corrective action, or (2) where the need for training or supervision is "so obvious" that the failure to do so constitutes conscious disregard of constitutional rights. *Canton*, 489 U.S. at 390; *Connick v. Thompson*, 563 U.S. 51, 61–63 (2011).

**369.**    Municipal liability may also be established where final policymakers ratify unconstitutional conduct by knowingly approving, condoning, or failing to correct actions taken by subordinates after being placed on actual notice of constitutional violations. Ratification occurs when policymakers affirmatively approve a decision or knowingly acquiesce in unconstitutional conduct, thereby adopting it as county policy. See City of St. Louis v.

Praprotnik, 485 U.S. 112, 127 (1988); Davidson v. City of Stafford, 848 F.3d 384, 395 (5th Cir. 2017).

**370.**    A county is liable when its policies, customs, or failures in supervision are the **moving force** behind the plaintiff's constitutional injury. *Board of the County Commissioners v. Brown*, 520 U.S. 397, 404 (1997).

### C. Guadalupe County Maintained Unconstitutional Policies and Customs

### 1. Custom of Deferring Criminal Investigations to the County Attorney's Office

**371.**    Guadalupe County maintained a practice—confirmed by written statements issued by Sheriff's Office leadership in response to official inquiries —under which sworn peace officers deferred investigative responsibility in certain felony matters to the County Attorney's Office, rather than conducting independent law-enforcement investigation. Under this practice, deputies transmitted complaints and materials to prosecutors, closed matters without inquiry, and relied on prosecutor-supplied assertions rather than verifying facts, assessing witness credibility, or correcting inaccuracies in sworn affidavits.

**372.**    This practice is evidenced by the County's written admission that the County Attorney's Office "would be conducting the investigation" into felony allegations involving Cody Lane Koelle, while the Sheriff's Office disclaimed investigative responsibility and closed the matter without review. The same practice governed the investigation and arrest of Plaintiff, where Investigator Reamer relied on assertions originating from prosecutors and defense counsel without conducting any independent verification.

**373.**    By permitting prosecutors—who are advocates, not neutral investigators—to direct or supplant law-enforcement investigation, Guadalupe County adopted a policy that predictably

124

resulted in unverified allegations being presented as probable cause, material exculpatory facts being omitted, and criminal proceedings being initiated and maintained without constitutional safeguards. This practice violated clearly established Fourth and Fourteenth Amendment principles and served as a moving force behind Plaintiff's unlawful arrest and prosecution.

**374.**    Guadalupe County cannot invoke the independent intermediary doctrine to defeat municipal liability. Where County policymakers and the County Attorney's Office controlled the evidentiary narrative presented to magistrates, and where arrest warrants were procured through affidavits that omitted material exculpatory evidence, any purported intermediary review was tainted and not independent. When a magistrate's probable-cause determination relies on false statements or material omissions supplied pursuant to County policy or custom, the causal chain is not broken, and municipal liability under 42 U.S.C. § 1983 remains. See, e.g., *Hand v. Gary*, *Deville v. Marcantel*, *Winfrey v. Rogers*, and *Green v. Thomas*.

**2. Custom of Obtaining and Maintaining Arrest Warrants Without Adequate Investigation**

**375.**    Guadalupe County maintained a widespread and well-settled custom permitting investigators to obtain arrest warrants without conducting basic verification of allegations, without reviewing the reliability of sources, and without disclosing material exculpatory information to magistrates.

**376.**    This unconstitutional custom is demonstrated by:

**a.**    Investigator Reamer's reliance solely on unverified hearsay from Cody Lane Koelle, despite Cody's documented criminal history—including convictions for filing false police reports and impersonating a police officer—and his subsequent April 14, 2025 felony arrest for false reporting in Kansas;

125

**b.**   the omission of known credibility concerns, including Cody's contradictory sworn affidavits and his admission (recorded March 18, 2025) that he was pressured to support Michael Allen Walker;

**c.**   the failure to obtain or review readily available phone records, travel records, medical documentation, or location data disproving the alleged conduct; and

**d.**   the County's complete failure to investigate or correct the affidavit after Plaintiff submitted extensive factual discrepancies, Internal Affairs complaints, and certified-mail documentation disproving the allegations.

377.   This pattern reflects a de facto policy of permitting felony-level arrests to proceed without independent law-enforcement investigation, in violation of clearly established Fourth and Fourteenth Amendment principles.

**3. Systemic Failure to Respond to Motions, Hearings, and Examination Requests**

378.   Guadalupe County maintained a systemic pattern of ignoring, delaying, or refusing to process motions filed by unrepresented or disabled defendants, including motions for examining trials under Tex. Code Crim. Proc. art. 16.01, motions to compel settings, motions to expedite, and ADA-related submissions.

379.   As applied to Plaintiff, this custom resulted in more than 190 days passing without:

**a.**   an examining trial;

**b.**   a ruling on any of Plaintiff's motions;

**c.**   clarification of indictment status; or

**d.**   access to any meaningful judicial review of his continued seizure.

126

**380.**   This systemic delay—combined with total administrative non-responsiveness—constitutes a longstanding County practice that deprived Plaintiff of due process and meaningful access to the courts.

**4. Custom of Ignoring ADA Title II and Section 504 Accommodation Requests**

**381.**   Guadalupe County maintained no functioning process for receiving, routing, reviewing, or responding to ADA Title II or Section 504 accommodation requests from disabled defendants—despite receiving federal funding for ADA compliance.

**382.**   Plaintiff submitted multiple written ADA/504 notices describing his wheelchair dependence, congestive heart failure, neuropathy, cancer diagnoses, and medical inability to travel long distances. These notices were ignored at every administrative level, including court administration, bond supervision, and the Sheriff's Office.

**383.**   The refusal to acknowledge or act upon ADA and Section 504 submissions demonstrates a widespread County practice of violating disability civil rights through deliberate indifference and noncompliance.

**5. Custom of Requiring In-Person Appearances Regardless of Disability or Medical Risk**

**384.**   The County routinely required elderly, disabled, or medically fragile defendants—including Plaintiff—to make long-distance in-person appearances for bond-supervision visits lasting only minutes, even though:

   **a.**   remote reporting and telephonic supervision were readily available;

   **b.**   Plaintiff's medical documentation stated that long travel posed significant cardiac and mobility risks;

   c.  Plaintiff was wheelchair-bound and receiving cancer treatment; and

   d.  reasonable modifications could have been provided without burdening County resources.

**385.**  This practice disproportionately burdened disabled individuals and denied Plaintiff equal access to the court system, in violation of the ADA, Section 504, and the Fourteenth Amendment.

## 6. Custom of Ignoring Internal Affairs Complaints and Citizen Reports

**386.**  Guadalupe County maintained a longstanding practice of disregarding Internal Affairs complaints, sworn citizen reports, and factual clarifications that alleged investigative misconduct or inaccuracies in warrant affidavits.

**387.**  Plaintiff's IA complaint—detailing inconsistencies in Reamer's affidavit, medical evidence contradicting the allegations, and communication records disproving the claimed threat—received no meaningful review, no interview, no corrective action, and no findings.

**388.**  Additionally, Plaintiff's son sent certified-mail submissions to Sheriff Ray on May 13, 2025 and June 11, 2025 requesting an internal investigation into Reamer's conduct. Sheriff Ray never responded, and no investigation was initiated.

**389.**  Instead, County leadership allowed Investigator Reamer—who had been reported to the FBI, DOJ, and Texas Rangers—to remain as the lead officer on the sworn criminal complaint filed by Dolores Jane Roden against Cody Lane Koelle. Reamer closed the matter with no investigation, incorrectly marking it as a "civil issue," despite clear allegations of felony-level perjury.

390. This pattern reflects a broader County custom of shielding investigators from review, suppressing exculpatory information, and preventing accountability for constitutional violations.

**7. Policymaker Knowledge, Ratification, and Deliberate Indifference**

391. Guadalupe County policymakers—including the Sheriff, County Attorney, Assistant County Attorneys, Chief Deputy, and Commissioners Court—were placed on actual notice through:

    a.  Internal Affairs complaints;

    b.  certified-mail submissions;

    c.  ADA notices;

    d.  medical documentation;

    e.  court filings;

    f.  emails and written communications; and

    g.  evidence of Cody Koelle's repeated criminal conduct and contradicting sworn statements.

392. Despite this notice, County policymakers took no corrective action, no supervisory action, and no remedial action, thereby **ratifying** the misconduct and demonstrating deliberate indifference to Plaintiff's constitutional rights.

393. The County's failure to supervise Investigator Reamer—despite overwhelming evidence demonstrating her affidavit was constitutionally defective—directly contributed to Plaintiff's unlawful arrest, prolonged seizure, denial of due process, ADA violations, and denial of access to the courts.

**D. Failure to Train and Supervise**

**394.**    Guadalupe County failed to train its investigators, administrative staff, court personnel, ADA coordinators, and bond-supervision officers in the most basic constitutional and statutory requirements governing criminal investigations and judicial access, including:

**a.**    the Fourth Amendment requirements governing warrant affidavits;

**b.**    verification and corroboration of witness statements, particularly from individuals with known credibility concerns;

**c.**    the obligation to disclose material exculpatory information to magistrates under Franks v. Delaware;

**d.**    timely scheduling of examining trials and compliance with Tex. Code Crim. Proc. art. 16.01;

**e.**    duties to docket and respond to defendant filings and motions;

**f.**    ADA Title II obligations, including the interactive process and reasonable-modification assessments;

**g.**    Section 504 requirements applicable to federally funded criminal-justice programs; and

**h.**    procedures for accommodating elderly, mobility-impaired, and medically fragile individuals in court-related supervision.

**395.**    These training failures were not isolated errors but represented a systemic and pervasive deficiency. The lack of training was so substantial that constitutional violations were the highly predictable and plainly obvious consequence—particularly given the County's regular supervision of elderly and disabled defendants.

**396.**    County policymakers were on actual or constructive notice of these deficiencies based on:

**a.**    multiple written notices from Plaintiff detailing unlawful warrant practices, ADA violations, and lack of judicial access;

**b.**   numerous unanswered motions, emails, and certified-mail submissions directed to judicial administration, bond supervision, and the Sheriff;

**c.**   Internal Affairs submissions identifying credibility issues with the complaining witness and inconsistencies in the investigative record;

**d.**   a documented pattern of extreme delay in scheduling examination hearings for unrepresented defendants; and

**e.**   repeated complaints from citizens and defendants regarding unresponsiveness and ADA noncompliance.

397.   Despite this notice, County policymakers took no remedial action, issued no corrective guidance, provided no additional training, and failed to supervise Investigator Reamer or administrative personnel. Their inaction constitutes deliberate indifference under Monell and directly enabled the constitutional violations suffered by Plaintiff.

**E. Deliberate Indifference**

398.   Guadalupe County's continued inaction in the face of repeated, specific warnings constituted deliberate indifference to the constitutional rights of individuals subjected to its criminal-justice processes. Despite receiving detailed written notices, Internal Affairs submissions, ADA requests, and multiple court filings identifying ongoing violations, the County took no steps to investigate, correct, or supervise the officials whose conduct was causing harm.

399.   County policymakers had actual or constructive knowledge that their policies, customs, and omissions routinely resulted in constitutional violations, including:

**a.**   unlawful arrests and warrant applications submitted without investigation or corroboration;

**b**.   systemic delays in scheduling examining trials and providing judicial review;

131

c. persistent failures to comply with ADA Title II and Section 504 obligations;

d. failure to correct or even examine investigative errors after receiving exculpatory evidence; and

e. administrative practices that denied defendants timely access to the courts and meaningful participation in their own cases.

400. Rather than take corrective action, County policymakers allowed these unconstitutional practices to persist, creating an environment in which the violations suffered by Plaintiff were not only foreseeable but the predictable and natural consequence of the County's longstanding failures. This deliberate indifference establishes Monell liability.

**F. Moving Force**

401. The unconstitutional policies, widespread customs, and systemic failures in training and supervision maintained by Guadalupe County were the moving force behind the constitutional violations suffered by Plaintiff. These County practices were not isolated or accidental but were the direct and foreseeable cause of:

a. **Plaintiff's false arrest**, because the County's custom of permitting investigators to obtain warrants without basic verification predictably resulted in the submission of materially incomplete and misleading affidavits that deprived magistrates of the information required for a lawful probable-cause determination;

b. **Plaintiff's prolonged seizure under restrictive felony bond conditions**, because the County's systemic failure to correct investigative errors, respond to factual submissions, or review arrest-warrant defects ensured that Plaintiff remained under unconstitutional restraints for months without judicial intervention;

132

c.  **the denial of an examining trial**, because the County's established practice of ignoring motions, delaying hearings, and providing no mechanism for timely pre-indictment judicial review predictably and routinely deprived defendants—including Plaintiff—of their statutory right under Texas law and their constitutional right to timely judicial access;

d.  **the denial of ADA and Section 504 accommodations**, because the County's lack of training, absence of any functional ADA-compliance process, and routine disregard of disability notices ensured that Plaintiff's accommodation requests would not be evaluated, routed, or granted, resulting in exclusion from judicial services by reason of disability;

e.  **the exclusion from meaningful access to judicial procedures**, because County customs—including ignoring filings, refusing to schedule hearings, and imposing physically unreasonable reporting requirements—predictably prevented disabled defendants from participating in their cases on equal terms; and

f.  **the continued effects and prolongation of Plaintiff's criminal prosecution**, because the County's policies and customs ensured that no official would investigate discrepancies, correct the record, or halt proceedings after probable cause had collapsed—thus allowing the unconstitutional prosecution to persist.

**402.**  These harms were the natural, direct, and foreseeable result of the County's established practices. Absent the County's unconstitutional policies and customs, none of the injuries described above would have occurred.

**G. Injury**

**403.**   As a result of Guadalupe County's unconstitutional policies and customs, Plaintiff suffered ongoing violations of his Fourth and Fourteenth Amendment rights and other harms incorporated by reference from the Global Damages section.

## H. Relief Requested

**404.**   Plaintiff seeks all forms of relief permitted under 42 U.S.C. § 1983, including compensatory damages and declaratory relief as detailed in the Global Prayer for Relief.

# IX. GLOBAL DAMAGES AND CONTINUING HARM

**405.**   Plaintiff incorporates all preceding paragraphs and alleges the following damages, all of which were directly and proximately caused by Defendants' unconstitutional actions and omissions.

## A. Loss of Liberty and Constitutional Injury

**406.**   Plaintiff suffered a prolonged and unconstitutional *continuing seizure* for more than six months under felony-level bond conditions—despite the absence of an indictment, the absence of judicial review, and the County's complete refusal to provide an examining trial or any mechanism to challenge probable cause.

**407.**   The conditions imposed by Defendants constituted significant restraints on liberty, including—but not limited to—travel prohibitions, firearm surrender, alcohol restrictions, mandatory in-person reporting, and geographic confinement. For a seventy-seven-year-old wheelchair-bound veteran with severe cardiac and mobility impairments, these restrictions were not merely inconvenient—they operated as substantial, ongoing deprivations of freedom that magnified Plaintiff's physical and emotional vulnerability.

**408.**     The loss of liberty, combined with months of uncertainty, lack of judicial access, and the stigma of being subjected to first-degree felony conditions, caused Plaintiff sustained fear, humiliation, anxiety, and dignitary harm. These injuries constitute compensable constitutional damages under the Fourth Amendment's protection against unreasonable seizures and the Fourteenth Amendment's guarantee of due process.

**409.**     Because Plaintiff is elderly, disabled, and medically fragile, the impact of these liberty restraints was disproportionately severe and foreseeably harmful. The continuing seizure imposed hardships far beyond those experienced by an average defendant, intensifying the constitutional injury and causing lasting effects on Plaintiff's physical, emotional, and psychological well-being.

**B. Physical Harm, Medical Impact, and Increased Health Risk**

**410.**     Plaintiff suffers from multiple severe and well-documented medical conditions— including congestive heart failure, neuropathy, chronic mobility impairments, and active cancer treatment—all of which substantially limit major life activities. Defendants' actions foreseeably aggravated these conditions by imposing physically dangerous and medically contraindicated requirements.

**411.**     The County's insistence on repeated eight-hour round-trip drives between League City and Seguin placed Plaintiff at significant medical risk, directly contrary to his physicians' written directives restricting long-distance travel. These mandatory trips exposed Plaintiff to prolonged periods of immobility, circulatory strain, fatigue, and cardiac stress—risks uniquely dangerous for a wheelchair-bound elderly veteran with heart disease and cancer.

412.    Plaintiff experienced increased fatigue, heightened pain, swelling, shortness of breath, and physical deterioration as a direct result of being required to travel for brief five-minute bond-supervision check-ins that could have been conducted remotely at no burden to the County. The medically unnecessary nature of these trips compounded their harmful impact.

413.    By refusing to provide ADA accommodations—despite receiving multiple written notices—the County deprived Plaintiff of safe access to the judicial process and knowingly subjected him to avoidable medical harm. Plaintiff's condition measurably worsened during the period of forced travel, demonstrating a direct causal connection between the County's conduct and his physical decline.

414.    The continued exposure to these medically hazardous conditions inflicted physical suffering, accelerated deterioration of Plaintiff's underlying conditions, and increased his long-term health risks—harms that are compensable under § 1983, Title II of the ADA, and Section 504 of the Rehabilitation Act.

**C. Emotional Distress, Dignitary Harm, and Psychological Injury**

415.    The arrest, felony classification, and prolonged bond restrictions caused Plaintiff severe emotional distress, including humiliation, fear of imprisonment, chronic anxiety, sleep disruption, and a profound loss of independence. These harms were compounded by Plaintiff's age, medical fragility, and previously stable, peaceful life.

416.    Plaintiff suffered significant dignitary and psychological injury uniquely severe for a decorated U.S. Army veteran who lived seventy-seven years with an impeccable record, a reputation for honesty, and a lifetime of honorable service to his family and community. Being

136

treated as a criminal after decades of lawful conduct inflicted an injury to identity, dignity, and personal honor that cannot be understated.

417.    The experience of being arrested, fingerprinted, photographed, and processed as a felon caused deep emotional trauma. Plaintiff reported feelings of shame, fear, vulnerability, and disorientation—psychological injuries amplified by the abrupt transformation from respected elder to criminal defendant without any factual basis.

418.    The stigma and community perception resulting from the false arrest produced ongoing emotional injury. Plaintiff experienced embarrassment in public, anxiety about social interactions, fear of judgment from neighbors and church members, and distress over the possibility of being remembered not for his service, but for an accusation unsupported by evidence.

419.    These harms—humiliation, reputational shame, emotional distress, and loss of dignity—are independently compensable under federal civil-rights law and are particularly severe in cases involving elderly individuals subjected to unjustified felony arrest and prosecution.

**D. Financial Losses and Economic Damages**

420.    Plaintiff was subjected to a preset $100,000 bond—an extraordinary amount for a seventy-seven-year-old disabled veteran with limited retirement income. Meeting this bond obligation forced Plaintiff to draw down substantial portions of his retirement savings, diverting funds earmarked for ongoing medical treatment, household stability, and the support needs of his wife.

421.    Because felony bond restrictions prohibited Plaintiff from leaving the country, he forfeited a fully prepaid 50th-wedding-anniversary cruise. This milestone trip represented decades of

planning and thousands of dollars in unrecoverable expenses. Its loss imposed not only direct financial harm but also significant emotional injury tied to the destroyed celebration.

**422.**    Travel restrictions also caused Plaintiff to lose the full value of his RCI vacation timeshare—a resource he had invested in over many years. Plaintiff was unable to utilize scheduled vacations, resulting in further financial depletion and wasted prepaid benefits.

**423.**    Bond-related travel requirements—including multiple 8-hour round-trip drives from League City to Seguin—imposed substantial additional economic burdens. Plaintiff incurred significant expenses for fuel, vehicle wear and maintenance, meals, lodging, and necessary medical support required for long-distance travel given his health conditions.

**424.**    These economic losses were the direct, foreseeable result of Defendants' unlawful conduct—including the false arrest, discriminatory failure to provide ADA/504 accommodations, and prolonged deprivation of judicial review—and are fully compensable under 42 U.S.C. § 1983, Title II of the ADA, and Section 504 of the Rehabilitation Act.

**E. Loss of Home Safety and Increased Vulnerability**

**425.**    As a condition of his felony bond, Plaintiff—a seventy-seven-year-old, wheelchair-bound, medically fragile veteran—was required to surrender the only means of self-defense available in his home. This condition left Plaintiff and his elderly wife defenseless, despite their physical limitations and inability to flee, resist, or summon help quickly during an emergency.

**426.**    The forced disarmament significantly heightened the risk of harm to Plaintiff and his spouse, creating daily fear for their personal safety. For an elderly couple living with limited mobility, the inability to protect their home constituted a severe deprivation of security, dignity, and emotional well-being.

**427.**    The resulting sense of vulnerability was profound. Plaintiff experienced persistent anxiety, loss of dignity, sleep disruption, and emotional distress stemming from the knowledge that he could not safeguard his home. Such harm is uniquely acute for disabled and elderly individuals who rely on home security measures for survival, independence, and peace of mind.

**428.**    These harms were the direct and foreseeable consequence of Defendants' decision to impose restrictive bond conditions without probable cause and without consideration of Plaintiff's age, disability, or medical vulnerabilities. The deprivation of home safety constitutes compensable injury under § 1983 as well as under the ADA and Rehabilitation Act for its disproportionate impact on a disabled individual.

**F. Loss of Life Enjoyment and Family Harm**

**429.**    Bond restrictions prohibiting Plaintiff from consuming even modest alcohol deprived him of a decades-long nightly ritual shared with his wife—a quiet nightcap that served as a symbol of companionship, emotional connection, and marital stability. The elimination of this routine disrupted one of the few remaining sources of comfort and normalcy in Plaintiff's daily life as an elderly, disabled veteran.

**430.**    The cumulative strain placed on Plaintiff and his spouse—through repeated travel demands, financial depletion, medical deterioration, and the constant threat of incarceration—resulted in shared suffering that harmed the marital relationship, diminished their quality of life, and eroded the emotional security of their household. These relational and lifestyle losses constitute compensable harm recognized under federal civil-rights law.

**431.**    Plaintiff's children, grandchildren, and extended family endured emotional distress, confusion, and fear as they witnessed a 77-year-old, wheelchair-bound veteran subjected to

felony prosecution without probable cause. Observing Plaintiff struggle under physical, financial, and psychological burdens imposed by unlawful government action caused family-wide anguish and lasting intergenerational harm.

432.    The loss of life enjoyment, family stability, and emotional connection resulting from Defendants' conduct reflects an injury that is especially severe for elderly disabled individuals whose remaining years depend heavily on routine, family support, and personal dignity.

**G. Damage to Reputation, Honor, and Community Standing**

433.    Before his arrest, Plaintiff enjoyed an unblemished reputation as a decorated U.S. Army veteran, a respected family patriarch, and a long-standing member of his religious and local community. His identity was inseparable from a lifetime of integrity, service, and honorable conduct.

434.    The dissemination of a false first-degree felony accusation—one carrying a potential sentence of up to 99 years in prison—inflicted immediate and lasting reputational injury. Neighbors, church members, family acquaintances, and community contacts perceived Plaintiff not as the law-abiding veteran they had always known, but as a person accused of one of the most serious crimes under Texas law. This reputational collapse is uniquely devastating for an elderly individual whose good name was built over seven decades.

435.    Because Plaintiff's age, military service, and community standing made his reputation one of his most valued possessions, the stigma attached to the false charge caused profound emotional, social, and dignitary harm. The loss of honor and community respect constitutes a compensable injury under federal civil-rights law—particularly where, as here, state actors acted without probable cause and in disregard of exculpatory information.

**436.**    The reputational damage is permanent. Even after dismissal of the case, the public nature of the arrest, bond conditions, and felony accusation ensures that the stain on Plaintiff's name will persist, affecting his social relationships, community participation, and emotional well-being for the remainder of his life.

## H. Punitive Damage Basis Against Investigator Reamer

**437.**    Investigator Reamer's actions—including knowingly or recklessly omitting material exculpatory information from the arrest-warrant affidavit, failing to conduct even a minimal investigation, disregarding evidence already in the County's possession, and continuing to allow the prosecution to proceed after the factual foundation had collapsed—demonstrate a reckless or callous indifference to Plaintiff's clearly established constitutional rights. Such conduct satisfies the standard for punitive damages under § 1983. *See* Smith v. Wade, 461 U.S. 30, 56 (1983).

**438.**    Reamer's conduct was not the product of mistake, negligence, or oversight; it reflected a conscious disregard for the truth, for the reliability of the sole complaining witness, and for the obvious risk of imprisoning a 77-year-old disabled veteran based on an affidavit devoid of probable cause. The foreseeable harm to Plaintiff—loss of liberty, physical danger, reputational destruction, and emotional injury—was substantial and ignored.

**439.**    Punitive damages are therefore warranted to punish this unconstitutional conduct and to deter future violations, particularly where the victims are elderly, disabled individuals who are disproportionately harmed by unlawful arrests, prolonged pre-indictment restraints, and the withholding of exculpatory information.

## I. Future Damages and Continuing Harm

440.    Plaintiff continues to suffer significant and compounding harm as a direct and proximate result of Defendants' unconstitutional actions, including ongoing physical deterioration, increased cardiac and mobility complications, persistent emotional distress, reputational damage, and substantial continuing financial burdens. These harms did not end when the criminal proceedings ceased but instead continue to manifest and worsen due to the stress, travel strain, loss of resources, and diminished physical stability caused during the period of unlawful restraint.

441.    Given Plaintiff's advanced age, wheelchair dependence, chronic cardiac and neuropathic conditions, and ongoing cancer treatment, the injuries inflicted by Defendants have long-term and in many respects permanent consequences. The physical decline, emotional trauma, reputational damage, and financial depletion will endure for the remainder of Plaintiff's life and will likely accelerate further medical challenges and loss of independence.

442.    These future damages—including anticipated medical expenses, loss of quality of life, continuing emotional distress, and permanently diminished life enjoyment—are compensable under 42 U.S.C. § 1983, Title II of the ADA, and Section 504 of the Rehabilitation Act, as they flow directly from the constitutional and statutory violations perpetrated against Plaintiff.

# X. PRAYER FOR RELIEF

443.    WHEREFORE, PREMISES CONSIDERED, Plaintiff **James Louis Roden Sr.** respectfully prays that this Court enter judgment in his favor and against all Defendants, and award the following relief as permitted by law:

**A. Declaratory Relief**

**444.**    A declaration that Defendants' actions and omissions described herein violated Plaintiff's rights under the Fourth Amendment, Fourteenth Amendment, ADA Title II, Section 504 of the Rehabilitation Act, and 42 U.S.C. § 1983.

**445.**    A declaration that Plaintiff was subjected to an arrest and continuing seizure without probable cause, deprived of timely judicial review, denied meaningful access to the courts, and excluded from participation in County programs and services by reason of disability.

**B. Compensatory Damages**

**446.**    An award of compensatory damages against all appropriate Defendants for:

   **a.**   loss of liberty and constitutional injury;

   **b.**   emotional distress, fear, humiliation, and dignitary harm;

   **c.**   physical deterioration, medical risk, and travel-related hardship;

   **d.**   financial losses, including bond expenditures, travel costs, and lost anniversary and timeshare benefits;

   **e.**   loss of enjoyment of life and family routines;

   **f.**   damage to reputation, honor, and community standing; and

   **g.**   all other economic and non-economic damages proved at trial.

**C. Punitive Damages**

**447.**    An award of punitive damages against **Investigator Elaine M. Reamer** in her individual capacity for her reckless disregard of Plaintiff's constitutional rights, as permitted under federal law.

**D. Injunctive and Equitable Relief**

**448.**    An order requiring Guadalupe County to comply with Title II of the ADA and Section 504, including policies and training that ensure:

    **a.**    timely responses to ADA accommodation requests;

    **b.**    reasonable modifications for disabled defendants; and

    **c.**    procedures to ensure meaningful access to judicial proceedings for mobility-impaired individuals.

**449.**    An order prohibiting Defendants from further denying Plaintiff reasonable accommodations or meaningful access to judicial processes on the basis of disability.

## E. Attorney's Fees and Litigation Costs

**450.**    An award of attorney's fees and costs under 42 U.S.C. § 1988, 29 U.S.C. § 794a, and all other applicable federal statutes, including fees incurred by future counsel who may enter an appearance on Plaintiff's behalf.

## F. Pre-Judgment and Post-Judgment Interest

**451.**    An award of pre-judgment and post-judgment interest at the maximum rate allowed by law.

## G. Any Further Relief

**452.**    Such other and further relief, at law or in equity, as this Court deems just, proper, and necessary to redress the injuries Plaintiff has suffered and to protect the rights of elderly and disabled individuals within Guadalupe County's criminal-justice system.

462.
449.    Plaintiff **demands a trial by jury** on all issues so triable under the Constitution and laws

of the United States.

# XII. SIGNATURE BLOCK

Respectfully submitted,

Date: 29 Dec 25

James Louis Roden Sr.
Plaintiff, Pro Se
1555 Tahoe Court
League City, Texas 77573
jrodensr@gmail.com

144

## XIII. VERIFICATION

I, **James Louis Roden Sr.**, am the Plaintiff in this action. I have read the foregoing Complaint and declare that the factual statements contained therein are true and correct to the best of my knowledge, information, and belief. Matters stated upon information and belief are believed to be true.

I verify this Complaint under penalty of perjury.

James Louis Roden Sr.
Plaintiff, Pro Se

Date: 29 Dec 25

145

## XIV. DECLARATION UNDER 28 U.S.C. § 1746

I, **James Louis Roden Sr.**, declare under penalty of perjury that:

1. I am the Plaintiff in this case.

2. Everything stated in this Verified Complaint is true and correct based on my personal knowledge, or upon information and belief where indicated.

3. I verify and affirm the truth of my allegations as required by federal law, including 28 U.S.C. § 1746.

Executed on this ___29___ day of ___December___, 2025, in League City, Texas.

**James Louis Roden Sr.**
Plaintiff, Pro Se

Candice Sliger
Notary

CANDICE SLIGER
Notary Public, State of Texas
Comm. Expires 06-13-2027
Notary ID 13204936-2

146