IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JAMES LOUIS RODEN SR.,<br>*Plaintiff,*<br><br>v.<br><br>ELAINE MICHELLE REAMER, and<br>COUNTY OF GUADALUPE, TEXAS<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 5:26-cv-00081-XR |

**FIRST AMENDED VERIFIED CIVIL RIGHTS COMPLAINT AND JURY DEMAND**

**I. INTRODUCTION**

1. This civil-rights action arises from the arrest and nearly eight-month felony restraint of Plaintiff James Louis Roden Sr., a seventy-eight-year-old disabled United States Army veteran, father, and grandfather, on a first-degree felony witness-tampering warrant that did not allege facts satisfying Texas Penal Code section 36.05. Plaintiff is the grandfather of Shelby Jane Koelle ("S.J.K."), an intellectually and developmentally disabled rape victim in the underlying prosecution against Michael Allen Walker, who was charged with six first-degree felony counts of aggravated sexual assault. Plaintiff is also the father of Jamie Renee Walker, an intellectually and developmentally disabled domestic-violence victim and criminal defendant whom Plaintiff helped by providing transportation to and from court.

2. Plaintiff's role was limited and noncriminal. Other than transporting his daughter, Jamie, to court proceedings and supporting his disabled family members, Plaintiff had almost no contact with Cody Lane Koelle. Plaintiff did not know Cody was being treated as a witness or as a defense-aligned character witness for Michael Walker. To Plaintiff's knowledge, Cody had signed an affidavit in November 2024 supporting his mother, Jamie Walker, not Michael Walker.

Plaintiff therefore had no reason to believe Cody was a witness whose testimony Plaintiff could influence, and no reason to threaten, coerce, or pressure him and records show nearly no contact.

3. On April 7, 2025, Plaintiff was shocked and surprised when he was arrested while taking his daughter Jamie to a pretrial hearing. Both Plaintiff and Jamie were arrested on first-degree felony witness-tampering charges based on allegations routed from Michael Walker's defense lawyers, and a warrant was also issued for Plaintiff's son, James Louis Roden Jr., a public-school teacher, minister, mandated reporter, and the person who made the initial report of S.J.K.'s rape and later reported renewed exploitation concerns involving S.J.K and S.J.K chosen advocate. *(Exhibit A)*

4. Investigator Elaine Michelle Reamer did not interview Plaintiff, Cody Lane Koelle, Andrea Koelle, Jamie Renee Walker, S.J.K., the Kansas notary, James Jr., or any firsthand witness before seeking the warrant. She identified no phone record, text message, voicemail, recording, CPS record, travel record, subpoena record, or witness interview showing that Plaintiff threatened Cody or tried to influence false testimony. Instead, Reamer converted stale, defense-routed paperwork and a prosecutor summary into a first-degree felony warrant against an elderly disabled veteran who had acted as a father, grandfather, court transporter, and disability advocate, not as a witness tamperer.

5. The warrant affidavit stated that from March 17, 2025 through April 5, 2025, Reamer had been receiving documentation from the Guadalupe County Attorney's Office that the County Attorney's Office had received from Michael Walker's attorneys, whose client was being prosecuted for aggravated sexual assault involving S.J.K. and had a documented history of violence involving Jamie Walker.. The affidavit itself shows that Reamer did not conduct a twenty-day investigation. She merely received a packet. The only materials she referenced were January 31, 2025 affidavits attributed to Cody and Andrea Koelle, a March 4, 2025 Kansas

protective-order petition filed against Jamie Walker (all facilitated by Michael Walker defense attorney's), and a statement relayed by the County Attorney's Office that Cody supposedly said Plaintiff threatened CPS action. None of those materials named Plaintiff by legal name as making a verified criminal threat; none identified a date, time, method, phone number, text, recording, or official-proceeding nexus; and none identified what false testimony Plaintiff supposedly sought. *(Exhibit G)*

6. The statutory defect was obvious. Cody was not subpoenaed until March 18, 2025. The January affidavits and March 4 protective-order petition predated that subpoena. Cody was not a firsthand witness to the underlying Seguin sexual-assault allegations. In a preserved March 18, 2025 call sent to the County Attorney's Office, Cody stated in substance that he knew nothing firsthand about what happened in Seguin and would tell officials he knew nothing and was being pressured by County Attorney's to support Michael. *(Exhibit F)* Reamer omitted those facts while asserting that Plaintiff tampered with Cody as a witness in an aggravated-sexual-assault proceeding.

7. The March 4 protective-order petition was filed by Cody against Jamie Walker, not against Plaintiff. It did not identify James Louis Roden Sr. by name. It used the vague term "granddad" and alleged that if Cody lost $40,000, "he going to come done cracking hard." The petition did not say when the statement was made, how it was made, who heard it, what it meant, what testimony it concerned, or whether it had anything to do with Cody's later subpoena or any official proceeding. Reamer nevertheless used that ambiguous, stale, unverified phrase as probable cause for a first-degree felony arrest of a disabled seventy-seven-year-old veteran.

8. After the arrests, the County still refused to investigate. While in the Guadalupe County Jail, Plaintiff, James Louis Roden Jr., and Jamie Renee Walker each requested to speak with an

investigator about the first-degree felony witness-tampering accusations. They were told, in substance, that no investigator would ever speak with them about the case. No Guadalupe County investigator, Sheriff's Office investigator, County Attorney representative, or County official ever interviewed any of the three accused persons before or after arrest about the alleged tampering. Plaintiff was not presented to a grand jury. Upon information and belief, the related tampering matters against James Jr. and Jamie followed the same pattern. Each remained in legal limbo until the charge was declined when judicial review or procedural scrutiny approached.

9. The court-access and ADA record is equally important. Plaintiff filed a Motion for Examining Trial on August 26, 2025, repeatedly requested a hearing, renewed ADA accommodation requests, filed a motion to compel, filed a motion to expedite, requested remote participation and accessible written communication, and warned the County and court-related officials that his cancer, heart disease, severe neuropathy, hospitalizations, cardiac event, and inability to make repeated long-distance travel made delay medically dangerous. A December 1, 2025 Zoom setting was eventually provided, showing remote access was reasonable and available, but that setting came only after months of restraint and was for a motion to compel scheduling rather than the underlying examining trial itself. The charge was declined on November 30th before Plaintiff ever received meaningful probable-cause review. *(Exhibit C)*

10. The June 18, 2025 certified bond-hearing transcript *(Exhibit G)* in Jamie Walker's case further confirmed that probable cause had collapsed. Cody testified under oath that he did not write an affidavit, did not sign the affidavit shown to him, and "didn't sign any affidavits at all." When asked whether he wrote any affidavit supporting Michael Walker, he answered no. Those affidavits and protective-order materials were foundational to the April 7 warrant stream used to arrest Plaintiff, Jamie Walker, and James Jr. If Cody testified truthfully, the County relied on

unauthenticated or misattributed affidavits. If Cody testified falsely, the County's key witness was willing to lie under oath. Either way, no reasonable officer or prosecutor could continue to rely on Cody as reasonably trustworthy evidence of probable cause.

11. This case is therefore not about a good-faith prosecution. Plaintiff alleges that Guadalupe County used the process of arrest as punishment: first-degree felony warrants, $100,000 bond, restrictions, delay, refusal to interview the accused, refusal to present the case to a grand jury, delay of examining-trial review, disability-access barriers, and declination only when review approached. The process itself was used to silence and chill a family that had reported abuse, petitioned courts and officials for ADA accommodations, and advocated for intellectually disabled women.

12. A corrected affidavit would have told the magistrate that Plaintiff was disabled and medically limited; that his disability had already been placed in the related court record; that Cody's credibility defects were disclosed before arrest; that the materials came through Michael Walker's defense side and the County Attorney's Office; that the January affidavits and March 4 protective order predated Cody's subpoena; that Cody lacked firsthand knowledge; that the protective order was against Jamie, not Plaintiff; that "granddad" was ambiguous and unverified; that no objective record showed any threat by Plaintiff; and that Reamer had interviewed no one. With those facts included, probable cause and arguable probable cause disappear.

13. Plaintiff brings claims under 42 U.S.C. section 1983, the Fourth and Fourteenth Amendments, the First Amendment, Title II and Title V of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Monell v. Department of Social Services. Plaintiff seeks compensatory damages, punitive damages against Reamer individually, declaratory relief, injunctive relief, costs, and all other relief the Court deems just.

## II. PARTIES, JURISDICTION, VENUE, AND PLEADING STANDARD

14. Plaintiff James Louis Roden Sr. is a resident of League City, Texas. He is a disabled United States Army veteran born February 14, 1948. He suffers from severe neuropathy, mobility impairment, cancer, heart disease, and other medical conditions that substantially limit walking, travel, standing, and safe participation in distant court proceedings. He was arrested on April 7, 2025 for first-degree felony witness tampering and remained under felony bond restrictions until the prosecution was declined.

15. Defendant Elaine Michelle Reamer was at all relevant times an investigator with the Guadalupe County Sheriff's Office. She is sued in her individual capacity for damages. She prepared, swore to, and submitted the April 7, 2025 warrant affidavit that caused Plaintiff's arrest and continuing seizure.

16. Defendant Guadalupe County, Texas is a political subdivision of the State of Texas. It is sued for municipal liability under section 1983 and as a public entity under Title II and Title V of the ADA and Section 504 of the Rehabilitation Act. Plaintiff alleges County liability based on sheriff-side warrant practices, failure to independently investigate prosecutor-routed accusations, failure to train and supervise, failure to accommodate disability, retaliation for disability advocacy, failure to correct after notice, and ratification. The County's relevant services, programs, or activities include law enforcement, warrant practices, bond-supervision participation, complaint intake, records and communications, County Attorney functions, courthouse access support, and related criminal-justice programs.

17. This Court has jurisdiction under 28 U.S.C. sections 1331 and 1343 because the claims arise under the United States Constitution and federal civil-rights statutes. This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. sections 2201 and 2202.

18. Venue is proper in the Western District of Texas, San Antonio Division because the warrant affidavit was prepared in Guadalupe County, the warrant issued there, the criminal process was maintained there, the bond restrictions were administered there, and the relevant County customs and omissions occurred there.

19. Plaintiff was never convicted. His charge was declined without indictment, trial, plea, admission, deferred adjudication, or pretrial diversion. Heck v. Humphrey does not bar this action. Younger abstention does not apply because no ongoing prosecution remains.

20. This Complaint satisfies Rule 8 because it identifies the actors, dates, documents, statements, omissions, statutory elements, corrected-affidavit facts, legal process, disability notices, accommodation requests, County responses, and injuries. The allegations are factual and plausible, not labels or conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), require plausibility, not proof at the pleading stage. As a pro se civil-rights pleading, it must also be liberally construed. Haines v. Kerner, 404 U.S. 519 (1972); Erickson v. Pardus, 551 U.S. 89 (2007).

### III. FACTUAL ALLEGATIONS

**A. Pre-arrest disability, court-record notice, and protected advocacy**

21. Before the April 7 warrant, the related court record already identified Plaintiff's disability. On March 21, 2025, James Louis Roden Jr. filed a written complaint with Judge Gary Steel in Cause No. 24-1775-CR-B. That filing stated that subpoenaed family members lacked firsthand knowledge relevant to Jamie Walker's bond hearing and identified Plaintiff as a 77-year-old Army veteran suffering from severe neuropathy that significantly limited his mobility.

22. The March 21 filing also warned that subpoenas had been issued to family members only after James Jr. tried to help officials obtain S.J.K.'s firsthand testimony. The filing alleged

retaliation, abuse of subpoena power, and failure to verify facts before seeking bond-related testimony. It placed the Court and County Attorney's Office on notice that the Roden family was alleging retaliatory legal process and that Plaintiff was disabled.

23. On March 21-22, 2025, the County Attorney's Office also received written notice that Cody Koelle had credibility problems and criminal-history issues involving false statements to law enforcement, impersonation of a police officer, obstruction-related conduct, and unauthorized emergency-style lights. This notice was material because Cody was the only witness or alleged victim that Reamer later treated as supporting probable cause against Plaintiff. *(Exhibit B)*

24. On April 1, 2025, James Jr., a certified educator, mandated reporter, and disability advocate, filed a report concerning new sexual exploitation and safety risks involving S.J.K., an intellectually disabled adult. The report warned that Cody and Andrea had allowed a dangerous adult male to live with S.J.K. and that Cody had admitted awareness of sexual exploitation. James Jr. requested anonymity because he feared retaliation. Six days later, Plaintiff, James Jr., and Jamie Walker were arrested or subjected to coordinated first-degree felony witness-tampering warrants. Plaintiff pleads this sequence as context, motive, retaliation evidence, and Monell pattern evidence, not to assert claims on behalf of nonparties.

**B. What Reamer swore to and what she did not do**

25. Reamer swore that Plaintiff, between November 2024 and March 2025 in Guadalupe County, Texas, coerced Cody Koelle, "who was a witness in an official proceeding, namely Aggravated Sexual Assault," by contacting Cody and telling him that if Cody lost $40,000 Plaintiff was going to start cracking down. Reamer also swore that Plaintiff told Cody he would come to where Cody lived and have Cody's children removed if Cody did not help Jamie Walker, with intent to influence Cody to testify falsely.

26. The probable-cause section did not provide facts supporting those conclusions. Reamer stated that beginning March 17, 2025, she had been receiving documentation from the Guadalupe County Attorney's Office that the County Attorney's Office had received from Michael Walker's attorneys. She referenced an affidavit attributed to Cody, an affidavit attributed to Andrea, and a statement that the County Attorney's Office advised her that Cody had repeatedly said Plaintiff threatened CPS action.

27. Reamer did not say she interviewed Cody. She did not say she interviewed Andrea. She did not say she interviewed Plaintiff. She did not say she interviewed Jamie, S.J.K., James Jr., Dolores Roden, the Kansas notary, or any firsthand witness. She did not say she reviewed phone logs, text messages, voicemails, emails, notary records, subpoena records, CPS records, travel records, or court records establishing when Cody became a witness. The affidavit therefore identified no independent investigation between March 17 and April 5, 2025.

28. The affidavit admitted on its face that the information stream was not neutral law-enforcement investigation. It was Michael Walker's attorneys to the Guadalupe County Attorney's Office, then to Reamer, then to the magistrate. Michael Walker was the criminal defendant whose exposure would be reduced if the Roden family and the intellectually disabled victim's advocates were discredited. A reasonable officer would know that defense-routed materials from an interested adversarial source required independent verification before being used for a first-degree felony warrant.

29. A warrant affidavit may rely on hearsay only when the information is reasonably trustworthy and provides a sufficient basis for a neutral magistrate to assess probable cause. Beck v. Ohio, 379 U.S. 89, 91 (1964); Illinois v. Gates, 462 U.S. 213, 238 (1983). Reamer provided no indicia of reliability, no authentication, and no independent corroboration.

**C. What the referenced documents actually showed**

30. The January 31 Cody affidavit did not identify James Louis Roden Sr. by legal name as making a witness-tampering threat. It described generalized family pressure and referred to "my grandfather on Jamie's side" contacting them to sign affidavits. It did not identify a date, time, communication method, phone number, text, recording, false testimony sought, official proceeding, or act by Plaintiff that would satisfy Texas Penal Code section 36.05. *(Exhibit E)*

31. The January 31 Andrea affidavit likewise did not identify facts showing Plaintiff committed witness tampering. It contained vague and confused references to family fear and possible CPS retaliation. It did not clearly name Plaintiff, did not identify a specific statement by Plaintiff, did not provide a date or method of communication, and did not connect any alleged statement to Cody's testimony in an official proceeding.

32. The March 4 Kansas protective-order petition was filed by Cody against Jamie Walker, not against Plaintiff. It stated: "This week at 12:32pm when they called and texed me asking me to write a letter lieing saying that she has not been in concact with my sister when she has and having are granddad threaten us by saying if he looses 40,000$ he going to come done cracking hard." This passage did not name Plaintiff; did not identify when, where, or how any statement was made; did not define "granddad"; did not quote Plaintiff; did not identify any testimony; did not mention Cody's subpoena; and did not show intent to cause false testimony. *(Exhibit G and I)*

33. The $40,000 issue had no clear connection to Jamie Walker's bond hearing or the underlying aggravated-sexual-assault case. The protective-order petition concerned Cody's dispute with Jamie and family members. Reamer did not explain how a vague, unverified complaint about

"granddad" and $40,000 became probable cause to arrest Plaintiff for first-degree felony witness tampering in Guadalupe County.

34. The relied-upon January affidavits and March 4 protective-order filing were created before Cody was subpoenaed on March 18, 2025. Reamer did not disclose that timing problem. She did not explain how Plaintiff could have tampered with Cody as a witness during months when Cody had not been subpoenaed or identified as a witness for the relevant hearing.

35. The March 18 recorded call is also material. In that call, Cody stated in substance that he had no firsthand knowledge of what happened in Seguin in the sexual-assault case and would tell officials he knew nothing. Cody could at most repeat what others allegedly told him. Reamer omitted that Cody lacked firsthand knowledge and failed to explain what admissible, material testimony Plaintiff supposedly tried to influence.

**D. Element-by-element failure under Texas Penal Code section 36.05**

36. Texas Penal Code section 36.05 requires facts showing that the accused, with intent to influence a witness or prospective witness in an official proceeding, offers, confers, or agrees to confer a benefit, or coerces a witness or prospective witness to testify falsely, withhold testimony or information, elude process, absent himself from an official proceeding, or delay or discontinue prosecution. The first-degree felony label under section 36.05(e-1)(2) does not eliminate those required elements.

37. First, Reamer's affidavit did not plead a knowing communication by Plaintiff. It did not identify a call, text, email, voicemail, recording, letter, visit, or witness interview showing that Plaintiff communicated the alleged threat. It did not identify the date, time, place, phone number, device, sender, recipient, or words allegedly used by Plaintiff.

38. Second, the affidavit did not plead actual coercion or an unlawful benefit. It alleged no bribe, promise, offer, payment, agreement, or benefit from Plaintiff. A vague accusation that someone threatened to call CPS is not automatically unlawful coercion, especially when serious child-safety concerns and existing CPS issues were part of the broader record. Reamer alleged no verified CPS call by Plaintiff and no record showing Plaintiff ever contacted CPS about Cody or Andrea.

39. Third, the affidavit did not identify what false testimony Plaintiff supposedly wanted Cody to give. It did not state whether Cody was allegedly being asked to lie about Jamie contacting S.J.K., about Michael Walker, about affidavits, about the $40,000, about CPS, or about any material fact in any official proceeding.

40. Fourth, the affidavit did not establish a nexus to an official proceeding. Saying "Aggravated Sexual Assault" is not enough. Reamer did not explain how Cody's expected testimony at a bond hearing about alleged Jamie-S.J.K. communications related to firsthand knowledge of the sexual-assault charges. She did not explain how an alleged family dispute over affidavits was tied to testimony in that proceeding.

41. Fifth, the affidavit did not establish Cody's witness status during the alleged period. The warrant alleged conduct from November 2024 through March 2025, but the relied-upon documents predated Cody's March 18 subpoena. The affidavit did not allege facts showing Plaintiff knew Cody would be called as a witness before March 18 or that any alleged statement after March 18 occurred.

42. Sixth, the affidavit did not establish venue in Guadalupe County. Plaintiff lived in League City. Cody lived in Kansas. The affidavit did not allege that Plaintiff was in Guadalupe County,

that Cody was in Guadalupe County, that a communication was made from or received in Guadalupe County, or that any act by Plaintiff occurred in Guadalupe County.

43. Seventh, the affidavit did not establish first-degree felony probable cause. It alleged no act of family violence by Plaintiff, no threat of violence by Plaintiff against Cody, no date-specific coercion, no witness interview, and no corrected evidentiary basis for the enhancement. The label "FV case with F1 case" did not substitute for facts.

## E. Material falsehoods and omissions under Franks

44. Reamer's statement that Cody was "a witness in an official proceeding" was materially misleading because the affidavit alleged a period beginning in November 2024 while the relied-upon materials predated Cody's March 18, 2025 subpoena. The affidavit omitted that Cody had not been subpoenaed when the January affidavits and March 4 petition were created.

45. Reamer's statement that Plaintiff contacted Cody and made threats was materially misleading because she identified no contact record and performed no contact verification. A corrected affidavit would have disclosed that no phone log, text, voicemail, email, recording, or witness interview supported the alleged threat and that Reamer did not interview Plaintiff or Cody before seeking the warrant.

46. Reamer's reference to an "affidavit written by Cody" was materially misleading because she did not verify authorship, voluntariness, notary validity, or consistency with Cody's other statements. She also omitted that Cody had made contradictory statements, had criminal-history credibility issues, and had been the subject of warnings sent to the County before the warrant.

47. Reamer's reliance on Andrea's affidavit was materially misleading because Andrea's statement did not clearly identify Plaintiff and was based on generalized fear. It did not establish

a crime by Plaintiff. Reamer omitted that she never interviewed Andrea and never corroborated the alleged fear with objective evidence.

48. Reamer's use of the March 4 protective-order allegation was materially misleading because the petition was against Jamie, did not name Plaintiff, used the ambiguous term "granddad," and did not state when or how the alleged "cracking hard" phrase was said. Reamer omitted that context.

49. Reamer's CPS-threat allegation was materially misleading because it was relayed by the County Attorney's Office, not obtained through Reamer's direct interview of Cody. Reamer did not disclose that it was hearsay on hearsay, did not verify whether Plaintiff ever contacted CPS, and did not disclose that child-safety concerns existed independent of any alleged statement by Plaintiff.

50. Reamer omitted Plaintiff's disability and physical implausibility. The court record already stated Plaintiff was a 77-year-old Army veteran with severe neuropathy and mobility limitations. Reamer omitted those facts from the affidavit, preventing the magistrate from evaluating whether the alleged conduct was plausible.

51. Reamer omitted Cody's lack of firsthand knowledge. Cody was not a firsthand witness to the Seguin events, and in the March 18 recorded call he stated in substance that he knew nothing firsthand and would say so. That omission was material because witness-tampering probable cause depends on what testimony Cody could provide and what testimony Plaintiff allegedly tried to influence.

52. Reamer omitted the County's prior notice of Cody's credibility problems. Before the warrant, County officials had been warned about Cody's law-enforcement-related criminal history and reliability concerns. This included a September 2024 arrest involving allegations that Cody filed

a false police report, made false statements to law enforcement, concealed or obscured evidence, impersonated a police officer, and used unauthorized red and blue emergency lights on his vehicle to create the appearance of law-enforcement authority. After the warrant, Cody was arrested in Kansas for felony interference with law enforcement and lying to police based on a false bomb-threat report and criminal threat. Those post-arrest facts reinforced the need to reassess probable cause and the unreasonableness of maintaining Plaintiff's prosecution.

53. Under Franks v. Delaware, 438 U.S. 154 (1978), material false statements and reckless omissions that are necessary to probable cause invalidate a warrant. The Fifth Circuit has held that material misstatements and omissions in warrant materials can constitute a clearly established Fourth Amendment violation. Hughes v. Garcia, 100 F.4th 611, 620-22 (5th Cir. 2024); Winfrey v. Rogers, 901 F.3d 483, 494-96 (5th Cir. 2018); Terwilliger v. Reyna, 4 F.4th 270, 279-83 (5th Cir. 2021).

**F. Failure to authenticate Cody affidavits and post-arrest collapse of probable cause**

54. Reamer's affidavit represented that she relied on an affidavit "written by Cody." But Reamer did not allege that she personally interviewed Cody, watched him sign any affidavit, obtained authentication from the notary, verified the document's origin, or confirmed that Cody adopted the statements attributed to him. She treated defense-routed paperwork as reliable evidence without authentication.

55. On June 18, 2025, Cody testified under oath in Jamie Renee Walker's bond hearing that he did not write an affidavit, did not sign the affidavit shown to him, and "didn't sign any affidavits at all." When asked whether he wrote any affidavit supporting Michael Walker, he answered no. Assistant County Attorney Jonathan Amdur questioned Cody and was present for this testimony.

56. This testimony destroyed the reliability of the affidavit foundation. If Cody testified truthfully, then the affidavits and materials used in the April 7 warrant stream were unauthenticated, misattributed, or false. If Cody testified falsely, then the County's key witness was willing to lie under oath. Under either scenario, Cody's statements could not continue to support reasonably trustworthy probable cause.

57. The June 18 transcript also confirmed Cody's credibility problems. Cody admitted that he was on probation for criminal threat and interference with law enforcement and acknowledged prior charges involving impersonating a police officer, unauthorized emergency lights, and false reporting. Those admissions were directly relevant because Reamer's affidavit depended on Cody's credibility.

58. The transcript did not cure the warrant defect. Cody's testimony described family pressure and bond-related discussion. It did not identify a verified date, text, recording, voicemail, or specific communication from Plaintiff threatening CPS action. It did not identify what false testimony Plaintiff supposedly sought. It did not explain how a request for help with bond became first-degree felony witness tampering by Plaintiff.

59. Within days of Plaintiff's arrest, Cody was arrested in Kansas for felony interference with law enforcement and criminal threat. The police narrative alleged that Cody reported a bomb threat, that call logs did not support his story, that camera footage showed he was not in dispatch during the times he claimed, and that he was seen searching "burner phone numbers" on the work computer. This post-arrest evidence gave Guadalupe County additional reason to reassess probable cause. Instead, the County maintained Plaintiff's felony restraints.

**G. Refusal to investigate after arrest, no grand jury, and legal limbo**

60. After Plaintiff, James Jr., and Jamie were arrested on first-degree felony witness-tampering allegations, each requested to speak with an investigator while in custody at the Guadalupe County Jail. Each was refused. Jail personnel stated, in substance, that no investigator would ever speak with them about the case. At no time did any Guadalupe County investigator, Sheriff's Office investigator, County Attorney representative, or County official interview Plaintiff, James Jr., or Jamie about the alleged tampering.

61. This refusal was material because the charges turned on alleged communications, intent, witness status, authenticity of affidavits, and whether Cody possessed material testimony. Plaintiff, James Jr., and Jamie each possessed information disproving the accusation stream. The County chose not to obtain their statements, not to test Cody's claims, not to verify the affidavits, and not to conduct a neutral investigation.

62. Nor was Plaintiff promptly presented to a grand jury. Plaintiff remained under first-degree felony bond restrictions for nearly eight months without indictment, without an examining trial, and without meaningful post-arrest probable-cause review. Upon information and belief, the same pattern applied to James Jr. and Jamie Walker: no meaningful interview, no prompt grand-jury presentation, no timely judicial review, months of restraint, and dismissal or declination only when procedural scrutiny approached.

63. The timing of the related dismissals supports Plaintiff's process-as-punishment theory. James Jr.'s charge was dismissed or declined on or about July 28, 2025. Plaintiff's charge was declined on or about November 30-December 1, 2025. Jamie Walker's tampering-related matter was dismissed or rejected on or about February 18, 2026. Plaintiff pleads these related outcomes as pattern, motive, and Monell evidence. The County used the felony process to restrain and chill advocates, then dismissed when review became unavoidable.

64. Under Manuel v. City of Joliet, 580 U.S. 357 (2017), Fourth Amendment protection extends to pretrial restraint after legal process when that process fails to establish probable cause. Under Thompson v. Clark, 596 U.S. 36 (2022), favorable termination requires only that the prosecution end without a conviction. Plaintiff satisfies those standards.

**H. Examining-trial delay, ADA notice, and denial of meaningful court access**

65. On August 26, 2025, Plaintiff filed a stamped Motion for Examining Trial. The motion stated that he had been arrested on April 7, 2025, that the arrest was based on Reamer's sworn complaint and affidavit, that he had not been indicted, and that Article 16.01 of the Texas Code of Criminal Procedure entitled him to an examining trial before indictment.

66. On August 28, 2025, Plaintiff emailed the Court Administrator and Assistant County Attorney Jonathan Amdur requesting that the examining-trial motion be set for hearing at the earliest available opportunity. He explained that the right was time-sensitive and that delaying the hearing weeks or months could effectively deny the right. On September 3, 2025, he followed up again because no setting had been confirmed.

67. On September 24, 2025, Plaintiff sent a detailed notice to County, Sheriff, County Attorney, and Commissioners Court. He stated that it was his fourth request for a date certain, that he had made prior written requests and phone calls, and that he was a near-80-year-old veteran with cancer, heart disease, severe neuropathy, recent hospitalization, major surgery, inability to walk, difficulty speaking, and inability to continue making an eight-hour round trip to Seguin for brief court and supervision matters. He renewed his ADA request for remote appearance by secure video or telephone for the examining trial and supervision meetings, and he requested written identification of the ADA coordinator and grievance process.

68. The September 24 notice also explained that, between November 2024 and April 2025, Plaintiff had spoken to Cody only twice for short personal calls, that he could provide phone records, that Reamer never contacted Plaintiff, his son, Cody, or Andrea, and that much of the so-called evidence came through Michael Walker's defense attorneys. Plaintiff requested a written hearing date, written ADA accommodation confirmation, and written acknowledgment that Sheriff Ray received the complaint against Reamer.

69. On October 8 or 9, 2025, Plaintiff filed a Motion to Compel Setting of Examining Trial, Notice of Non-Response, and Request for ADA Accommodation. The motion stated that more than six months had passed without indictment or examining trial; that Plaintiff had made four written requests and multiple phone and voicemail attempts between August 28 and September 24; that no hearing had been scheduled; that Plaintiff was a 77-year-old wheelchair-bound Army veteran with chronic cardiovascular disease, cancer, and other serious health conditions; and that he had been hospitalized twice and suffered a cardiac event consistent with a heart attack since arrest.

71. On October 14, 2025, Plaintiff emailed Amdur and copied the Court Administrator to coordinate a hearing date for the Motion to Compel Examining Trial and ADA Accommodation. He stated that the filed motion had been accepted and that he was making a good-faith effort to coordinate a hearing date before requesting a setting.

72. On October 15, 2025, Plaintiff sent a courtesy notice that the Court Administrator had set a hearing on the Motion to Compel Setting of Examining Trial for December 1, 2025. The notice did not provide an examining-trial hearing; it set only the motion to compel scheduling of one. Thus, even if the hearing occurred as noticed, Plaintiff still would not have received the underlying probable-cause review he requested in August.

73. Also on October 15, 2025, Plaintiff again asked Amdur to confer regarding the original Motion for Examining Trial filed August 26, 2025. Amdur replied: "Received and acknowledged. We are still processing your prior request to my office relating to declining charges. If conclusive action has not been taken by December 1st, then we anticipate being ready for the examining trial." Plaintiff responded the same night that he was 77, disabled, suffering from cancer, heart disease, and severe neuropathy, that his health was deteriorating rapidly, and that he might not live to see December 1. He asked the County to finalize the declination or support expedited review.

74. On October 15, 2025, Plaintiff filed a Motion to Expedite Hearing / Motion for Accelerated Setting. He stated that more than 190 days had passed since arrest without indictment or completed examining trial; that the December 1 hearing was only to decide when an examining trial might be scheduled; and that the sequence of delay rendered the examining-trial right meaningless and denied timely access to justice.

75. On October 15, 2025, Plaintiff also filed a Supplemental ADA Title II Notice and Request for Reasonable Modification requesting expedited scheduling as a reasonable modification. He stated that procedural delays effectively denied him equal access to the judicial process because of his advanced age, cancer treatment, cardiac impairment, and neuropathy; he renewed his request for remote appearance; and he requested a written explanation if the modification was denied.

76. On October 15, 2025, Plaintiff filed a Notice of Continued Violation and Preservation of Record. That filing again placed the Court, County, and agents on notice that continued delay, inaction, and failure to accommodate were causing ongoing denial of meaningful access.

Plaintiff also sent a notarized letter to Judge Old explaining that he was not seeking special treatment, only a fair opportunity to be heard and clear his name while still living.

77. On October 20 and October 28, 2025, Plaintiff again requested prompt scheduling. He stated that he had remained under active bond conditions for nearly seven months without indictment or judicial probable-cause review, that ADA Title II concerns were ongoing, and that each day of delay compounded the harm. He asked for the earliest available docket and for confirmation by November 4, 2025.

78. On October 28, 2025, the Court Administrator responded that the case had been set via Zoom as requested for December 1st, 2025 and that no other notices would go out. The Zoom setting shows that remote participation was reasonable and available. But the setting did not cure the denial of timely access because it came after months of repeated requests and concerned the motion to compel scheduling, not the examining trial itself.

79. On October 29, 2025, Plaintiff clarified in writing to the Court Administrator, County Attorney, District Clerk, Sheriff, and other officials that the original examining-trial motion filed August 26 had never been set, that the December 1 hearing was merely a hearing to compel scheduling, that December 1 would be 238 days after arrest, and that he remained under restrictive bond conditions, required supervision appearances, an eight-hour round-trip burden he could not make, and the public stigma of a first-degree felony charge.

80. The prosecution was declined before Plaintiff received meaningful examining-trial review. The County Attorney's Office later verified a decline date of November 30, 2025 for the same $100,000 first-degree witness-tampering bond. After declination, Plaintiff still had to request accessible written documentation because no declination or dismissal had been filed in the

official case record, the court docket contained no clear entry reflecting the prosecutorial

decision, and the bond system still reflected a posted status rather than a declined one.

81. On December 5, 2025, Plaintiff sent a Texas Public Information Act request and ADA Title

II notice seeking the written declination document, signatures, and accessible written

communication. He stated that, as a 77-year-old disabled veteran with documented mobility and

medical limitations, he required clear, accessible, and timely written communication to

understand, participate in, and navigate his legal obligations.

## I. Warrant-process opacity and retaliation against transparency

82. After the arrest, Plaintiff and his family sought basic warrant-processing records: the filing

timestamp, routing logs, method of Judge Old's signature, return of service, docket sheet, and

records showing when the affidavit was presented for probable-cause review. The County

Attorney's Office responded that there were no responsive items, and the District Clerk stated

there was no filed case with the District Clerk's Office and therefore no records responsive to the

request. Both GCAO and GCSO both stated no record of how Judge Old signed or reviewed the

probable cause warrant, existed.

83. Plaintiff does not rely on warrant-record opacity alone to establish liability. It reinforces the

broader pattern: first-degree felony warrants without visible investigative work, no documented

independent review, no interviews, no grand jury, delayed examining-trial access, and no

meaningful correction after notice.

84. The County's response to transparency requests further supports retaliatory motive and

ratification. A County Attorney employee contacted defense counsel and complained that

Plaintiff's sons' lawful Public Information Act requests were "angering" County officials and

asked that the requests stop. This supports an inference that County officials were hostile to efforts to test the warrant process rather than neutrally seeking the truth.

**J. ADA access, disability-related harm, and accommodation failures**

85. Plaintiff is a qualified individual with disabilities. His severe neuropathy, limited mobility, cancer, heart disease, hospitalizations, cardiac event, and other health conditions substantially limit major life activities including walking, standing, traveling, driving, communicating safely, and attending distant proceedings.

86. The Court and County had pre-arrest notice of Plaintiff's disability through the March 21 filing. After arrest, Plaintiff repeatedly notified the County, Sheriff's Office, County Attorney's Office, District Clerk, court administration, bond-supervision personnel, and County leadership of his disability, health risks, need for remote participation, need for electronic and written communications, need for expedited scheduling, and need for reasonable modifications.

87. Plaintiff's September 24 notice specifically requested remote appearance for the examining trial and supervision meetings, and written identification of the ADA Coordinator and grievance process. Plaintiff's October 8/9 motion requested remote participation and accessible communication. Plaintiff's October 15 supplemental ADA notice requested expedited scheduling as an ADA modification. Plaintiff's December 5 ADA notice requested accessible written declination documentation.

88. The County nevertheless maintained or allowed criminal-justice, bond-supervision, court-access, complaint-intake, and records processes that imposed long-distance travel for short in person bond supervisor meetings, uncertainty, unclear written status, and months of unresolved felony restraint on a disabled elderly veteran. Reasonable alternatives such as remote appearance, telephone check-ins, local supervision, electronic notice, written status communication,

expedited scheduling, and clear ADA grievance information were available and would not have fundamentally altered any County program.

89. The eventual Zoom setting did not cure the harm. It confirmed that remote access was feasible, but it came after repeated requests and did not provide timely access to the underlying examining trial before declination. Under the facts alleged, delay itself became a disability-access barrier because Plaintiff's disability, age, cardiac risk, cancer, neuropathy, and inability to travel made time and uncertainty materially more burdensome for him than for a nondisabled defendant.

90. Title II of the ADA provides that no qualified individual with a disability shall, by reason of disability, be excluded from participation in, denied the benefits of, or subjected to discrimination by a public entity. 42 U.S.C. section 12132. Title II applies to access to courts and judicial proceedings. Tennessee v. Lane, 541 U.S. 509, 531-34 (2004). Section 504 applies to programs or activities receiving federal financial assistance. 29 U.S.C. section 794.

91. The County's failures denied Plaintiff meaningful access to court services, bond-supervision programs, records and written-status communications, complaint processes, and pretrial procedures. They also burdened Plaintiff because of his disability and because of his association with and assistance to disabled family members, including Jamie Walker and S.J.K.

92. For compensatory damages under Title II and Section 504, Plaintiff alleges intentional discrimination and deliberate indifference. County officials had actual notice of Plaintiff's disability, actual notice of his accommodation needs, actual notice of the medical risks from delay and travel, and actual notice that accessible written communication was needed. They nevertheless failed to provide timely and meaningful access before the charge was declined.

Delano-Pyle v. Victoria County, 302 F.3d 567, 574-75 (5th Cir. 2002); Cadena v. El Paso County, 946 F.3d 717, 724-25 (5th Cir. 2020).

**K. County pattern, failure to correct, and ratification**

93. After Plaintiff's arrest, County leadership received multiple notices that Reamer's affidavit was false, incomplete, and unsupported. James Jr. sent a May 13, 2025 letter to Sheriff Ray with evidence challenging Cody's credibility and the warrant narrative. Dolores Jane Roden later filed a sworn criminal complaint against Cody alleging perjury, false report, and tampering with governmental records, supported by a certified transcript, notary verification, signature comparison, recordings, mailing proof, and criminal-history records. *(Exhibit D)*

94. The Sheriff's Office did not treat Dolores's sworn criminal complaint against Cody with the same urgency it gave Cody's accusations against the Roden family. The complaint was classified as civil or routed away. The Sheriff's Office later stated that the County Attorney's Office, not the Sheriff's Office, would conduct the investigation into the criminal offense alleged, and that documents had been forwarded by Sgt. Reamer. This supports the same pattern alleged here: sheriff-side abdication of independent investigation and prosecutor-routed decision-making.

95. The three coordinated felony arrests were not isolated mistakes. They followed the same pattern: prosecutor-routed and defense-originated materials, no independent sheriff investigation, no pre-arrest interview of the accused, no authentication of Cody's affidavits, no verification of phone or text records, no meaningful post-arrest investigation, no grand-jury presentation, months of felony restraint, delayed examining-trial access, disability-access barriers, and dismissal or declination only when judicial review approached.

96. Even after repeated notice that Cody was unreliable, contradictory, and accused of perjury, the County Attorney's Office continued using Cody-related complaints in 2026 to seek

restrictions or protective conditions against family members. This supports deliberate indifference, ratification, selective investigation, and retaliation. Plaintiff does not sue prosecutors individually for courtroom advocacy; the prosecutor-related facts are pleaded as notice, causation, motive, and municipal-policy evidence.

97. Plaintiff also sought oversight outside the County, including reporting his concerns to the United States Department of Justice Civil Rights Division and to state-level offices. Those reports are pleaded as evidence of Plaintiff's good-faith efforts to obtain accessible review and to mitigate harm, not as a prerequisite to this suit.

## IV. CLAIMS

**COUNT 1 - Fourth Amendment False Arrest / Franks and Malley (Against Reamer Individually)**

98. Plaintiff incorporates all prior paragraphs.

99. Reamer violated Plaintiff's Fourth Amendment right to be free from arrest without probable cause by submitting a warrant affidavit that was facially deficient and materially misleading. The affidavit failed to plead facts satisfying the elements of Texas Penal Code section 36.05, including communication, coercion or benefit, witness status, false testimony sought, official-proceeding nexus, venue, and first-degree felony enhancement facts.

100. Reamer violated Franks v. Delaware by including materially misleading assertions and omitting facts necessary to the probable-cause determination. Those omitted facts included the pre-subpoena timing of the relied-upon documents, Cody's lack of firsthand knowledge, the protection order's failure to name Plaintiff, the ambiguity of "granddad," the absence of any date or method of communication, Plaintiff's disability and physical limitations, Cody's credibility

problems, the April 1 mandated report, the March 18 recorded call, and the absence of corroborating records or interviews.

101. Reamer violated Malley v. Briggs, 475 U.S. 335 (1986), because no reasonably well-trained officer with her asserted training and experience could believe this affidavit established probable cause. Malley asks whether a reasonably well-trained officer would have known that the affidavit failed to establish probable cause and that she should not have applied for the warrant.

102. The independent-intermediary doctrine does not protect Reamer because the magistrate saw only the facts Reamer chose to present. The magistrate was deprived of the omitted facts that defeated probable cause. Under Franks, Malley, Winfrey, Terwilliger, and Hughes, a magistrate's signature does not shield an officer who obtains a warrant through material falsehoods, reckless omissions, or a facially deficient affidavit that no reasonably competent officer would submit.

103. At the pleading stage, Plaintiff identifies the affidavit's false or misleading portions and gives supporting reasons for each defect: the March 17-April 5 investigation label, the assertion that Cody was a witness, the assertion of contact and coercion, the ambiguous protective-order phrase, the CPS allegation, the "affidavit written by Cody" claim, and the omission of Cody's subpoena timing, lack of firsthand knowledge, credibility problems, the April 1 report, the March 18 call, and Plaintiff's disability. A corrected-affidavit analysis shows no probable cause.

104. The right was clearly established. Before April 2025, Franks, Malley, Winfrey, Terwilliger, and Hughes made clear that officers may not seek warrants through material falsehoods, reckless omissions, unverified unreliable statements, or affidavits that fail to establish probable cause. Reamer is not entitled to qualified immunity.

105. As a direct result, Plaintiff was arrested, searched, booked, restricted, publicly stigmatized, and subjected to severe emotional, financial, physical, reputational, and liberty injuries.

**COUNT 2 - Fourth Amendment Seizure Through Legal Process / Malicious Prosecution (Against Reamer Individually)**

106. Plaintiff incorporates all prior paragraphs.

107. Reamer caused Plaintiff to be seized through legal process by submitting the defective April 7 warrant affidavit. Plaintiff remained under felony bond restrictions for months despite the absence of probable cause, indictment, plea, conviction, or meaningful post-arrest probable-cause review.

108. The prosecution terminated in Plaintiff's favor when the charge was declined without conviction, plea, deferred adjudication, pretrial diversion, indictment, or admission of guilt. Under Thompson v. Clark, Plaintiff need only show that the prosecution ended without conviction. Under Manuel v. City of Joliet, pretrial restraint after defective legal process is governed by the Fourth Amendment.

109. Plaintiff's bond conditions, travel restrictions, firearm restriction, contact restrictions, supervision requirements, financial burden, and repeated long-distance access burden constituted a continuing Fourth Amendment seizure. The continuing seizure was caused by Reamer's materially deficient affidavit and by the failure to correct the record after notice that probable cause had collapsed.

110. No reasonable officer could believe it lawful to continue relying on Cody-related accusations after the County was repeatedly notified that Cody denied or contradicted key affidavits, had no firsthand knowledge, had criminal-history credibility issues, and was later arrested for a false-report/felony-threat matter. To the extent Reamer did not personally control later prosecutorial decisions, Count 2 rests on the continuing seizure caused by her original

affidavit and her failure, upon information and belief, to correct or supplement the record once the warrant foundation collapsed.

111. Reamer is not entitled to qualified immunity because the clearly established Fourth Amendment barred initiating and causing legal process through material falsehoods, omissions, and an affidavit that did not establish probable cause.

**COUNT 3 - First Amendment Retaliation (Against Reamer and Guadalupe County Through Monell)**

112. Plaintiff incorporates all prior paragraphs.

113. Plaintiff and his family engaged in protected speech, petitioning, court participation, mandated reporting, requests for investigation, public-information requests, and disability advocacy. Before the arrest, the related court record contained a March 21 complaint to Judge Steel alleging retaliation, subpoena abuse, and failure to obtain S.J.K.'s firsthand testimony. On April 1, 2025, a protected mandated report concerning S.J.K.'s safety and exploitation was submitted, with a request for confidentiality due to fear of retaliation.

114. Upon information and belief, Reamer received, reviewed, or had access to the March 21-22 warnings and April 1 report through the same County Attorney information stream she claimed to be receiving from March 17 through April 5. In the alternative, the County had notice through the County Attorney's Office, Sheriff-side records, and later leadership complaints.

115. The April 7 first-degree felony warrant against Plaintiff was an adverse action that would chill a person of ordinary firmness from reporting abuse, assisting disabled family members, seeking court access, or petitioning courts and officials. The timing, source of the accusations, failure to investigate the April 1 report, use of Cody as the complaining witness, lack of probable cause, and later hostility toward records requests support a plausible causal connection.

116. Because probable cause was absent, Nieves v. Bartlett, 587 U.S. 391 (2019), does not bar the retaliation claim. In the alternative, the objective pattern alleged here also supports retaliation under Gonzalez v. Trevino, 602 U.S. 653 (2024): the County used an extraordinary first-degree felony arrest process in circumstances where no reasonably comparable good-faith prosecution would occur, while ignoring similar or stronger evidence against Cody.

117. Guadalupe County is liable to the extent the retaliation resulted from sheriff-side customs, failure to investigate, failure to train, prosecutor-routed accusation processing adopted by County policymakers, and ratification after notice.

## COUNT 4 - ADA Title II and Section 504 Failure to Accommodate / Denial of Access (Against Guadalupe County)

118. Plaintiff incorporates all prior paragraphs.

119. Plaintiff is a qualified individual with disabilities. He is an elderly disabled United States Army veteran with severe neuropathy, mobility impairment, cancer, heart disease, hospitalizations, a cardiac event, and other serious medical conditions that substantially limit walking, standing, traveling, driving, communicating safely, and participating in distant court and bond-supervision proceedings.

120. Guadalupe County is a public entity under Title II of the ADA. On information and belief, Guadalupe County also receives federal financial assistance for law-enforcement, court-support, victim-services, pretrial, emergency, records, or related public programs, making it subject to Section 504 of the Rehabilitation Act.

121. Plaintiff was entitled to meaningful access to County services, programs, and activities, including law-enforcement complaint processes, records and written communications, bond

supervision, court-access support, criminal-justice services, pretrial procedures, and the processes necessary to obtain meaningful probable-cause review.

122. Guadalupe County and its officials had actual notice of Plaintiff's disability and disability-related limitations before and after arrest. Before arrest, Plaintiff's disability and severe mobility limitations had been placed into the related court record. After arrest, Plaintiff repeatedly notified County officials, Sheriff's Office personnel, court personnel, bond-supervision personnel, and the County Attorney's Office that he was a disabled veteran with cancer, heart disease, severe neuropathy, mobility limitations, hospitalizations, cardiac risk, and inability to safely make repeated long-distance travel from League City to Seguin.

123. Plaintiff requested reasonable modifications in direct and specific terms. Those requests included remote appearance by video or telephone, electronic and written communications, expedited scheduling because delay worsened his medical hardship, local or remote alternatives for bond-supervision obligations, identification of the ADA coordinator and grievance process, and written confirmation of accommodations and case status.

124. Those requested modifications were reasonable. Remote appearance, electronic notice, written communication, expedited scheduling, and local or remote supervision alternatives were readily available and would not have fundamentally altered any County service, court process, records process, complaint process, or bond-supervision program. The later Zoom setting confirmed that remote participation was available and reasonable.

125. Guadalupe County failed to provide timely and meaningful accommodations. Although remote access was eventually provided for a later setting, Plaintiff alleges it came only after months of requests and delay, and it did not provide meaningful access to the examining-trial procedure before the charge was declined. Delay itself became a disability-access barrier because

Plaintiff's age, cancer, heart disease, neuropathy, cardiac risk, and mobility impairment made prolonged legal uncertainty, unclear written case status, and repeated travel demands medically dangerous.

126. Guadalupe County's failure to provide timely reasonable modifications denied Plaintiff meaningful access to public services and imposed greater physical, emotional, medical, financial, and legal burdens on him because of his disability. The County's conduct also showed deliberate indifference because officials had repeated actual notice of Plaintiff's disability, limitations, requested accommodations, worsening medical hardship, and need for accessible written communication, yet failed to provide timely access or a clear ADA process before the criminal restraint was declined.

127. The County's failures also reflected the absence of functioning ADA procedures, training, supervision, or accountability within County criminal-justice programs. Tennessee v. Lane, 541 U.S. 509 (2004); Frame v. City of Arlington, 657 F.3d 215 (5th Cir. 2011); Delano-Pyle v. Victoria County, 302 F.3d 567, 574-75 (5th Cir. 2002); Cadena v. El Paso County, 946 F.3d 717, 724-25 (5th Cir. 2020).

128. Plaintiff seeks compensatory damages, declaratory relief, injunctive relief, costs, and all other relief available under Title II and Section 504.

**COUNT 5 - ADA Title V Retaliation and Interference (Against Guadalupe County)**

125. Plaintiff incorporates all prior paragraphs.

126. Title V of the ADA prohibits discrimination, coercion, intimidation, threats, or interference against any individual because that individual opposed disability discrimination, participated in ADA-protected activity, requested accommodations, or aided or encouraged another person in exercising ADA rights. 42 U.S.C. section 12203.

127. Plaintiff was associated with and assisted disabled family members, including Jamie Walker and S.J.K. He served as a family supporter and court escort, helped Jamie comply with court obligations, and was part of a family effort to secure disability-aware treatment, protection, and access for intellectually disabled women involved in the underlying criminal proceedings.

128. The County's felony process against Plaintiff, its failure to accommodate him, its refusal to timely review probable cause, its refusal to interview the accused, its delay of judicial review, its lack of accessible written communication, and its continued reliance on Cody-related accusations after notice plausibly interfered with and retaliated against disability advocacy. The April 7 arrests came six days after a protected abuse/safety report concerning an IDD adult and after written advocacy concerning subpoenas and disability-related access.

129. The County's conduct would deter reasonable people from assisting disabled family members, reporting abuse of disabled individuals, seeking guardian or accommodation protections, requesting ADA procedures, or challenging disability-related failures. Plaintiff seeks damages and equitable relief for this retaliation and interference.

**COUNT 6 - Monell Municipal Liability (Against Guadalupe County)** *(Exhibit H)*

130. Guadalupe County, through the Sheriff as final policymaker for law-enforcement warrant practices and through County practices ratified by senior officials, maintained or tolerated customs that caused Plaintiff's injuries. These customs included accepting prosecutor-routed and defense-originated accusations without independent sheriff investigation; using stale, unverified, ambiguous paperwork as warrant support; failing to verify witness identity, witness status, communication records, venue, and statutory elements before seeking felony warrants; and failing to disclose material exculpatory facts to magistrates.

**132.** The County also maintained customs of failing to train and supervise officers and County personnel regarding *Franks* obligations, warrant affidavits, exculpatory evidence, unreliable witnesses, ADA accommodation requests, IDD witnesses, mandated reporters, witness-affidavit authentication, accessible written communication, prompt court-access procedures, and conflict-free review of complaints against favored witnesses.

**133.** This was not a single alleged mistake by one officer. Plaintiff alleges a repeated County practice shown by three coordinated first-degree felony witness-tampering warrants arising from the same Cody-related accusation stream, the same defense-routed materials, the same failure to interview the accused, the same failure to authenticate affidavits, the same failure to verify phone or text records, the same failure to test Cody's credibility, and the same prolonged felony restraint without prompt grand-jury or examining-trial review.

**134.** The County ratified the unconstitutional process after notice. It received evidence that Cody's statements were unreliable; received Plaintiff's and family complaints; received Dolores's sworn criminal complaint against Cody; classified or routed that complaint away; stated that the County Attorney's Office, not the Sheriff's Office, would conduct the investigation; continued relying on Cody-related accusations; delayed meaningful examining-trial access; provided only late and partial accommodation; and failed to ensure accessible written status after declination. These policies, customs, failures, and ratification were the moving force behind Plaintiff's false arrest, continuing seizure, retaliation, ADA injuries, and damages. Plaintiff does not seek respondeat superior liability; he alleges sheriff-side customs, County failures, and ratification that directly caused the violations. *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *City*

*of Canton v. Harris*, 489 U.S. 378 (1989); *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997); *Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001).

V. DAMAGES

135. Plaintiff suffered loss of liberty, arrest, booking, reputational injury, fear of imprisonment, public stigma, humiliation, emotional distress, anxiety, sleep disruption, and loss of dignity as a disabled veteran with no criminal history.

136. Plaintiff suffered financial harm, including bond-related costs, legal costs, travel expenses, depletion of savings, loss of planned travel and family activities, and other economic damages caused by the felony charge and bond restrictions.

137. Plaintiff suffered physical and medical harm because the County imposed or threatened long-distance travel, supervision burdens, delay, uncertainty, and inaccessible communication despite known disability and mobility limitations. The stress of the felony case aggravated his health and diminished his quality of life.

138. Plaintiff suffered denial of meaningful access to court and County services because disability-related requests for timely remote access, expedited scheduling, ADA grievance information, and clear written status were delayed, ignored, or only partially provided after months of harm.

139. Plaintiff suffered loss of home safety and autonomy due to firearm restrictions, travel restrictions, contact restrictions, and other bond conditions imposed without probable cause. As a mobility-impaired elderly veteran, those restrictions affected him more severely than a nondisabled person.

136. Plaintiff seeks compensatory damages, punitive damages against Reamer in her individual capacity, declaratory relief, injunctive relief, costs, attorney's fees if counsel appears, pre- and post-judgment interest, and all other lawful relief.

## VI. PRAYER FOR RELIEF

140. Plaintiff respectfully asks the Court to enter judgment in his favor and against Defendants and grant the following relief: (a) a declaration that Defendants violated Plaintiff's federal constitutional and statutory rights; (b) compensatory damages; (c) punitive damages against Reamer individually; (d) injunctive relief requiring ADA-compliant procedures and training for disability accommodation, pretrial supervision, accessible written communication, complaint handling, warrant-affidavit review, and conflict-free review of felony complaints; (e) costs and attorney's fees as allowed by law; (f) pre- and post-judgment interest; and (g) all other relief the Court deems just and proper.

## VII. JURY DEMAND

141. Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,

/s/ James Louis Roden Sr.
James Louis Roden Sr.,
Plaintiff Pro Se
1555 Tahoe Court
League City, Texas 77573
Email: jrodensr@gmail.com

**VERIFICATION UNDER 28 U.S.C. SECTION 1746**

I, James Louis Roden Sr., declare under penalty of perjury that I am the Plaintiff in this action, that I have reviewed this First Amended Verified Civil Rights Complaint, and that the factual statements in it are true and correct to the best of my knowledge, information, and belief. Matters stated on information and belief are believed to be true.
Executed on: <u>May 4th, 2026</u>

<u>/s/ James Louis Roden Sr.</u>
James Louis Roden Sr.,
Plaintiff Pro Se
1555 Tahoe Court
League City, Texas 77573
Email: jrodensr@gmail.com

**CERTIFICATE OF SERVICE**

I certify that on May 5, 2026, I electronically filed the foregoing First Amended Civil Rights Complaint with the Clerk of the Court using the Court's CM/ECF system through PACER. Notice of this filing will be sent through the CM/ECF system to all counsel of record who are registered users.

Respectfully submitted,

/s/ James Louis Roden Sr.
**James Louis Roden Sr.**
Plaintiff, Pro Se
1555 Tahoe Court
League City, Texas 77573
Email: jrodensr@gmail.com