# Exhibit G

# Cody's June 18th Testimony

# Michael Walker Sentencing Hearing

**<u>Cody claims to have never signed any affidavit for Mihcael Allen Walker</u>**

THE WITNESS: Yes, sir.

Q.    (BY MS. MIDDLETON) Okay.  So you're -- just to get this right, you're saying a notary in Kansas also notarized this and forged paperwork?

A.    I'm not saying that.  I did not write the affidavit at all.

Q.    Did you sign it?

A.    No.

Q.    Okay.

A.    I didn't sign any affidavits at all.  Because I told them pacifically (sic) I did not want to be a part of it.

Q.    Okay.  So this was on behalf of Michael Walker, not your mother?

A.    Uh-huh.

Q.    So you didn't write any affidavit speaking up for Michael?

A.    No.

MR. AMDUR:  So really quickly, if I could just ask a couple more questions, Judge, then I'm done.

Q.    (BY MR. AMDUR) Is it your position that you never did voluntarily sign any kind of affidavit in this case?

A.    No, sir.

Q.    No, it's not your position?

A.    I did not sign any at all.

Q.    Is it your position that you felt that the

1

**Officer Reamer Swore out a Warrant against James Louis Roden Sr. based entirely on unverified affidavits received by Michael Allen Walker defense lawyers.**

From 3/17/2025, I have been receiving documentation from the Guadalupe County Attorney's Office that they had received from Michael Walker's attorneys. In the affidavit written by Cody, he stated the Defendant told him if he lost $40.000.00, "he going to come don cracking hard".

**Andy said "family" not James Louis Roden Sr, phone records show no calls between Plaintiff and Andy.**

Incldued in the file, is an affidavit from Cody's wife, Andy. Andy stated Cody and her are in fear of Jamie's family. Andy advised they are afraid the family will retaliate if they did not cooperate with their demands and call Child Protective Services on the couple.

**Cody nor Andrea ever stated James Louis Roden Sr. name when complaining about CPS. Cody tells law enforcement when he thinks he is in trouble accuses the other person of calling CPS on him.**

I was advised by Guadalupe County Attorney's Office that Cody had told them repeatedly that the Defendant stated he would call Child Protective Services on him and have his children removed if he did not side with Jamie and sign the affidavits that had been sent to them.

2

**Example of such an instance. When Cody was accused of raping his mistress 7 times he told the officer that she threatened to have CPS take her kids. CPS has been involved in Cody' and Andrea's life based on calls from the hospital and doctors they take their kids to for malnutrition and unhygienic living conditions.**

## MISCELLANEOUS INCIDENT REPORT

Page 1 of 1

**Dodge City Police Dept.**

NCIC Id. KS 0290100

| 1. LOCATION OF INCIDENT          Report Area | 2.DATE/TIME OCCS | 3. DATE/TIME REPORTED | 4. CASE NO. |
|---|---|---|---|
| 910 WILROADS GARDEN RD. DODGE CITY, KS 67801 | M T W T F S  11/26/2024 2235 HOURS | M D Y T  11/26/2024 | 2424106 |

| 5. NATURE OF INCIDENT | | | | |
|---|---|---|---|---|
| ☐ Accidental Injury ☐ Lost Property | ☐ Found Property ☐ Suicide | ☐ Accidental Death ☐ Natural Death | ☐ Attempted Suicide ☐ Protective Custody | ☐ CINC ☐ Return Runaway ☒ Other |

**CODES: V=VICTIM    B=BUSINESS    W=WITNESS    P=PARENT    RP=REPORTING PARTY    G=GUARDIAN    PK=PERSON w/ KNOWLEDGE**

| 6. NAME:LAST FIRST MIDDLE | 7. CODE | & RESIDENCE ADDRESS-PHONE |
|---|---|---|
| ▓▓▓ SUMMER ▓▓▓ | RP | ▓▓▓▓▓▓▓▓ |

| 9. RACE | 10 SEX | 11. AGE | 12. DATE OF BIRTH | 13. SSN | 14.HT. | 15.WT. | 16. HAIR | 17. EYES | 18. OCCUPATION | 19. BUSINESS ADDRESS |
|---|---|---|---|---|---|---|---|---|---|---|
| W | F | ▓ | ▓▓▓ | ▓▓▓ | 507 | 215 | | BLUE | | |

| 20. CODE | 21. NAME | 22. D.O.B. | 23. ADDRESS | 24. RESIDENT PHONE | 25. BUSINESS PHONE |
|---|---|---|---|---|---|
| S | KOELLE, CODY LANE | ▓ | ▓▓ROADS GARDEN RD. DODGE CITY, KS | ▓▓▓ | |
| PK | KOELLE, ANDREA MICHELLE | ▓▓ | ▓▓ D. DODGE CITY, KS | ▓▓ | |

On 11/26/2024 at approximately 2235 hours, I was dispatched to a public service regarding phone harassment and questions about a restraining order. I called Summer ▓▓▓ (DOB ▓▓▓) and she informed me, Cody Koelle (DOB ▓▓▓) was contacting her and asking her for money she owes him. Summer began to inform me she used to live with Cody and his wife, Andrea Koelle (DOB ▓▓▓), but moved to Arkansas for her safety. Summer disclosed information of an incident a month prior. Summer informed me she would wake up with her pajamas down to her feet and Cody penetrating her. Summer said she would sleep on an air mattress, in the same room as Cody and Andrea. I asked Summer if Andrea witnessed anything, she said Andrea is a heavy sleeper and would not wake up. I asked how many times did this occur, Summer said it happened about 7 or 8 times. I asked Summer why she waited a month to report it. Summer said Cody was always around her and she never had the space to make a phone call.

I spoke to Cody at 910 Wilroads Garden Rd. Cody said he allowed Summer to stay with him and Andrea. Cody said Summer began to steal and accuse him of rape to interfere with his relationship with Andrea. Cody also said Summer would send him nudes. Cody informed me Summer would text Andrea and tell her she was going to ruin their lives, send Cody to jail and have the kids taken away. Cody said he still had the text messages with Summer. After review the messages, there was text messages between Cody and Summer expressing love for each other. There was also text messages of both of them meeting up to have sexual relations. Other messages showed Summer asking Cody for money and she would send him explicit pictures. Other messages showed Summer telling Cody she would perform oral sex, next time she comes to Kansas, if he sent her money. Pictures of the messages were taken.

I asked Cody if he has ever had intercourse with Summer and he denied. Cody said Summer tried to force him to have sex with her. I asked Cody if he ever touched Summer while she slept, he said no.

**The record supports the inference that the tampering accusation originated from Michael Walker's defense strategy and was accepted without adequate independent investigation**

Finally just to give more context on the Rhoden family, they were consistently making calls to Shelby and to other members of the family including Cody who was mentioned by opposing counsel. And one of the calls from Jamie to Cody was saying that -- and I'm paraphrasing here, Judge, I don't have the exact quote in front of me, if you want that eight thousand dollars you better help me out by signing this affidavit and if you don't I'll call CPS on your family. So the Rhoden family at this time is now -- has been arrested, I don't know if they've been indicted for witness tampering -- all three of them. And again that's where the PSI narrative derives its facts.

So I just want to make the Court aware of that before we go into this because other than the Rhoden family getting involved as far as Shelby's concerned, the only thing that she has ever said about this is that she wants to have the kid with Michael, and there will be evidence of that later on that she said that. And that this was entirely consensual.

4

**First Assistant Johnathan Amdur stated this about Michael Allen Walker defense attorney Mr. Green.**

Mr. Green did, to his credit, an amazing job of coming in at the right time, meeting with us, showing us the evidence that he has, and convincing me, quite frankly, that the interest of justice in this case would not necessitate our prosecuting him at the highest levels, right? Because we could have had him as first degree and second degrees. But instead we

**The Private Investigator who gave the evidence to Reamer only spoke to Michael Supporters and less than one minute to Shelby.**

Q.  In doing your investigation who did you talk to?

A.  I spoke with Cody, the brother of complainant. I spoke with the ex-wife of the defendant. I spoke with the sister-in-law of the complainant. And I also spoke with Shelby.

Q.  And specifically was there anything that we brought to the attention of the Guadalupe County DA's office?

A.  Yes.

Q.  And what was that?

A.  I think we included about four audio recordings, maybe five. The most concerning was where Jaime mentioned a large sum of money.

Q.  Who was she speaking to at that time?

A.  Cody.

John Green and his private investigator admits in open court under oath that the allegation of bribery was the reason the entire family was arrested. For what the PI stated "sounded like" which was proven false. No investigation into the allegations, they were excepted at face value and all three arrested.

Q. So she was wanting him -- she was going to pay him money for a false affidavit; is that correct?

A. That's what it sounded like, yes.

Q. And did you come with me to meet with the D.A.'s office to tell them this information?

A. We did twice.

Q. What happened after that?

A. They were then charged -- several family members were charged with witness tampering.

Q. And that would be Jaime, James Roden and James Roden, Sr.?

A. Correct.

Q. And who is Cody in all of this?

A. Cody is Jaime's biological son. So it's Shelby's brother.

6

Cody never filed a protective order in his life before, and it can be inferred that he was pressured to do it and sent it the same day at the request of the Michael Allen Walker defense.

Q. (BY MR. GREEN) Did you talk to Cody about how he felt about that?

A. Several times.

Q. Okay. And how did he feel about that?

A. He was very stressed out. He would call me at all hours. I always answered. And he didn't know how to proceed. He was scared that he was, you know, being dragged into a situation that would, you know, put him in a bad light with the Court.

He knew that he couldn't lie, but he, you know, felt "This is my mom. I don't know what to do." It was difficult. He had three small children so he's also trying to, you know, work and support his family and his wife. So it was a difficult time for them.

Q. And what did Cody end up having to do?

---

Melissa Cortez - November 3, 2025
Direct Examination by Mr. Green

Q. (BY MR. GREEN) Was there a protective order filed?

A. There was in January of this year.

Q. Would you recognize it if you saw it?

A. Yes, I would.

Q. Do you recognize this?

A. Yes.

Q. How do you recognize it?

A. This was forwarded to me on the day that Cody filed it.

Q. What is this on the top here?

A. This is showing that it has been electronically filed with district court.

Q. Is that in Ford County?

ELECTRONICALLY FILED
2025 Mar 04 PM 1:09
CLERK OF THE FORD COUNTY DISTRICT COURT
CASE NUMBER:  FO-2025-DM-000041
PII COMPLIANT

IN THE DISTRICT COURT OF **FORD COUNTY**, KANSAS

**Cody LANE Koelle**
Plaintiff

VS.                                     Case No. _____

**Jamie Renee Walker**
Defendant

Petition Pursuant to K.S.A. Chapter 60

Incident #1:

This week at 12:32pm when they called and texed me asking me to write a letter lieing saying that she has not been in concact with my sister when she has and having are granddad threaten us by saying if he looses 40,000$ he going to come done cracking hard.

Reamer used this statement without saying who "they" were and that it was allegation made by Cody who was told this by his mother about a threat that doesn't make sense and has nothing to do with Jamie's case for his $40,000 is in reference to Cody's settlement that James Jr help secure for him and Cody wasted on his mistress he was having an affair with instead of paying his bills and supporting his family. Cody spent all his money by the end of October 2024 months after this protective order was made against Jamie Renee Walker.

This from Reamer Arrest Warrant. Notice what the protection order says and what Reamer claims Cody stated. Cody never mentioned James Louis Roden Sr. said that to him, just texts from "they" and she "having our granddad" meaning it was alleged to be said by Jamie to Cody.

From 3/17/2025, I have been receiving documentation from the Guadalupe County Attorney's Office that they had received from Michael Walker's attorneys. In the affidavit written by Cody, he stated the Defendant told him if he lost $40.000.00, "he going to come don cracking hard".

8

MR. GREEN:  Judge, I move to enter into -- as Defense Exhibit 1, the Petition for Protection from Stalking Sexual Assault or Human Trafficking order that was filed by Cody Cole against Jaime Walker.

MR. AMDUR:  I don't think it's admissible, but I will stipulate.

THE COURT:  It's admitted.

Mr. Amdur on cross examination admits that the accusation was the reason he arrested the entire family while at the same time knowing that it wasn't real evidence against Plaintiff (James Louis Roden Sr.)

CROSS-EXAMINATION

Q.   (BY MR. AMDUR) Ma'am, where does it talk about James, Sr. threatening in this document, State's exhibit -- Defense Exhibit 1?

A.   The third page.  It says grandad.

Q.   Okay.  Not by name, right?

A.   Correct.

Q.   Okay.  You're assuming that it is James Roden, Sr. though?

A.   Yes.

Q.   And while that's your assumption, in full disclosure the State has filed charges -- not indicted -- both James, Sr., the father of Jaime; James, Jr., the brother of Jaime; and Jane I think is her name, the mother of Jaime.  Is that correct?

A.   Yes.

Amdur's questioning confirms that the defense-routed accusation stream preceded the tampering charges and was followed by a more favorable plea posture for Michael Walker. She admitted that she didn't look into Jamie's case at all, the only people she interviewed were those who favored Michael and GCAO and GCSO bought it wholesale without investigation and arrested James Sr, James Jr and Jamie Walker on tampering.

59

Melissa Cortez - November 3, 2025
Cross-Examination by Mr. Amdur

Q.    Okay.  You actually did, with Mr. Green, bring this to our attention, did you not?

A.    I did.

Q.    And, if you know, shortly after that -- actually it was at that meeting we indicated a willingness to look into the matter.  And shortly after that we indicated to Mr. Green a willingness to work out a plea offer on much more lenient charges than aggravate sexual assault or sexual assault, right?

A.    Yes.

Q.    Okay.  Do you know -- and part of your investigation duties, did that entail looking into the charges against Jaime at this point?

A.    I did not look into Jaime's case, specifically.  No.

10

County Attorney's office admitted that the advocacy for an IDD domestic violence victim was turned into a criminal charge knowing there was no bribe.

Q. Right. But these were affidavits to try to exonerate Jaime that were being discussed, right? The $8,000 was bond money for Jaime. Really it had nothing to do with this particular case, right?

A. No, it did. I mean it was to put all the blame on one person -- on Michael.

Q. Did you witness any direct communication involving Jaime or her immediate family that related to conspiring to set up or frame or falsely accuse this defendant, your client --

A. Well --

Q. -- or was it -- let me finish really quickly -- or was it more for the benefit of Jaime getting her out of jail or getting documentation to show that she was a victim in this?

Amdur admits that the bias and unverified evidence presented by Michael Allen Walker defense secured the Roden family arrest.

Q. And did Andrea or Cody do anything with that information to the detriment of your client?

A. No.

Q. All right. So as far as this case is concerned, it was wholly ineffective. And it just scored three of them -- actually, and Jaime as well with additional charges, right?

**Michael Walker defense attorney John Green states this in open court:**

I think that the -- this case -- the facts are certainly murky, Judge. I think that's because from the very beginning the Roden family was out to get Michael Walker because they thought it was a rape from the beginning. That's why they called APS. That's why they told APS that he's a

The goal was to make the Roden Family the bad guy and Michael Walker the victim.

It wasn't until she took a two-hour ride with her grandfather, the father of the co-defendant, out to Houston. And they were talking all the way to Houston I'm sure, Judge, that she came up with the story that was rape.

And again it's clearly illegal to have sex with your stepdaughter, Judge, so we're not arguing against that. But I think all the other stuff that's come out, whether this is rape or she was forced to, I think it's fictitious and made up by the Roden family in order to get Jaime out of trouble that she got herself in.

And specifically, Judge, if we look at the Piner report -- and I will remind the Court that this report was made after Shelby was with the Roden family for multiple days and then she went in to make this report.

It wasn't until the Roden family got involved that all of this other narrative came out that he was raping both of them and holding them captive and everything else.

Mr. Amdur admits that there was violence in the home and that Jamie and Shelby were victims of domestic violence and Shelby was raped. Yet still held the charge against Plaintiff long after this hearing.

Judge, this case -- these accusations did not begin once the Roden family got their hands on Shelby as Mr. Green is trying to portray. The problems -- the cracks started to show on March 29th, 2022 when Shelby ran to the neighbors to report an assault.

And State's Exhibits 1 through 8 show pictures of the broken strap -- the cut strap on the purse and the knife that was probably used to cut that purse as well as three photos of the goose egg and red marks on the neck.

Shelby's statement in State's Exhibit 9, which was admitted, all of that came in before she went to live with the Roden's before they got her on that long drive from Seguin to the greater Houston area.

13

77

Closing Statement by Mr. Amdur
November 3, 2025

And if the case was in fact pled down to deadly conduct, which it was -- it was technically dismissed as part of the plea deal. As the evidence showed, that was because Jaime filed an affidavit of non-prosecution.

She filed an affidavit of non-prosecution because ostensibly they were scared of the defendant. They were scared of the defendant because of what he did to her. He choked her. He threatened repeatedly, "I'm going to kill you. I'm going to kill you" while he choked her out.

The evidence says she passed out. She hit the floor and she came to as he was slamming her head on the floor, hence the goose egg. And deadly conduct -- or the Roden family's getting ahold of Shelby a year later cannot explain away the goose egg.

So while two years might be appropriate for a mildly egregious situation -- because any instance of this crime that I can imagine is egregious when you're having sex with your stepdaughter and there might be situations where two years is appropriate.

But when you have a man who, in March of 2022, has committed these -- this assaultive behavior to the extent that he's leaving these marks, he's threatening to kill her and her retarded daughter is scared enough to go try to find his gun, which is the gun the evidence said -- or it is a gun as the evidence said he was freaking out over a gun that he

14

78

Closing Statement by Mr. Amdur
November 3, 2025

had accused Jaime of stealing at like 5:00 in the morning or something like that.  So of course they were scared of him.

And then their sexual relations started, some evidence would say, before then according to Shelby.  Some of the evidence comes out suggesting that maybe it was after that.

But, again, Shelby is not reliable because she is saying different things.  She doesn't have to be reliable. She's pregnant.  She has a kid and the defendant has owned that that kid is biologically his.  He's admitted that.

The evidence, State's 1 through 9, shows the damage he did.  That's Shelby's statement and the photos in 1 through 8.  In State's Exhibit 10 the police officer is writing down the observations he has.  He makes a diagram of where the injuries were.

And that officer, Officer Wheeler -- or Deputy Wheeler is saying Shelby had him write down her statement because she couldn't write.  So if there's conflicting evidence later that says she actually can read and write, that does cloud things in terms of Shelby's ability to understand or Shelby's ability to even consent.

It doesn't cloud anything about Shelby's fear of the defendant or Shelby's -- that Shelby has less than average intelligence and that Shelby was taken advantage of given the power imbalance.

15

79

Court's Ruling
November 3, 2025

And if the Roden's pointed out to her "Shelby, this is wrong" -- or if it hadn't been the Rodens who pointed it out to her, we can ask ourselves:  Why didn't Jaime or why didn't the defendant point that out to her?  That just shows how much more egregious this offense was.

Given his tendency for violence and his threats to harm Jaime and the fact that he scared Shelby enough that she ran to the neighbors to call the police, all of that suggests this man was a threat to them.

They're scared of him and he should be put away for a long time for the egregious behavior he did.  And for that reason we would ask for -- we would ask for the maximum, Judge.